Abhilash M. Raval                                    Fabiana Y. Sakai[1]
Lauren C. Doyle                                      MILBANK LLP
Dennis C. O'Donnell                                  Rua Colômbia, 325
MILBANK LLP                                          CEP 01438-000
55 Hudson Yards                                      São Paulo, SP, Brazil
New York, NY 10001                                   +55 11.3927.7781
(212) 530-5000

*Counsel for the Petitioner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| USINA DE AÇÚCAR SANTA TEREZINHA LTDA., *et al.*, | ) ) | Case No. 19-11199 (MEW) |
| | ) | (Joint Administration Requested) |
| Debtors in a Foreign Proceeding.[2] | ) ) | |

**DECLARATION OF ANDREW B. JÁNSZKY, FOREIGN**
**REPRESENTATIVE, IN SUPPORT OF (I) VERIFIED PETITION**
**FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND**
**RELATED RELIEF; AND (II) MOTION FOR PROVISIONAL RELIEF**

I, ANDREW B. JÁNSZKY, an individual over the age of 18, pursuant to 28

U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.       I am a restructuring consultant for, and designated representative of, each

of the above-captioned foreign debtors (the "Foreign Debtors" and, collectively with their direct

and indirect subsidiaries and their holding company Santa Terezinha Participações S.A. ("UST

Holding Company"), the "Company" or the "UST Group").[3]  Each Foreign Debtor is the subject

---

[1]       Not admitted to practice in the United States District Court for the Southern District of New York.

[2]       The Foreign Debtors in these chapter 15 cases (these "Chapter 15 Cases") are:  (i) Usina de Açúcar Santa Terezinha Ltda. ("UST"); and (ii) USACIGA – Açúcar e Álcool e Energia Elétrica Ltda. ("USACIGA").

[3]       The other entities that comprise the UST Group are not Foreign Debtors.  A list of the UST Group entities that commenced the RJ (as defined herein), along with the Individual Guarantors (as defined herein), are listed on **Exhibit A** hereto.

of the *recuperação judicial* proceedings (collectively, the "Brazilian Proceeding" or the "RJ")

filed on March 22, 2019, and currently pending before the 4th Civil Court in the city of Maringá,

State of Paraná, Brazil (the "Brazilian Court").

## PURPOSE OF DECLARATION

2.      On March 15, 2019, I was duly appointed as the foreign representative of

each Foreign Debtor by resolution of its shareholders adopted at general shareholders meetings

(the "Shareholder Consent"), as thereafter reflected in an engagement letter dated March 23,

2019 (the "Engagement Letter").  (A copy of the minutes, certified by UST's and USACIGA's

respective Secretaries, reflecting (in an English translation) the adoption of the Shareholder

Consent, is attached hereto as **Exhibit B**.)

3.      I submit this Declaration in support of:  (i) the *Verified Petition for

Recognition of Foreign Main Proceeding and Related Relief* (the "Verified Petition" and,

together with the Voluntary Petition Forms for each Foreign Debtor filed at [ECF No. 1] in each

Chapter 15 Case, the "Petition"); and (ii) the *Motion for Provisional Relief Pursuant to 11 U.S.C.

§§ 1519, 1520, 1521(a)(7), 105(a) and 362* (the "Provisional Relief Motion").[4]  The Petition and

Provisional Relief Motion are being filed simultaneously herewith on the date hereof (the

"Petition Date").  I have reviewed the Petition and Provisional Relief Motion and have

knowledge of the matters set forth therein, and, if called upon, could and would competently

testify to all matters set forth herein and in the Petition.

4.      Except as otherwise indicated, all facts set forth in this Declaration (i) are

based upon my personal knowledge; (ii) are based upon information supplied to me by members

---

[4]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Verified
Petition or the Provisional Relief Motion.

of the Foreign Debtors' management and professionals or learned from my review of relevant documents; or (iii) reflect my opinion based upon my experience and knowledge of the Company's industry, operations, and financial condition.

## BACKGROUND AND CREDENTIALS

5.     I was appointed and retained as a restructuring consultant by the Foreign Debtors pursuant to a shareholder consent and the engagement letter.  I have been a practicing attorney since 1977, and until November 2016, I served as the head of the Latin America Practice Group of Milbank LLP ("Milbank"), as well as managing partner of its São Paulo office.  Before that, I was the head of Shearman & Sterling's Capital Markets Group, ran its Latin American Group, and opened and managed its São Paolo office.

6.     My principal activity has been New York law-based advice in the areas of restructuring, capital markets, M&A, financing transactions, and corporate governance.  I speak English, Portuguese, Spanish, and French, among other languages.

7.     I spent more than a quarter of my career in and around the restructuring/bankruptcy area, including more than eight years in Shearman & Sterling's Restructuring Group (as Deputy Head of that group for part of that time).  I have also participated in countless in-court and out-of-court restructurings in the United States, Brazil, and elsewhere.

8.     I recently represented Vitro, the Mexican bottle and glass producer, in its multi-year restructuring pursuant to Mexican and United States (chapter 15) proceedings and Gol Linhas Aéreas Inteligentes S.A ("GOL"), Brazil's largest airline and a NYSE-listed company, in an exchange offer of unsecured bonds for secured bonds in the context of GOL's efforts to restructure its funded indebtedness.  In addition, I have been involved in the chapter 11

3

proceedings of scores of companies, including Penn Central, Southland (7-Eleven), Western

Union, Seaman's Furniture, and Majik Markets, among others.

      9.    In the two years since my departure from Milbank, I have served on the

board of directors of GOL and as a member of its Audit, Governance, and Financial Policies

Committees, and as a member of a special committee charged with investigative and remediation

efforts as to corporate practices.  I also serve on the board of directors of Netshoes, a Brazilian

e-commerce company with shares listed on the NYSE, where I have been named to the Audit,

Corporate Governance, and Compensation Committees.  In addition, I have served as the board

of directors observer for lenders to a Brazilian alternative energy company.  Finally, I have been

asked to serve on special committees formed by the boards of directors of several

Brazilian companies listed on the São Paulo stock exchange, where the role of the committees

has been to oversee, without interference by, or influence from, management or controlling

shareholders, independent investigations by outside counsel and forensic specialists of

allegations of corruption.

## **FACTUAL BACKGROUND**

**A.**    **The Company's Business**

      10.    The Company was founded in the early 1960s when the six Meneguetti

brothers, along with their sister, Terezinha, and her husband, opened a sugar mill in the district of

Iguatemi, in the city of Maringá, which is in the southern region of Brazil.

      11.    From the late 1970s through the early 1990s, the Company embarked on

an ambitious expansion of its manufacturing facilities, both organically and by acquisitions, in

the southern region of Brazil, including the acquisition of its operating units Paranacity,

Tapejara, and Ivaté.

      12.    In the early 2000s, to enhance its competitive advantages, the Company

invested in: (i) logistics terminals with storage facilities for sugar and grains as well as calcareous soils, fertilizers, and liquids (inflammables and others); and (ii) an interconnected highway-railway terminal in the city of Paranaguá, State of Paraná, Brazil. From the early 2000s through 2013, the Company acquired five additional industrial and agricultural operating units in the region (São Tomé, Rondon, Cidade Gaúcha, Umuarama, and Moreira Sales) and completed its first greenfield project (Terra Rica). Today, the Company consists of 11 industrial and agricultural operating units (including the original Maringá unit) and one logistics operating unit, all of which are located in the State of Paraná in the southern region of Brazil. The Company also has a pre-operational industrial and agricultural unit in the city of Eldorado, State of Mato Grosso. A map depicting the Company's geographic operations is attached hereto as **Exhibit C**.

13.    The Company has become one of the leading providers of sugar and ethanol products in Brazil. It is the largest sugar and ethanol producer in the southern region of Brazil, as well as a major producer and seller of sugarcane-based bioelectricity. The Company is also among the world's largest exporters of sugar (in the form of very high polarity sugar[5]— known as "VHP" in the international commodities markets), exporting its sugar products to 25 countries on five continents. The Company has also obtained the international sustainability certification, VIVE, attesting to the sustainability of its agricultural and manufacturing activities according to international standards.

14.    The Company's four product lines are: (i) very high polarity sugar; (ii) anhydrous ethanol; (iii) hydrated ethanol; and (iv) bioelectricity (which it generates from sugarcane biomass and sells to Brazil's National Interconnected System, the country's electrical

---

[5]    Very high polarity sugar, or "VHP," is essentially raw sugar with a very high sucrose content. The Company exports its VHP to countries worldwide for the production of refined sugar.

grid.  In addition to producing and selling sugar, ethanol, and bioelectricity, the Company has a

controlling interest in Paraná Operações Portuárias S.A. ("PASA"), which owns and operates a

terminal at a major logistics port in the South of Brazil (the "Paranaguá Port") at which the

Company maintains three warehouses to support its global distribution efforts.

   15. The Company employs over 11,000 employees (including 180 in its

Maringá headquarters and 2,600 at its largest sugar cane plant in Tapejara), which makes it one

of the top five Brazilian agricultural companies by headcount.  The Company's harvest areas

span 273,000 hectares,[6] or 1,054 square miles (which is roughly three-and-a-half times the size

of New York City), with a crushing capacity of 21,000,000 tons of sugarcane per harvest (which

corresponds to the production of 2.2 million tons of sugar per harvest,[7] equivalent to the annual

recommended amount of sugar consumption by more than 121.5 million people), and 445 cubic

kilometers, or 445 million mega liters, of ethanol per harvest[8] (which is enough supply volume

of ethanol to fill the tanks of more than 8 million cars).  The Company produces enough

bioelectricity in each harvest to power 160,000 Brazilian households for one year.

   16. For the year ended December 31, 2018,[9] the UST Group's consolidated

gross revenue totaled approximately R$2,456.6 million (USD$673.0 million),[10] of which

approximately R$1,300 million (USD$356 million) and R$1,155.2 million (USD$316.3 million)

were attributable, respectively, to (i) the export of sugar and (ii) sales to the Brazilian market of

---

[6] The Company does not own most of the land on which it grows the sugarcane crops, but rather operates in
partnerships with landowners.

[7] This corresponds to approximately 65% of the Company's revenues from the harvest.

[8] This corresponds to approximately 35% of the Company's revenues from the harvest.

[9] The financial data presented herein, for the year ended December 31, 2018, has not been audited by the
Company's independent auditors and was prepared by the Company's management on a consolidated basis.

[10] References to U.S. dollar amounts in this Declaration are approximations based on an exchange rate of
R$3.6513/USD$1.00 as of January 31, 2019.

mainly ethanol, and to a lesser extent, (iii) bioenergy. For the same period, UST Group had

EBITDA of approximately R$557.0 million (USD$152.5 million) and net losses of R$220.8

(USD$60.5 million).

**B.   Organizational Structure**

17.    A chart showing UST Group's organizational structure is attached hereto

as **Exhibit D** and copied below.



### Usina de Açúcar Santa Terezinha Ltda.

**Notes**

1.    Referred to herein as "STP" or "Parent Holding Company"
2.    The Company was founded by and is owned by members of the Meneguetti family in the city of  Maringá,
      state of Paraná, Brazil.  Individual ownership of the Parent Holding Companies is not reflected in this chart.
3.    The Parent Holding Companies' direct ownership of UST (i.e., not through their interests in UST Holding Company)
      totals 15.22%.
4.    The Parent Holding Companies, through their direct interests in UST Holding Company, own the following indirect
      interests in UST, and by extension, USACIGA:
      • JL Participações e Comércio Agropastoril S.A.= 25.77%;
      • Iguatemy Participações e Comércio de Produtos Agropastoril Ltda. = 17.30%;
      • IMEF – Participações e Comércio de Produtos Agro Pastoril Ltda. = 14.41%;
      • Participações e Agropecuária M.M. Ltda. = 10.17%;
      • Hemfil Participações e Comércio de Produtos Agropastoril Ltda. = 9.50%;
      • Amefil Participações e Comércio Agropastoril S.A. = 7.63%.
5.    In addition to its 84.78% interest in UST, UST Holding Company holds a 33% interest in Maringá Armazéns,
      a storage facility unrelated to UST's business.

**Key**

◇  Parent Holding Company
△  Subsidiary with financials
   consolidated into STP's financial
   statements
▲  Individual Financial Statements

18.     As reflected in the chart, UST Holding Company,[11] a Brazilian closely held corporation, is controlled by six holding companies, each of which is owned by the descendants of the founding Meneguetti family.  UST Holding Company directly owns 84.78% of the interests in Foreign Debtor UST; the remaining 15.22% is directly held by the six Meneguetti family holding companies.

19.     Foreign Debtor UST:  (i) directly owns 100% of the interests in Foreign Debtor USACIGA; (ii) directly owns 11 industrial and agricultural operating units (Paranacity, Tapejara, Ivaté, Iguatemi, Maringá, Terra Rica, São Tomé, Rondon, Cidade Gaúcha, Umuarama, and Moreira Sales) and the logistics operating unit (Paranaguá); (iii) indirectly, through USACIGA, owns 100% of the interests in Usina Rio Paraná S.A., which owns a pre-operational industrial and agricultural unit in the city of Eldorado, State of Mato Grosso; and (iv) directly or indirectly owns significant interests in other entities, including:  (a) a 64.16% interest in CPA Trading S.A. (a sugar and ethanol storage/logistics company); (b) a 62.15% interest in CPLPar Holding S.A. (a non-operational ethanol logistics company); (c) a 53.10% interest in Álcool do Paraná Terminal Portuário S.A. (an ethanol exports storage/logistics company); and (d) as described above, a 48.45% interest in PASA (of which Foreign Debtor USACIGA separately owns an additional 14.70%).  While UST has significant interests in the companies described in item (iv) above, UST does not control them and, therefore, for accounting purposes, does not consolidate their results of operations as subsidiaries in UST's financial statements.  Instead, UST accounts for these companies as investments.

---

[11]     UST Holding Company also holds a 33% interest in Maringá Armazéns, which is not affiliated with the UST Group.

20.     Each of the Foreign Debtors is organized under the laws of, and maintains its principal place of business in, Brazil.  The Foreign Debtors maintain a registered office and principal place of business in the city of Maringá, State of Paraná, Brazil.  The Company's operations are managed on a global basis by a board of directors and executive officers in Maringá, and all personnel with oversight responsibilities for the Company's Brazilian operations are located there.  The Foreign Debtors do not have a domicile in the United States.

## C.     **Prepetition Capital Structure**

21.     Based on the unaudited consolidated financial information prepared by UST's management, as of December 31, 2018, the Company's total assets were R$5,594.1 million (USD$1,532.1 million) and total liabilities were R$5,111.9 million (USD$1,400 million).  As of the same date, the Company's total financial indebtedness was R$4,173.6 million (USD$1,143.0 million).

22.     As of January 31, 2019,[12] the Company's total financial indebtedness was R$3,979.89 million (USD$1,090.0 million).  The chart attached hereto as **Exhibit E** summarizes the Company's outstanding indebtedness as of January 31, 2019, grouping such indebtedness into the classes of claims contemplated by the Brazilian Restructuring and Bankruptcy Law.

### 1.     **Export Prepayment Facilities**

23.     The vast majority of the Company's financial indebtedness arises from various export prepayment agreements[13] entered into between the Company, and various bank lenders (the "EPAs").  The Company has 21 EPAs with 20 different banks.  Of these, there are

---

[12]    This is the same reference date used by the RJ Debtors to present information related to their financial indebtedness in the RJ Proceeding.

[13]    Export prepayment agreements are financing facilities, which are widely used by exporters in Brazil (especially in the sugar and ethanol sectors), the proceeds of which are generally required to be used in connection with the export of commodities.

two syndicated EPAs and 19 bilateral EPAs. The majority of these EPAs are governed by New York law; the balance are governed by Brazilian law. Eighteen of the EPAs (the two syndicated EPAs and 16 of the bilateral EPAs) (the "Restructured EPA Facilities" and, the lenders thereunder, the "Restructured EPA Lenders") were the subject of a prior restructuring in 2016 (the "2016 Restructuring") as described more fully below.

24.     In general, the Restructured EPA Facilities are secured by (a) the "Pooled Export Collateral," which consists of the applicable obligors' interests: (i) under all "Assigned Export Contracts" (but only to the extent currently assigned) and all related invoices, accounts, insurance proceeds, tax refunds, as well as all documents and instruments with respect to goods shipped thereunder; (ii) all "Collection Accounts"[14] and all cash from time to time credited thereto or deposited or held therein; and (iii) all proceeds, supporting obligations, products, substitutions and replacements of, for, or relating to, any of the foregoing; and (b) the "Shared Collateral," which consists of various types of security interests, including (i) mortgages covering approximately 400 real estate properties, (ii) fiduciary sale agreements[15] relating to certain equipment and machinery, and (iii) fiduciary assignment agreements relating to certain other assets, such as receivables of co-generation of energy and future receivables from claims against the Brazilian government, as well as any cash received in the above-mentioned fiduciary sales. The non-Restructured EPA Facilities are also secured, as the case may be, by certain other

---

[14]   Collection Accounts are accounts into which receivables related to any "Assigned Export Contract" are to be deposited for the benefit of Restructured EPA Lender.

[15]   Fiduciary sales and fiduciary assignments are common collateralization mechanisms in Brazil. In a fiduciary sale, a debtor assigns title to, and the "indirect possession" of, specific assets to a lender to serve as security for the repayment of a loan. A fiduciary assignment is similar and involves an assignment of specific rights relating to assets. In either case, the debtor retains "direct possession" of the property interest during the life of the loan but does not regain legal title until the loan is repaid. Claims secured by fiduciary sales and assignments are not subject to the RJ, and therefore holders of such sales and assignments may exercise remedies with respect to their collateral notwithstanding the occurrence of the RJ.

collateral, including (i) fiduciary sales of real estate, equipment and machinery, (ii) fiduciary assignments of any cash received in the above-mentioned fiduciary sales, (iii) certain other export contracts and receivables thereunder, and (iv) liens on sugar cane crops.

### 2. Other Secured and Unsecured Financings

25.     The Company is also party to certain other secured and unsecured financing arrangements, including 10 "N.C.E. Facilities" (Nota de Crédito à Exportação)[16] and "C.C.E. Facilities" (Cédula de Crédito à Exportação) [17] that were also subject to the 2016 Restructuring (together with the Restructured EPA Facilities, the "Restructured Debt" and the lenders party thereto, including the Restructured EPA Lenders, the "Restructured Lenders"). The N.C.E. and C.C.E. facilities are governed by Brazilian law and are secured by the Shared Collateral described in paragraph 24 *supra*.  In addition, the Company is party to various other agreements that were not subject to the 2016 Restructuring, including certain A.C.C. (Adiantamento sobre Contrato de Câmbio), or Advance on Foreign-Exchange Contracts,[18]

---

[16]     N.C.E. (*Nota de Crédito à Exportação*), or Export Notes, are Brazilian *real*- or U.S. dollar-denominated credit lines designed to incentivize export transactions by granting certain tax benefits to export companies in Brazil. Funds raised under N.C.E. and C.C.E. facilities are applied to the production of goods to be exported, as well as in connection with supportive and complementary activities related to export transactions. The borrower must prove that products have been exported; otherwise, the tax benefits are revoked.

[17]     C.C.E. (*Cédula de Crédito à Exportação*), or Export Notes, like the N.C.E., are credit lines, denominated in either Brazilian *reais* or U.S. dollars, designed to incentivize export transactions by granting certain tax benefits to export companies in Brazil.

[18]     A.C.C. (*Adiantamento sobre Contrato de Câmbio*), or Advance on Foreign-Exchange Contracts, are foreign currency-denominated credit lines, pursuant to which a financial institution advances, in Brazilian *reais*, the equivalent of any foreign currency purchased by the borrower (usually U.S. dollars).  This arrangement is designed to incentivize export transactions by granting tax benefits to export companies in Brazil.  The borrower receives funds in advance of shipments, but must prove that products were exported in order to benefit from the tax exemption. Some of these A.C.C. agreements have been refinanced into ordinary unsecured loan agreements.

Prorenova facilities,[19] FINAME facilities (equipment financing facilities),[20] Working Capital

(*Capital de Giro)* facilities,[21] PESA facilities,[22] Securitization facilities,[23] and C.C.R. facilities

(Cédula de Crédito Rural), or Rural Notes.[24]  The FINAME facilities are secured by the

equipment being financed.  Certain of the Working Capital, C.C.R., PESA and Securitization

facilities are secured by certain mortgages.

26.    Lastly, the Company is party to certain advance payment agreements with

various counterparties.  These advance payment agreements oftentimes are secured by a lien on,

or fiduciary assignment of, customer receivables, and, in some circumstances, the Company's

sugarcane and sugarcane root.

27.    Foreign Debtor UST is either a borrower or guarantor on substantially all

of the Company's funded indebtedness.[25]  Foreign Debtor USACIGA is also a guarantor on a

number of the financings.  In addition, certain affiliates of the Company (including the Individual

---

[19]    Prorenova is a program of the Brazilian Development Bank (BNDES) created to incentivize the production of sugarcane. It consists of Brazilian *real*-denominated credit lines, which proceeds are used to finance the renovation of old sugarcane farms and the expansion of the cultivated area.  Under the Prorenova program, certain financial institutions selected by BNDES are authorized to grant financing to companies using BNDES funds.

[20]    FINAME agreements are Brazilian *real*-denominated credit facilities funded by BNDES to finance the acquisition of capital assets, such as equipment.  Under the FINAME program, certain financial institutions selected by BNDES are authorized to grant financing to companies using BNDES funds.  FINAME agreements are usually secured by the asset that is being financed and are commonly used by companies in various industries in Brazil.

[21]    The *Capital de Giro* (working capital) facilities are financing agreements for working capital purposes, which are usually short term.

[22]    PESA, or *Special Asset Sanitation Program*, is a program of the Brazilian National Monetary Committee (CMN), which allows for rural production companies to renegotiate existing financial debt with financial institutions (as per the terms and conditions set forth in applicable law), under more favorable conditions than those practiced by the market.

[23]    Securitizations are financing agreements that the Company entered into with Banco do Brasil and are similar in nature to the the PESA facilities.

[24]    C.C.R. (*Cédula de Crédito Rural*), or Rural Notes, are Brazilian *real*-denominated credit lines that are available to either legal entities or individuals who develop rural activities.

[25]    UST's indirect wholly owned subsidiary, Usina Rio Paraná, is also in some circumstances a borrower under the Company's indebtedness.

Guarantors), are guarantors under the UST Group's financing arrangements. Of the Company's total financial indebtedness, R$326.8 million (USD$89.5 million) [26] is believed by the Company to be secured, or at least partially secured.

### 3. Other Indebtedness

28.    As of January 31, 2019, the Company also had ordinary course and trade debt of approximately R$63.9 million (USD$17.5 million). As of the same date, the Company had a small amount of labor and tax claims, which in the aggregate total R$28.9 million (USD$7.9 million).

29.    The chart attached hereto as **Exhibit E** summarizes the RJ Debtors' outstanding indebtedness as of January 31, 2019 (a small percentage of which relates to obligations owed solely by the Individual Guarantors), grouping such indebtedness into the classes of claims contemplated by the Brazilian Restructuring and Bankruptcy Law: (a) "Labor" (which refers to certain employee, wage, benefit and labor claims), (b) "Secured" (which refers to that portion of the RJ Debtors' total obligations believed to be secured, excluding fiduciary assignments and sales),  (c) "Unsecured" (which refers to that portion of the RJ Debtors' obligations believed to be unsecured, including deficiency claims where the value of the collateral is less than the value of the outstanding obligations), (d) "Small Creditors" (which refers to claims due to small businesses entitled to separate treatment under the Brazilian Restructuring and Bankruptcy Law), and (e) "Outside of the Judicial Recovery Proceeding" (which refers to claims that are excluded from the RJ Proceeding, including fiduciary sales and fiduciary assignments).

---

[26]    This amount does not include amounts attributable to fiduciary assignments and sales.

**D.**   **Events Leading to the Restructuring**

30.   Despite the Company's prominent position in Brazil's sugar and ethanol markets—and the fact that its operations on the whole remain strong—adverse conditions beyond its control have afflicted the commodities markets for sugar and ethanol over the last ten years and, more severely, in recent years, and, in turn, have impaired the Company's financial health.

31.   In the face of adverse industry, macroeconomic, and environmental conditions, a number of sugar and ethanol producers worldwide have commenced restructurings or bankruptcy proceedings, or have needed to shut down their activities in various countries, including in the United States and Brazil.  These conditions, combined with the high level of debt incurred by the Company to make investments in working assets, the overly restrictive terms imposed by the Restructured Lenders, and the absence of any debt-impairment as part of the 2016 Restructuring, have caused the Company to default on its obligations and compelled it to commence the Brazilian Proceeding and to seek parallel chapter 15 relief for the Foreign Debtors.

**1.**   **Adverse Market, Macroeconomic and Environmental Conditions**

32.   For years, the Brazilian sugar and ethanol industry has suffered from pressures exerted by significant fluctuations in the price of sugar in the international market, which have forced producers, including the Company, to sell sugar inventories at prices well below production cost.  In addition, the Brazilian federal government, in the 2010-2016 period, imposed price controls on the retail sale of fuels, which negatively affected the Company's revenue from sales of ethanol products, the Company's natural alternative to selling sugar products.

33.     Adverse weather conditions in 2015, caused by unusually high precipitation in the southern region of Brazil, flooded the area and reduced accessibility to crops and their harvesting.  In addition, during 2015, the Brazilian *real* depreciated 48% in relation to the U.S. dollar.  This meant that servicing the cost of the Company's U.S. dollar-denominated debt (representing 78% of the total financial indebtedness at the time) required almost twice as many Brazilian *reais*.

34.     In 2016, the Company incurred costly financial indebtedness to make the necessary significant investments to repair damaged areas and increase its productivity.

35.     As described more fully below, at the end of 2016, the Company was forced to undertake a restructuring of most of its indebtedness, which included its U.S. dollar-denominated bank debt (mainly its former EPAs) and certain N.C.E. and C.C.E. facilities.  A key assumption in these negotiations was an increase in the price of sugar, which was a widely held prediction of industry participants and observers at the time.  However, the price of sugar decreased by 12.78% from 2016 to 2017 and further decreased by 22.62% from 2017 to 2018.  In 2018, the price of sugar reached its lowest level in ten years.  The primary reason for the drop in sugar prices was a severe supply/demand imbalance caused by a reduction in the global consumption of sugar and increased production by the world's leading sugar producing nations India and, to a lesser extent, by alternative commodities produced in the European Union.

36.     In response to the falling global price of sugar, and in light of the Brazilian federal government's lifting of controls on the price of fuels in 2016, the Company adjusted its production mix, increasing its ethanol production and decreasing its sugar output from 75% to 62% of its total sugar-ethanol output in 2018.  However, the price of ethanol also declined during this period (although not as precipitously as that of sugar).

37.     In 2017, under the stress of debt repayments, the Company was forced to forgo investing in replanting and growing sugarcane.  In 2018, the Company's crop productivity significantly decreased and the Company was unable to meet its revenue, profit, and cash flow from operation targets.

38.     Compounding the problem, exchange rate variations of the Brazilian *real* in relation to the U.S. dollar have also had a material adverse effect on the Company's financial condition.  Over the course of 2018, mostly due to political uncertainties in Brazil, the *real*/U.S.-dollar exchange rate worsened by 17%.

39.     The Company's gross revenue for 2018 was R$2,456.6 million (USD$673.0 million), compared to R$2,946.5 million (USD$806.3 million) for 2017 and R$2,780.2 million (USD$761.4 million) for 2016.

## 2.     Interest and Amortization Burden

40.     The Company is heavily indebted.  In the short term, the Company is facing substantial interest payments and principal amortization payments.  In 2019, the Company would be required to make payments of principal and interest under its financial indebtedness in the total amount of R$1,651.6 million (USD$452.3 million).  In 2020, payments of principal and interest would total R$702.6 million (USD$192.4 million).  In 2021, the scheduled principal and interest payments would balloon to R$1,608.9 million (USD$440.7 million).

## 3.     Prior Restructuring Efforts

41.     In December 2016, the Company undertook a restructuring of most of its indebtedness, which included EPA, C.C.E., and N.C.E. debt.  The Company succeeded in extending the term of, and renegotiating interest rates on, the Restructured Debt.

42.     As an incentive, most of the Restructured Lenders were offered new collateral packages, including the "pooled" export collateral (*i.e.*, a pool of export receivables

securing EPA facilities with multiple lenders) and/or packages of the "shared" export collateral (each as described more fully above).

### 4.     Recent Restructuring Efforts

43.     The 2016 Restructuring was premised on an understanding with, and the Company believed a commitment from, certain of the Restructured Lenders to provide additional financing and go-forward credit to the Company.  However, those Restructured Lenders did not provide the necessary additional financing that the Company had expected, and the Company continued to experience financial difficulties due to the continued adverse market, macroeconomic, and environmental conditions, as described above.  As a result of these difficulties, the Company was not able to avoid a default on certain principal and interest payments due under the Restructured EPA Facilities and other debt instruments, and still maintain operations at the required levels.   By February 2018, the Company realized it would need to restructure the terms and conditions of all its financial indebtedness and restart restructuring negotiations with its creditors.   The Company's first payment default was in June 2018.   As a condition to engaging with the Company, the Restructured Lenders demanded that the Company improve its corporate governance and operating efficiency.

44.     In response to these demands, the Company undertook a number of initiatives (which remain in process today), including: (i) hiring KPMG to perform a top-down analysis of the organization that led to a recommendation to reorganize the Company's operating units into three cost-efficient, synergistic "clusters," which recommendation the Company has already implemented; (ii) replacing a number of key top executives, including the Chief Operating Officer and other members of management, which included laying off 10 members of the Meneguetti family; and (iii) hiring a prominent agricultural consultant to recommend operational improvements to increase agricultural yields.

45.     In May 2018, the Restructured Lenders chose to engage White & Case LLP, as U.S. legal counsel, Mattos Filho, as Brazilian legal counsel, and FTI Consulting, as their financial advisor, for which the Company agreed to pay related fees and expenses.

46.     In June 2018, the Company determined to cease making certain payments of principal and interest under their financial indebtedness pending a further restructuring.  In August 2018, the Company's management, together with its financial advisor, Laplace, and Brazilian counsel, Thomaz Bastos, Waisberg, Kurzweil Advogados, presented the Restructured Lenders with a proposed term sheet for a comprehensive restructuring of the Restructured Debt.

47.     Several months of negotiations between the Company and the Restructured Lenders followed, and the Company and the Restructured Lenders exchanged multiple drafts of the proposed term sheet between September and early December. Notwithstanding the Company's eagerness to finalize these discussions, several weeks would go by without any response from the Restructured Lenders or their advisors.   In an effort to finalize the negotiations in December, the Company expressed its willingness to accede to nearly all of the egregious terms proposed by the Restructured Lenders (including, among other things, a request to appoint an observer to the Company's board of directors that would not be bound by confidentiality restrictions).  However, after another lengthy period of silence, the Restructured Lenders came back asking for more changes, including additional due diligence even though the Restructured Lenders had been engaged with the Company for nearly six months.

48.     In an effort, yet again, to come to closure on these negotiations and save the Company from immediate collapse, the Company, through its financial advisor, conveyed in writing by email to the Restructured Lenders on February 11, 2019,  and also at a meeting with some of the Restructured Lenders on February 14, 2019, that it was willing to accept virtually all

of the terms of the Restructured Lenders' last proposal.  The Company believed that it had

reached an agreement with the Restructured Lenders to further restructure its debts.

49.    However, one of the Restructured Lenders, Banco Votorantim, on January

31, February 6, February 21, and, as refiled, on March 22, 2019, commenced collection suits

against certain of the RJ Debtors in the São Paulo Civil Court, seeking to recover more than

R$155 million (USD$42.45 million) from the defendants.   Thereafter, Banco Votorantim

obtained an order from the São Paulo Civil Court freezing funds in certain Company bank

accounts in order to partially secure any judgment that Banco Votorantim may ultimately obtain

against the Company defendants following a ruling on the merits of the collection suits.

50.    In the face of the Banco Votorantim Collection Actions, on March 11,

2019, at a meeting held with some of the Restructured Lenders in the city of São Paulo, the

Company informed the Restructured Lenders that, if they were not able to come to a global

compromise in the short term, the Company would have no other option but to commence the

RJ.   On March 19, 2019, the Restructured Lenders delivered a further revised term sheet to the

Company on "a final and non-negotiable," but non-binding basis.  Because the term sheet was

delivered on a non-binding basis (that is, subject to various internal approvals, diligence, and

revision by the Restructured Lenders), it carried significant execution risk for the Company—

particularly in light of the Restructured Lenders' changes to their previously delivered "agreed"

term sheet.

51.    In fact, this latest iteration of the term sheet also changed material terms

that the Company believed to have already been agreed as of February 2019.  In addition, the

March 19, 2019 term sheet required the consent of 100% of the Restructured Lenders, meaning

that Banco Votorantim would have had to drop its collection lawsuits and join the remainder of

the Restructured Lenders in support of this term sheet.  In light of Banco Votorantim's continued recalcitrance to engage in renewed settlement discussions, this condition precedent severely limited the Company's ability to achieve a global compromise.  The Company determined that it had no other choice but to commence the RJ.

E.      **Foreign Debtors' RJ**

52.      As set forth above, on or about March 22, 2019, the RJ Debtors filed their RJ Petition in the Brazilian Court seeking the relief available to them in a *recuperação judicial* proceeding under the Brazilian Restructuring and Bankruptcy Law.  A copy of the RJ Petition, together with a translation thereof, is attached hereto as **Exhibit F**.  On March 31, 2019, the Brazilian Court entered an Order, pursuant to Article 300 of the Brazilian New Code of Civil Procedure, granting the equivalent of a preliminary injunction (the "RJ Preliminary Injunction, a copy of which is attached hereto, together with a translation thereof, as **Exhibit G**) suspending all proceedings against the Foreign Debtors and the other RJ Debtors (including certain individual guarantors of the UST Group's indebtedness who were joined to the RJ Petition (the "Individual Guarantors")) pending (a) submission by the RJ Debtors of additional documentation required under Brazilian law[27] and (b) a decision by the Brazilian Court on whether to accept the RJ Petition, including the joinder of the Individual Guarantors as "rural producers" under Brazilian law.[28]  In addition, the Brazilian Court appointed an expert, Luis Vasco Elias, of Deloitte Touche Tohmatsu, to review and analyze the documents filed along with the RJ-Petition

---

[27]     The documents that were unavailable at the time of the filing of the RJ Petition pertained to the financial information of the Individual Guarantors, including their balance sheets, statements of income for the last three years, lists of assets, and statements of bank accounts, as well as the lists of the private assets of the controlling partners and members of management of the UST Group.  Supplemental filings were made on April 4, 2019, and all required financial information has now been provided to the Brazilian Court.

[28]     The RJ Petition was accepted by the RJ Court as to all Individual Guarantors other than Sidney Samuel Meneguetti, to whom RJ relief as a "rural producer" under Brazilian law was denied.

to ensure that (i) the Company was qualified to enter into an RJ (*i.e.*, all the requisite documents had been duly filed in accordance with applicable law); and (ii) the Company did in fact exist and had been conducting business in Brazil for the requisite time period of two years.  Mr. Elias submitted his report to the Brazilian Court on April 5, 2019, and on April 15, 2019, the Brazilian Court entered an Order accepting the RJ and appointing Deloitte Touche Tohmatsu as the Judicial Administrator (*administrador judicial*) (the "RJ Acceptance Order").

53.     The primary objectives of the Restructuring and the RJ Plan will be to modify the Company's capital structure to materially reduce its debt burden, make available new sources of liquidity, and extend debt maturities to maximize the likelihood that the Company can continue as a going concern and ensure its recovery and eventual growth.  Upon formulation, approval and implementation of the RJ Plan, it is anticipated that the Company's amended debt profile and the injection of additional capital will reduce its financial burden, enabling the Company to operate profitably.

**E.      Chapter 15 Petition**

54.     The Verified Petition seeks two separate orders.  The first order, attached to the Verified Petition as Exhibit A (the "First Order"), seeks:  (i) recognition of the Brazilian Proceeding, on a final basis, as a foreign main proceeding under section 1517(a) of the Bankruptcy Code; (ii) recognition, on a final basis, of me as the foreign representative (as that term is defined in section 101(24) of the Bankruptcy Code) of each Foreign Debtor; (iii) finding that the Petition meets the requirements of section 1515 of the Bankruptcy Code; (iv) recognition and enforcement in the U.S. of the RJ Acceptance Order; and (v) extension of the scope of the stay, in effect upon recognition of the Brazilian Proceeding under section 1520 of the Bankruptcy Code, to any and all actions taken by the Foreign Debtors' creditors in the United States.

21

55.     The second order, attached to the Verified Petition as Exhibit B (the "Second Order"), seeks—upon notice to the parties directed by the Court and, only to the extent objections are filed, further hearing—recognition of the to-be-proposed RJ Plan, when such plan is approved by Order of the Brazilian Court (the "RJ Plan Confirmation Order"), and the RJ Plan Confirmation Order, as well as enforcement of the terms of such RJ Plan, including any injunctive and release provisions therein.

56.     The Verified Petition seeks: (i) entry of the First Order on May 16, 2019, subject to this Court's availability for a hearing; and (ii) entry of the Second Order after I have submitted a supplemental declaration (the "Supplemental Jánszky Declaration") evidencing the Brazilian Court's approval of the RJ Plan, in the form sanctioned by the Brazilian Court, to the extent set forth herein pursuant to sections 105(a), 1507(a), and 1521(a) of the Bankruptcy Code.

## REQUEST FOR RECOGNITION AND RELATED RELIEF

57.     To the best of my knowledge and belief, the Brazilian Proceeding: (i) is a "foreign main proceeding" under section 1502(4) of the Bankruptcy Code, as the Foreign Debtors' center of main interest is located in Brazil; and (ii) is a judicial proceeding currently pending in Brazil and administered under Brazilian law relating to insolvency or adjustment of debt, in which the RJ Debtors' assets and affairs are subject to the supervision of the Brazilian Court for the purpose of reorganization or liquidation. Accordingly, I believe that the Brazilian Proceeding is a "foreign proceeding" under section 101(23) of the Bankruptcy Code.

58.     The Foreign Debtors, as of the Petition Date, have property in the United States and, specifically, in this District. *First*, a significant portion of the Company's revenue expected for 2019 derives from payments of export receivables due to the Foreign Debtors that will soon either run through correspondent bank accounts in the U.S. (more specifically, in New York) before being deposited into Foreign Debtor bank accounts elsewhere, or that may be

deposited directly into Foreign Debtor U.S. bank accounts in the future.  *Second*, the Foreign

Debtors have executed an engagement letter with the New York office of Milbank, which is

governed by New York law, and tendered a retainer thereunder, which is on deposit in a New

York bank account maintained by Milbank.  *Third*, a substantial percentage of the Foreign

Debtors' debt obligations (as well as of certain of the other RJ Debtors) is denominated in

U.S. dollars and governed by New York law.  The combination of these circumstances, I am

informed by counsel, readily satisfies the flexible standard for eligibility under section 109(a).

59.    Finally, after consultation with counsel, I believe that:  (i) recognizing the

Brazilian Proceeding as a foreign main proceeding and granting the relief requested in the

Verified Petition is consistent with the purpose of chapter 15 of the Bankruptcy Code and public

policy of the United States; and (ii) the relief requested in the Verified Petition is necessary for

the Foreign Debtors to fully realize the benefits of the Restructuring, which would enable the

Foreign Debtors to continue to operate profitably and thus maximize value for all their creditors

and other stakeholders.  Therefore, I believe that the relief requested in the Verified Petition is

necessary and appropriate and in the best interests of the Foreign Debtors, their creditors and

other parties in interest.

## **SECTION 1515 OF BANKRUPTCY CODE**

60.    I am informed by counsel that section 1515(b)(1) of the Bankruptcy Code

provides that "[a] petition for recognition shall be accompanied by—a certified copy of the

decision commencing such foreign proceeding and appointing the foreign representative."  In

compliance with this section, attached as **Exhibit H** hereto, is a certified copy of the RJ

Acceptance Order entered by the Brazilian Court on April 15, 2019, which deems the Brazilian

Proceeding to have been commenced as of the filing of the RJ Petition.[29]  For purposes of

evidencing my appointment by each Foreign Debtor as its Foreign Representative, I rely on the

Shareholder Consent, a copy of which is annexed hereto as **Exhibit B**, as "other evidence

acceptable to the court" within the meaning of section 1515(b)(3).

61.    I am also informed by counsel that section 1515(c) of the Bankruptcy

Code provides that "[a] petition for recognition shall also be accompanied by a statement

identifying all foreign proceedings with respect to the debtor that are known to the foreign

representative."  In compliance with this section, I hereby declare that, to my knowledge, the

only foreign proceeding (as such term is defined in section 101(23) of the Bankruptcy Code)

currently pending with respect to each Foreign Debtor is the Brazilian Proceeding.

## LIST PURSUANT TO BANKRUPTCY RULE 1007(A)(4)

62.    In accordance with rule 1007(a)(4) of the Federal Rules of Bankruptcy

Procedure, a *Statement Pursuant to Bankruptcy Rule 1007(a)(4)* has been attached as Exhibit A

to the *Voluntary Petition Forms*, which have been filed at [ECF No. 1] in each Chapter 15 Case.

Additionally, I am currently unaware of any litigation pending in the United States in which

either of the Foreign Debtors is a party.

## NEED FOR PROVISIONAL RELIEF

63.    I am seeking provisional relief in the form of the immediate application of

the automatic stay provided by section 362 of the Bankruptcy Code, *nunc pro tunc* to the Petition

Date, pending this Court's recognition of the Brazilian Proceeding.  If the Foreign Debtors'

creditors in the U.S. choose not to comply with the RJ Acceptance Order, and obtain preferential

treatment by commencing actions in the United States, the Foreign Debtors will be required to

---

[29]    The Foreign Representative will file with the Court an English translation of the RJ Acceptance Order as soon as it is available.

defend any such actions, causing depletion of the Company's resources and potentially

jeopardizing the entire Restructuring.

64.     Notwithstanding the commencement of the Brazilian Proceeding, and the

implementation of the stay of actions against the RJ Debtors in Brazil, the Company, and in

particular the Foreign Debtors, remain exposed to the risk that creditors will attempt to attach

and eventually levy upon key assets of the Company located outside of Brazil, and in particular

with respect to U.S. dollar-denominated payments of export receivables due to the Foreign

Debtors.  The Foreign Debtors are parties to three primary trade agreements pursuant to which

the Company exports its sugar products.  Because these trade agreements are U.S. dollar-

denominated, these payments currently run through correspondent bank accounts in the U.S.,

and, more specifically, New York, before being deposited in the Foreign Debtors' bank accounts.

In addition, given that the payments are U.S. dollar-denominated, the Company may choose in

the future to deposit directly into the bank accounts in the U.S.  The export receivables comprise

approximately 70% of the Company's expected cash flow from operations in 2019, and are

needed to fund operations and avoid a complete liquidation.

65.     Absent chapter 15 recognition of the RJ and the requested provisional

relief, there is a risk that dissenting creditors could take action against such funds while they are

in the U.S, thus crippling the Company's operations and derailing the Restructuring and ultimate

approval of any RJ Plan.  In order to ensure that the Restructuring and the RJ Plan process are

protected from undue interference by dissenting creditors in the U.S., this Court should grant a

stay against creditor actions in the U.S. that is of the same scope as the stay afforded to the

Foreign Debtors by the RJ Acceptance Order in Brazil.

66.     The prospect of such adverse creditor action in the near term by one or

more of the Restructured Lenders is real and demonstrable. As set forth above, Banco

Votorantim has already commenced the Banco Votorantim Collection Actions and, by diligent

pursuit of these actions, has obtained an attachment order as to a number of the RJ Debtors' bank

accounts in Brazil and has, thereby, been able to levy upon more than $R1.56 million

(USD$427,245) of the Company's cash.

67.     Moreover, both Banco Votorantim and one or more of the other

Restructured Lenders appear to be able to seek comparable remedies in the U.S. All of these

parties are sophisticated lenders, with international banking operations and Brazilian and

U.S. counsel with extensive experience in transnational finance and enforcement issues. Given

the fact that the Foreign Debtors' correspondent bank accounts are in the U.S., I have a

reasonably-based concern that these parties could otherwise commence litigation against the

Foreign Debtors in the U.S. that could seek to freeze all export receivable payments and, thereby,

halt the Company's operations and adversely affect subsequent restructuring discussions.

68.     The potentially adverse consequences of such creditor action is

particularly high at this juncture. The Company is in the midst of its 2019 harvest season, during

which it harvests and produces the sugar products for export and makes investments to maintain

the crops for the next harvest. By the beginning of May, the Company will enter the export

season when it will start receiving payments under export contracts of sugar. Substantially all of

export receivables are payable to the Company in U.S. dollars by customers located in other

jurisdictions. Because these payments pass through bank accounts in the U.S. before being

deposited in UST's bank accounts, there is a risk that, with the RJ stay of enforcement in place,

Restructured Lenders or other creditors could seek to use the laws of the U.S. to take action

otherwise barred by the RJ and to attempt to attach these assets.

69.     At the very least, the nuisance costs of adverse creditor action would also harm the Foreign Debtors by unduly consuming time, money, attention, and other resources from an operation that is already stretched thin for the reasons set forth at length in the Verified Petition.  Even if the Foreign Debtors' export payment receivables and related cash flowing through U.S. bank accounts are not immediately subject to attachment and levy, any litigation in the United States (and the need for the Foreign Debtors to defend any such actions) would have the result of diverting the attention of the Company and its management, as well as their financial resources, toward these ancillary disputes and serve only to deplete enterprise value.

70.     In sum, these export payments for the 2019 harvest are crucial for the Company's survival and chances to successfully overcome its financial difficulties.  If the Foreign Debtors do not have access to these funds, the Foreign Debtors will suffer immediate and irreparable harm.

## NO PRIOR REQUEST

71.     No prior request for the relief sought in the Petition or the Provisional Relief Motion has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on April 17, 2019 in São Paulo, Brazil

Andrew B. Jánszky
*Petitioner and Foreign Representative*

## **EXHIBIT A**

**List of RJ Debtors**

**List of RJ Debtors**

The RJ Debtors, each of which was named as a petitioner in the RJ petition filed in the Brazilian Proceeding (the "RJ Petition") are:

1. UST
2. USACIGA
3. Usina Rio Paraná S.A.
4. Santa Terezinha Participações S.A.
5. Participações E Agropecuária M.M. Ltda.
6. J.L. Participações E Comércio Agropastoril S.A
7. Imef – Participação E Comércio De Produtos Agro Pastorial Ltda.
8. Iguatemy Participações E Comércio Agropastoril Ltda.
9. Hemfil Participações E Comércio De Produtos Agropastoril S.A.
10. Amefil Participações E Comércio Agropastoril S.A.
11. P Meneguetti Agropecuária
12. Marcela Paula Maria Zanin Meneguetti
13. I M Crema Meneguetti Agropecuária
14. Moacir Meneguetti Agropecuária
15. Maria Beatriz Magalhães Silva Meneguetti Agropecuária
16. A. Meneguette Agropecuária
17. Rosângela Perin Meneguette Agropecuária
18. J Batista Meneguetti Agropecuária
19. Nívea Maria Tortato Meneguetti
20. J Cesar Meneguetti Agropecuária
21. M E Bolonhez Meneguetti Agropecuária
22. Francisco Meneguetti Agropecuária
23. Nilsa Correa Faria Meneguetti
24. W J Meneguetti Agropecuária
25. Álvaro Meneguetti
26. S S Meneguetti Agropecuária
27. Elen Cristian Moreno Meneguetti
28. V A Fernandes Meneguetti Agropecuária

## EXHIBIT B

**Minutes of Meeting of UST and USACIGA Shareholders**

**USINA DE AÇÚCAR SANTA TEREZINHA LTDA**
**CNPJ Nº 75.717.355/0001-03**
NIRE Nº 41203347106

**24ª REUNIÃO EXTRAORDINÁRIA DOS SÓCIOS**

**Folha 1**

**DATA, HORA E LOCAL:** Aos 15 (quinze) dias do mês de março de 2019, na sede social da **USINA DE AÇÚCAR SANTA TEREZINHA LTDA.,** inscrita no CNPJ/ME sob nº75.717.355/0001-03, registrada na Junta Comercial do Paraná sob NIRE 4120334710-6 em 14.07.1995, sita na Avenida Pioneiro Victório Marcon, nº 693, no Município de Maringá, Estado do Paraná ("Sociedade"), às 08h00 (oito horas); **QUORUM/PRESENÇAS:** Sócios, representando a totalidade do Capital Social (Artigo 124 da Lei 6404/76), conforme livro nº 001, folhas 006 e 007, Registrado na MM Junta Comercial do Paraná sob nº 18/017829-6, em 15 (quinze) de março de 2018; **CONVOCAÇÃO:** Dispensada a publicação de Edital conforme disposto no Parágrafo 2º do Artigo 1.072 da Lei nº10.406/02, conforme alterada ("Código Civil"); **COMPOSICAO DA MESA:** Presidente: Sidney Meneguetti; Secretário: Paulo Meneguetti; **ORDEM DO DIA:** Em complemento às deliberações tomadas na 23ª Reunião de Sócios ocorrida no dia 12 (doze) de março de 2019 acerca do pedido de recuperação judicial da Sociedade, deliberar sobre as seguintes matérias: **a)** o ajuizamento, pela Sociedade, suas filiais e controladas, de pedido de natureza semelhante ao de recuperação judicial previsto no artigo 1.071, VIII, do Código Civil, perante (i) as cortes e tribunais norte-americanos, nos termos do capítulo 15 da lei de falências dos Estados Unidos da América ("*US Bankruptcy Code*"), e (ii) cortes e tribunais de outras jurisdições, conforme se faça necessário, nos termos das respectivas legislações aplicáveis; **b)** aprovação, nos termos do Contrato de Prestação de Serviços anexo à presente ata ("Contrato de Serviços"), do Sr. André Béla Janszky como representante da Sociedade, suas filiais e controladas, nos procedimentos descritos no item "a" acima, perante (i) cortes e tribunais norte-americanos, na função de "*foreign representative*", definida nos termos do *US Bankruptcy Code*, e (ii) em cortes e tribunais de outras jurisdições, conforme se faça necessário; e **c)** a autorização a prática pela Sociedade, seus administradores e/ou procuradores constituídos em conformidade com o contrato social da Sociedade, de todas e quaisquer providências necessárias ou convenientes para consecução das deliberações acima. **DELIBERAÇÕES:** Os Sócios, após a devida análise das matérias constantes da Ordem do Dia, por unanimidade, sem ressalvas ou restrições, resolveram, diante da difícil situação financeira em que a Sociedade, suas filiais e controladas, atualmente se encontram, considerando as deliberações da 23ª Reunião de Sócios, aprovar a totalidade das matérias listadas na Ordem do Dia acima, restando autorizado, portanto, **a)** o ajuizamento dos referidos procedimentos nos Estados Unidos da América e em outras jurisdições, conforme se faça necessário, para assegurar a preservação dos interesses dos sócios da Sociedade, bem como de seus trabalhadores e credores, promovendo, dessa forma, a preservação da função social da empresa; **b)** a atuação do Sr. André Béla Janszky como representante da Sociedade, suas filiais e controladas, nos termos do Contrato de Serviços; e **c)** a prática pela Sociedade e seus administradores de todas as

**USINA DE AÇÚCAR SANTA TEREZINHA LTDA**
**CNPJ Nº 75.717.355/0001-03**
NIRE Nº 41203347106

## 24ª REUNIÃO EXTRAORDINÁRIA DOS SÓCIOS

Folha 2

medidas que se façam necessárias ou convenientes para consecução das deliberações acima, sem a necessidade de nova Reunião de Sócios. **ENCERRAMENTO E APROVAÇÃO:** Deixando a palavra livre para que fizesse uso quem assim o desejasse, e, como ninguém tenha se manifestado, foram suspensos os trabalhos pelo tempo necessário a lavratura da ata, que, elaborada por mim, ao reinício da sessão, li para que todos dela tomassem conhecimento e pudessem deliberar. Isto ocorreu, sendo em tudo achada conforme, tanto que vai assinada por todos os presentes.

Maringá-PR, 15 de março de 2019.

_____          _____
Sidney Meneguetti                                        Paulo Meneguetti
*Presidente*                                                    *Secretário*

**Sócios:**

_____          _____
Santa Terezinha Participações S/A                J.L. Part. e Com. Agropastoril S.A.
*p. Paulo Meneguetti p. Sidney Meneguetti*      *p. Paulo Meneguetti p. João Batista*
                                                                        *Meneguetti*

_____          _____
Iguatemy Part. e Com. Agrop. Ltda.              Imef – Part. e Com. de Prod. Agro Past. Ltda.
*p. Sidney Meneguetti p. Julio Meneguetti Neto*   *p. Ivaldo Meneguette p. Nereu Meneguette*

_____          _____
Participações e Agrop. M.M. Ltda                Hemfil Part. e Com. de Prod. Agrop.S.A.
*p. Mário Meneguetti p. Moacir Meneguetti*        *p. Hélcio Meneguetti p. Francisco Meneguetti*

_____          _____
Amefil Part. e Com. Agrop S.A.                     Paulo Meneguetti
*p. Julio Cesar Meneguetti*
*p. Wilson José Meneguetti*

**USINA DE AÇÚCAR SANTA TEREZINHA LTDA**
**CORPORATE TAXPAYERS' REGISTRY (CNPJ) NO. 75.717.355/0001-03**
**COMPANY REGISTRY (NIRE) NO. 41203347106**

**24TH EXTRAORDINARY PARTNERS' MEETING**

**DATE, TIME AND PLACE:** March 15, 2019, at the headquarters of **USINA DE AÇÚCAR SANTA TEREZINHA LTDA.**, enrolled with the Corporate Taxpayers' Registry (CNPJ) under No. 75.717.355/0001-03, registered with the Board of Trade of the State of Paraná (NIRE) under No. 4120334710-6, on July 14, 1995, located at Avenida Pioneiro Victório Marcon, 693, in the city of Maringá, State of Paraná ("Company"), at 8:00 a.m.; **QUORUM/ATTENDANCE:** Partners, representing 100% of the Capital Stock (Article 124 of Law No. 6,404/76), in accordance with book No. 001, pages 006 and 007, registered with the Board of Trade of the State of Paraná under No. 18/017829-6, on March 15, 2018; **CALL NOTICE:** the publication of the Call Notice was dismissed, pursuant to paragraph 2 of Article 1,072 of Law No. 10,406/02; **BOARD:** Chairman: Sidney Meneguetti; Secretary: Paulo Meneguetti; **AGENDA:** in addition to the resolutions taken in the 23rd Partners' Meeting held on March 12, 2019 regarding the judicial recovery of the Company, to pass a resolution on the following matters: **(a)** the filing, by the Company, its branches and subsidiaries, of a petition similar to that of a judicial recovery, as set forth in Article 1,071, item VIII, of the Brazilian Civil Code, before (i) U.S. courts and tribunals, pursuant to Chapter 15 of the US Bankruptcy Code, and (ii) courts and tribunals in other jurisdictions, as required, pursuant to applicable law; **(b)** approval, pursuant to the Service Agreement attached hereto ("Service Agreement"), entered into with Mr. André Béla Jánszky as representative of the Company, its branches and subsidiaries, in the proceedings described in item "a" above, before (i) U.S. courts and tribunals, acting as foreign representative, as defined in the U.S. Bankruptcy Code, and (ii) courts and tribunals in other jurisdictions, as required; and **(c)** the authorization for the Company, its directors, officers and/or attorneys-in-fact duly appointed in accordance with the articles of organization of the Company to take all measures required or convenient to implement the resolutions above. **RESOLUTIONS:** the Partners, after due consideration of the matters set forth in the agenda, unanimously, without any reservations or restrictions, resolved, in view of the current difficult financial condition of the Company, its branches and subsidiaries, taking into account the resolutions of the 23rd Partners' Meeting, to approve all the matters listed in the Agenda above, therefore authorizing: **(a)** the filing of the referred proceedings in the United States and in other jurisdictions, as required, to ensure the preservation of the interests of the partners of the Company, as well as the interests of the Company's workers and creditors, thus promoting the preservation of the social function of the company; **(b)** Mr. André Béla Jánszky to act as representative of the Company, its branches and subsidiaries, pursuant to the Service Agreement; and **(c)** the Company and its directors and officers to take all measures required or convenient to implement the resolutions above, dismissing any additional Partners' Meeting. **CLOSING AND APPROVAL:** Giving the floor to whomever would like to take it and, as no one did, the works were adjourned for the time required to draft these minutes, prepared by me. Once the meeting resumed, I read these minutes for all to become aware of and discuss them, the minutes were found conforming and were signed by all in attendance.

Maringá-PR, March 15, 2019.

_____          _____
Sidney Meneguetti                                                        Paulo Meneguetti
*Chairman*                                                                      *Secretary*

**Partners:**

_____
Santa Terezinha Participações S/A
*By: Paulo Meneguetti By: Sidney Meneguetti*

_____
J.L. Part. E Com. Agropastoril S.A.
*By: Paulo Meneguetti By: João Batista Meneguetti*

_____
Iguatemy Part. E Com. Agrop. Ltda.
*By: Sidney Meneguetti By: Julio Meneguetti Neto*

_____
Imef – Part. e Com. De Prod. Agro Past. Ltda.
*By: Ivaldo Meneguette By: Nereu Meneguette*

_____
Participações e Agrop. M.M. Ltda
*By: Mário Meneguetti By: Moacir Meneguetti*

_____
Hemfil Part. E Com
*By: Hélcio Meneguetti By: Francisco Meneguetti*

_____
Amefil Part. E Com. Agrop. S.A.
*By: Julio Cesar Meneguetti*
*By: Wilson José Meneguetti*

_____
Paulo Meneguetti

## DECLARATION CERTIFYING ACCURACY OF TRANSLATION

I, Juliana Kurasawa, Managing Partner of Flow Translations, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

1. I am a professional translator with approximately eight years of professional experience in translating Portuguese into English.

2. I have prepared the attached translation of the Minutes of the 24th Extraordinary Partners' Meeting of USINA DE AÇÚCAR SANTA TEREZINHA LTDA., dated March 15, 2019, which to the best of my professional knowledge and belief is a true and accurate translation from Portuguese into English.

I, Juliana Kurasawa, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:    March 21, 2019
               São Paulo, Brazil

By:    Juliana Kurasawa
Title:  Managing Partner, Flow Translations

**USACIGA - AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA LTDA.**
CNPJ n.º 75.031.633/0001-66
NIRE 41208821795

## ATA DA 10ª REUNIÃO DE SÓCIOS QUOTISTAS

**Folha 1**

**DATA. HORA E LOCAL:** Aos 15 (quinze) dias do mês de março de 2019, às 16h30 (dezesseis horas e trinta minutos) na sede social da **USACIGA – AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA LTDA.**, inscrita no CNPJ/ME sob n°75.031.633/0001-66, sita na Rodovia PR 082, KM 307+770, Zona Rural, no Município de Cidade Gaúcha, Estado do Paraná, CEP: 87820-000 ("Sociedade"). **QUORUM/PRESENÇAS:** Sócios representando a totalidade do capital social, dispensada, portanto, a convocação prévia nos termos do art. 1.072. § 2°, da Lei n° 10.406, de 10 de janeiro de 2002, conforme alterada ("Código Civil"); **COMPOSIÇÃO DA MESA:** Presidente: Sidney Meneguetti, Secretário: Paulo Meneguetti; **ORDEM DO DIA:** Em complemento às deliberações tomadas na 9ª Reunião de Sócios ocorrida no dia 12 (doze) de março de 2019 acerca do pedido de recuperação judicial da Sociedade, deliberar sobre as seguintes matérias: **a)** o ajuizamento, pela Sociedade, de pedido de natureza semelhante ao de recuperação judicial, previsto no artigo 1.071, VIII, do Código Civil, , perante (i) as cortes e tribunais norte-americanos, nos termos do capítulo 15 da lei de falências dos Estados Unidos da América ("US Bankruptcy Code"), e (ii) cortes e tribunais de outras jurisdições, conforme se faça necessário, nos termos das respectivas legislações aplicáveis; **b)** aprovação, nos termos do Contrato de Prestação de Serviços anexo à presente ata ("Contrato de Serviços"), do Sr. André Béla Janszky como representante da Sociedade nos procedimentos descritos no item "a" acima, perante (i) cortes e tribunais norte-americanos, na função de "foreign representative", definida nos termos do US Bankruptcy Code, e (ii) em cortes e tribunais de outras jurisdições, conforme se faça necessário; e **c)** a autorização a prática pela Sociedade, seus administradores e/ou procuradores constituídos em conformidade com o contrato social da Sociedade, de todas e quaisquer providências necessárias ou convenientes para consecução das deliberações acima. **DELIBERAÇÕES:** Os Sócios, após a devida análise das matérias constantes da Ordem do Dia, por unanimidade, sem ressalvas ou restrições, resolveram, diante da difícil situação financeira em que a Sociedade e sua controlada atualmente se encontram, considerando as deliberações da 9ª Reunião de Sócios, aprovar a totalidade das matérias listadas na Ordem do Dia acima, restando autorizado, portanto, **a)** o ajuizamento dos referidos procedimentos nos Estados Unidos da América e em outras jurisdições, conforme se faça necessário, para assegurar a preservação dos interesses dos sócios da Sociedade, bem como de seus trabalhadores e credores, promovendo, dessa forma, a preservação da

- 1 -

**USACIGA - AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA LTDA.**

CNPJ n.º 75.031.633/0001-66

NIRE 41208821795

## ATA DA 10ª REUNIÃO DE SÓCIOS QUOTISTAS

**Folha 2**

função social da empresa; **b)** a atuação do Sr. André Béla Janszky como representante da Sociedade, nos termos do Contrato de Serviços; e **c)** a prática pela Sociedade e seus administradores de todas as medidas que se façam necessárias ou convenientes para consecução das deliberações acima, sem a necessidade de nova Reunião de Sócios. **ENCERRAMENTO E APROVAÇÃO:** Deixando a palavra livre para que fizesse uso quem assim o desejasse, e, como ninguém tenha se manifestado, foram suspensos os trabalhos pelo tempo necessário a lavratura da ata, que, elaborada por mim, ao reinício da sessão, li para que todos dela tomassem conhecimento e pudessem deliberar. Isto ocorreu, sendo em tudo achada conforme, tanto que vai assinada por todos os presentes.

Cidade Gaúcha-PR, 15 de março de 2019.

_____              _____
Sidney Meneguetti                           Paulo Meneguetti
*Presidente*                                     *Secretário*

**Sócios:**

_____              _____
Usina de Açúcar Santa Terezinha Ltda.        Paulo Meneguetti
*p. Sidney Meneguetti p. Paulo Meneguetti*

**USACIGA – AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA LTDA.**
**CORPORATE TAXPAYERS' REGISTRY (CNPJ) NO. 75.031.633/0001-66**
**COMPANY REGISTRY (NIRE) NO. 41208821795**

**10th PARTNERS' MEETING**

**DATE, TIME AND PLACE:** March 15, 2019, at 4:30 p.m., at the headquarters of **USACIGA – AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA LTDA.**, enrolled with the Corporate Taxpayers' Registry (CNPJ) under No. 75.031.633/0001-66, located at Rodovia PR 082, KM 307+770, Zona Rural, in the city of Cidade Gaúcha, State of Paraná, CEP: 87820-000 ("Company"). **QUORUM/ATTENDANCE:** Partners representing 100% of the capital stock, therefore dismissing the previous call notice, pursuant to Article 1,072, paragraph 2, of Law No. 10,406, dated January 10, 2002; **BOARD:** Chairman: Sidney Meneguetti, Secretary: Paulo Meneguetti; **AGENDA:** in addition to the resolutions taken in the 9th Partners' Meeting held on March 12, 2019 regarding the judicial recovery of the Company, to pass a resolution on the following matters: **(a)** the filing of a petition similar to that of a judicial recovery, as set forth in Article 1,071, item VIII, of the Brazilian Civil Code, regarding the Company, before (i) U.S. courts and tribunals, pursuant to Chapter 15 of the US Bankruptcy Code, and (ii) courts and tribunals in other jurisdictions, as required, pursuant to applicable law; **(b)** approval, pursuant to the Service Agreement attached hereto ("Service Agreement"), entered into with Mr. André Béla Jánszky as representative of the Company in the proceedings described in item "a" above, before (i) U.S. courts and tribunals, acting as foreign representative, as defined in the U.S. Bankruptcy Code, and (ii) courts and tribunals in other jurisdictions, as required; and **(c)** the authorization for the Company, its directors, officers and/or attorneys-in-fact duly appointed in accordance with the articles of organization of the Company to take all measures required or convenient to implement the resolutions above. **RESOLUTIONS:** the Partners, after due consideration of the matters set forth in the agenda, unanimously, without any reservations or restrictions, resolved, in view of the current difficult financial condition of the Company and its subsidiaries, taking into account the resolutions of the 9th Partners' Meeting, to approve all the matters listed in the Agenda above, therefore authorizing: **(a)** the filing of the referred proceedings in the United States and in other jurisdictions, as required, to ensure the preservation of the interests of the partners of the Company, as well as the interests of the Company's workers and creditors, thus promoting the preservation of the social function of the company; **(b)** Mr. André Béla Jánszky to act as representative of the Company, pursuant to the Service Agreement; and **(c)** the Company and its directors and officers to take all measures required or convenient to implement the resolutions above, dismissing any additional Partners' Meeting. **CLOSING AND APPROVAL:** Giving the floor to whomever would like to take it and, as no one did, the works were adjourned for the time required to draft these minutes, prepared by me. Once the meeting resumed, I read these minutes for all to become aware of and discuss them, the minutes were found conforming and were signed by all in attendance.

Cidade Gaúcha-PR, March 15, 2019.

| | |
|---|---|
| _____ | _____ |
| Sidney Meneguetti | Paulo Meneguetti |
| *Chairman* | *Secretary* |

**Partners:**

| | |
|---|---|
| _____ | _____ |
| Usina de Açúcar Santa Terezinha Ltda. | Paulo Meneguetti |
| *By: Sidney Meneguetti p. Paulo Meneguetti* | |

## DECLARATION CERTIFYING ACCURACY OF TRANSLATION

I, Juliana Kurasawa, Managing Partner of Flow Translations, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

1. I am a professional translator with approximately eight years of professional experience in translating Portuguese into English.

2. I have prepared the attached translation of the Minutes of the 10th Partners' Meeting of USACIGA – AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA LTDA., dated March 15, 2019, which to the best of my professional knowledge and belief is a true and accurate translation from Portuguese into English.

I, Juliana Kurasawa, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:     March 21, 2019
                 São Paulo, Brazil


_____

By:     Juliana Kurasawa
Title:  Managing Partner, Flow Translations

## EXHIBIT C


**UST Operational Map**



**EXHIBIT D**


**Organizational Chart**

# Usina de Açúcar Santa Terezinha Ltda.



1. Referred to herein as "STP" or "Parent Holding Company".

2. Individual ownership of the parent holding companies is not reflected in this chart. The Company was founded by and is owned by members of the Meneguetti family in the city of Maringá, state of Paraná, Brazil.

3. The parent holding companies' direct ownership of UST (i.e., not through their interests in STP) totals 15.22%.

4. The parent holding companies, through their direct interests in Santa Terezinha Participações S.A. ("STP"), own the following indirect interests in UST, and by extension, USACIGA:
   • JL Participações e Comércio Agropastoril S.A. = 25.77%;
   • Iguatemy Participações e Comércio de Produtos Agropastoril Ltda. = 17.30%;
   • IMEF – Participações e Comércio de Produtos  Agro Pastoril Ltda. = 14.41%;
   • Participações e Agropecuária  M.M. Ltda. = 10.17%;
   • Hemfil Participações e Comércio de Produtos Agropastoril Ltda. = 9.50%; and
   • Amefil Participações e Comércio Agropastoril S.A. = 7.63%.

5. In addition to its 84.78% interest in UST, STP holds a 33% interest in Maringá Armazéns, a storage facility unrelated to UST's business.

**<u>EXHIBIT E</u>**

**Summary of Outstanding Indebtedness**

**UST - Debt Breakdown**

| Composition | Base: 03/31/2019 - Exchange Rate 3.6513 per dollar | |
|---|---|---|
| Class of Credit - Law 11.101/2005 | Amount | |
| Labor (R$) | | 8,432,273.81 |
| Secured (R$) | | 29,093,546.82 |
| Secured (USD) | | 81,541,815.44 |
| Unsecured (R$) | | 576,187,748.99 |
| Unsecured (USD) | | 728,898,916.56 |
| Small creditors (R$) | | 3,933,058.24 |
| Outside of the judicial recovery proceeding (R$) | | 231,070,054.63 |
| Outside of the judicial recovery proceeding (USD) | | 181,706,346.82 |
| Tax (R$) | | 20,461,641.55 |
| **Total (US$)** | $ | **992,147,078.82** |
| **Total (R$)** | R$ | **869,178,324.04** |
| Total (USD + R$) | R$ | 4,491,804,952.93 |

*This list of creditors and debt was based on the financial, business, legal and accounting information available at the time it it was put together and is subject to future changes.*

**<u>EXHIBIT F</u>**

**RJ Petition**



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

**EXMO. SR. DR. JUIZ DE DIREITO DA \_ª VARA CÍVEL DO FÓRUM DA COMARCA DE MARINGÁ/PR**

USINA DE AÇÚCAR SANTA TEREZINHA LTDA., sociedade empresária limitada, inscrita no CNPJ/ME sob o nº 75.717.355/0001-03, com sede na Cidade de Maringá, Estado do Paraná, na Avenida Pioneiro Victório Marcon, nº 693, Parque Industrial II, CEP 87065-120; **USINA RIO PARANÁ S.A.**, sociedade anônima, inscrita no CNPJ/ME sob o nº 07.743.689/0001-93; **USACIGA – AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA LTDA.**, sociedade empresária limitada, inscrita no CNPJ/ME sob o nº 75.031.633/0001-66; **SANTA TEREZINHA PARTICIPAÇÕES S.A.**, sociedade anônima, inscrita no CNPJ/ME sob o nº 79.109.237/0001-65; **PARTICIPAÇÕES E AGROPECUÁRIA M.M. LTDA.**, sociedade empresária limitada, inscrita no CNPJ/ME sob o nº 81.044.661/0001-10; **J.L. PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A.**, sociedade anônima, inscrita no CNPJ/ME sob o nº 78.906.369/0001-55; **IMEF – PARTICIPAÇÕES E COMÉRCIO DE PRODUTOS AGRO PASTORIL LTDA.**, sociedade empresária limitada, inscrita no CNPJ/ME sob o nº 76.755.040/0001-05; **IGUATEMY PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL LTDA.**, sociedade empresária limitada, inscrita no CNPJ/ME sob o nº 80.382.344/0001-41; **HEMFIL PARTICIPAÇÕES E COMÉRCIO DE PRODUTOS AGROPASTORIL S.A.**, sociedade anônima, inscrita no CNPJ/ME sob o nº

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ – Identificador: PJD8F 3EG2Z BWJJ5 6MNFR

PROJUDI - Processo: (Sem numeração) - Ref. mov. 1.1 - Assinado digitalmente por Joel Luis Thomaz Bastos
22/03/2019: JUNTADA PETIÇÃO DE DOCUMENTAL. Arq: petição inicial    Filed 04/18/19    Entered 04/18/19 16:07:03    Main Document
Pg 49 of 144



**THOMAZ BASTOS
WAISBERG
KURZWEIL**

ADVOGADOS

81.039.133/0001-73; **AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A.**, sociedade anônima, inscrita no CNPJ/ME sob o nº 81.039.687/0001-70; **P MENEGUETTI AGROPECUÁRIA**, empresário individual, inscrito no CNPJ/ME sob o nº 33.061.181/0001-15; **S MENEGUETTI AGROPECUÁRIA**, empresário individual, inscrito no CNPJ/ME sob o nº 33.103.647/0001-06; **M P M ZANIN MENEGUETTI AGROPECUÁRIA**, empresária individual, inscrita no CNPJ/ME sob o nº 33.070.910/0001-08; **I M CREMA MENEGUETTI AGROPECUÁRIA**, empresária individual, inscrita no CNPJ/ME sob o nº 33.083.839/0001-90; **MOACIR MENEGUETTI AGROPECUÁRIA**, empresário individual, inscrito no CNPJ/ME sob o nº 33.070.810/0001-73; **M B MAGALHÃES SILVA MENEGUETTI AGROPECUÁRIA**, empresária individual, inscrita no CNPJ/ME sob o nº 33.060.835/0001-96; **A. MENEGUETTE AGROPECUÁRIA**, empresário individual, inscrito no CNPJ/ME sob o nº 33.082.423/0001-57; **ROSÂNGELA PERIN MENEGUETTE AGROPECUÁRIA**, empresária individual, inscrita no CNPJ/ME sob o nº 33.061.019/0001-05; **J BATISTA MENEGUETTI AGROPECUÁRIA**, empresário individual, inscrito no CNPJ/ME sob o nº 33.077.117/0001-22; **N. MARIA TORTATO MENEGUETTI AGROPECUÁRIA**, empresária individual, inscrita no CNPJ/ME sob o nº 33.073.161/0001-64; **J CESAR MENEGUETTI AGROPECUÁRIA**, empresário individual, inscrito no CNPJ/ME sob o nº 33.086.347/0001-58; **M E BOLONHEZ MENEGUETTI AGROPECUÁRIA**, empresária individual, inscrita no CNPJ/ME sob o nº 33.060.847/0001-10; **FRANCISCO MENEGUETTI AGROPECUÁRIA**, empresário individual, inscrito no CNPJ/ME sob o nº 33.086.726/0001-48;

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

**NILSA CORREA FARIA MENEGUETTI**[1], brasileira, casada, empresária, inscrita no CPF nº 668.551.609-72 e RG nº 36.711.884, com endereço na Rua Cerqueira Cesar, nº 33, Maringá/PR, CEP 87014-190; **W J MENEGUETTI AGROPECUÁRIA**, empresário individual, inscrito no CNPJ/ME sob o nº 33.060.734/0001-15; **A MENEGUETTI**, **AGROPECUÁRIA**, empresária individual, inscrita no CNPJ/ME sob o nº 33.070.980/0001-58; **S S MENEGUETTI AGROPECUÁRIA**, empresário individual, inscrito no CNPJ/ME sob o nº 33.061.304/0001-18; **ELEN CRISTIAN MORENO MENEGUETTI AGROPECUÁRIA**, empresária individual, inscrita no CNPJ/ME sob o nº 33.086.797/0001-40; e **V A FERNANDES MENEGUETTI AGROPECUÁRIA**, empresária individual, inscrita no CNPJ/ME sob o nº 33.061.167/0001-11 **(doc. 1)**, todos com principal estabelecimento na Cidade de Maringá, Estado do Paraná, na Avenida Pioneiro Victório Marcon, nº 693, Parque Industrial II, CEP 87065-120, vêm, por seus advogados **(doc. 2)**, com fundamento no art. 47 da Lei 11.101/2005, formular o presente **PEDIDO DE RECUPERAÇÃO JUDICIAL**, o que fazem com base nas razões de fato e fundamentos de direito a seguir expostos.

## COMPETÊNCIA DESTE MM. JUÍZO PARA PROCESSAR E JULGAR A RECUPERAÇÃO JUDICIAL DOS REQUERENTES

1.          O art. 3º da Lei n. 11.101/2005 estabelece que "*[é] competente para (...) deferir a recuperação judicial (...) o juízo do local do principal estabelecimento do devedor*".

---

[1] Em 21/3/2019, a requerente formalizou o seu pedido de reabertura do registro de empresário individual perante a Junta Comercial do Estado do Paraná, motivo pelo qual não foi possível apresentar nesta oportunidade o seu Cadastro Nacional da Pessoa Jurídica.

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br   |   E-mail: contato@twk.com.br



2.　　　　　　O principal estabelecimento é, de fato, aquele de onde emanam as principais decisões estratégicas, financeiras e operacionais do(s) devedor(es), de modo que o processamento e o julgamento da recuperação judicial devem, sempre, se dar no foro/comarca em que o(s) devedor(es) centraliza(m) a direção geral dos seus negócios, e, ainda, onde se concentra o maior volume de negócios dos Requerentes – independentemente de onde esteja localizada sua sede estatutária/societária –, conforme jurisprudência já consolidada no eg. Tribunal de Justiça do Estado do Paraná[2]:

3.　　　　　　No presente caso, não há dúvidas de que o **principal estabelecimento** dos Requerentes está localizado nesta comarca de Maringá/PR, em que, para além de estar situada a sede estatutária da Requerente Usina de Açúcar Santa Terezinha Ltda. – controladora das demais usinas integrantes do doravante chamado Grupo Santa Terezinha – e de outras Requerentes; **(i)** são realizadas suas reuniões de conselho de administração; **(ii)** se encontra todo o corpo diretivo (incluindo-se aí as áreas comercial financeira, contábil e de recursos humanos) das Usinas Requerentes; **(iii)** são realizadas as operações comerciais que geram a maior parte das receitas dos Requerentes e, ainda, **(iv)** reside e trabalha grande parte dos Requerentes produtores rurais.

4.　　　　　　É o bastante, confia-se, para que se reconheça a indiscutível competência deste MM. Juízo para o processamento do presente pedido de Recuperação Judicial.

---

[2] (TJPR. Conflito de Competência nº 1605387-5; Rel. Des. Marcelo Gobbo Dalla Dea; 18ª Câmara Cível; J: 3/5/2017)

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

## HISTÓRICO, ESTRUTURA ORGANIZACIONAL E ATIVIDADES DESENVOLVIDAS PELOS REQUERENTES

5.          A Usina Santa Terezinha Ltda. foi constituída no início dos anos 60 pelos irmãos Albino, Felizardo, Hélio, Irineu, José, Mauro e Terezinha Meneguetti e, ainda, pelo Sr. Alberto Seghese, todos responsáveis por, com grande empenho e capacidade empreendedora, transformarem um pequeno engenho de aguardente localizado no distrito de Iguatemi em produtiva fábrica de açúcar.

6.          No fim dos anos 70 e início da década de 1980, valendo-se de financiamentos obtidos por meio do Programa Nacional do Álcool - PROÁLCOOL, bem assim como da relevância cada vez maior que adquiria no mercado sucroalcooleiro, a empresa deu início a um ambicioso processo de ampliação de seu já existente parque industrial, que, já no fim dos anos 1980, foi implementado também pela aquisição de outras usinas da região – caso das Unidades de Paranacity (1989), Tapejara e Ivaté (1993).

7.          Com o mercado cada vez mais exigente e objetivando aumentar ainda mais sua competitividade, a empresa construiu, nesta comarca de Maringá, seu Terminal Logístico com armazéns graneleiros para açúcar e demais grãos, um terminal de calcário, misturadora de adubos e tanques para estocagem de líquidos (inflamáveis e outros), cujas operações foram iniciadas em 2002, e, no ano de 2003, um terminal rodoferroviário de fertilizantes em



Paranaguá. Em 2007, entrou em operação a unidade de Terra Rica, primeiro *green field* da Requerente Usina Santa Terezinha.

8.           Ainda nos anos 2000, a Usina Santa Terezinha adquiriu mais três unidades, que, somadas ainda às duas usinas anexadas ao grupo nesta década de 2010 (Usina de Açúcar e Álcool Goioerê Ltda. e Costa Bioenergia Ltda.), e ao complexo industrial anteriormente já existente, **geram atualmente 11.000 (onze mil) empregos diretos** e, ainda, lhe garante capacidade de moagem de 21.000.000 (vinte e um milhões) toneladas de cana-de-açúcar/safra, atividade desempenhada sob a seguinte organização societária:





Composição societária: Usina Santa Terezinha

9.           A seriedade, o foco, a ética e o árduo trabalho das Requerentes são características que lhes são reconhecidamente inerentes, tendo

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

ensejado o recebimento de diversos certificados de sustentabilidade[3] emitidos pela VIVE International Account Manager (**doc. 10**).

10.           Foi justamente no contexto do constante desenvolvimento e aprimoramento das atividades das aludidas unidades, aliás, que, ao longo desses quase 60 anos de história, os integrantes da Família Meneguetti também requerentes do presente feito passaram a desenvolver, em imóveis rurais de sua propriedade, o plantio e cultivo da cana-de-açúcar, comercializada diretamente com as usinas ora Requerentes.

11.           Não há dúvida, portanto, de que a atividade empresarial desenvolvida pelos produtores rurais integrantes do pólo ativo desta Recuperação Judicial está íntima e intrínsecamente ligada à evolução e resultados das operações das usinas também requerentes deste feito, sendo, por essa razão e pelos motivos abaixo abordados, absolutamente pertinente a distribuição deste pedido em litisconsórcio ativo.

## LITISCONSÓRCIO ATIVO

12.           Como visto acima, as sociedades e produtores rurais Requerentes operam em absoluta harmonia entre si, e dependem uns dos outros para a continuidade de sua operação. Esse é o motivo, Exa., do ajuizamento do presente Pedido de Recuperação Judicial em litisconsórcio ativo.

---

[3] The Sustainable Supply Programme.

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br   |   E-mail: contato@twk.com.br

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ – Identificador: PJD8F 3EGQZ BWJJ5 6MNFR



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

13.             De fato, embora a Lei de Recuperação de Empresas e Falência não possua previsão expressa a esse respeito, a hipótese de litisconsórcio ativo para casos como o presente já foi bastante debatida pela jurisprudência, sendo hoje ampla e comumente aceita, inclusive por aplicação subsidiária do Código de Processo Civil, conforme autorizado pelo art. 189 da própria Lei nº 11.101/2005:

> RECUPERAÇÃO JUDICIAL. LITISCONSÓRCIO ATIVO. POSSIBILIDADE, DESDE QUE AS EMPRESAS INTEGREM O MESMO GRUPO ECONÔMICO (DE FATO OU DE DIREITO) E ATENDAM AOS REQUISITOS PREVISTOS NA LEI Nº 11.101/2005. MANIFESTA RELAÇÃO DE CONTROLE E DEPENDÊNCIA ENTRE AS EMPRESAS. ENTENDIMENTO DOUTRINÁRIO E JURISPRUDENCIAL. PRESSUPOSTOS ATENDIDOS. RECURSO NÃO PROVIDO.
> (...)
> Por outras palavras, está suficientemente demonstrado (mov. 1.1 e mov. 11.041.1) que as razões da crise da Agravada Seara interferem e afetam diretamente as atividades das demais empresas do grupo e o resultado da
> Recuperação Judicial em curso. (...) Passados alguns meses do ajuizamento da ação, a crise de todas as Recuperandas tornou-se clarividente e está retratada, em detalhes, nos diversos Relatórios Mensais de Atividades - RMA juntados nos autos de origem. Assim, apesar de não individualizada por empresa, em relação a todas foi atendido o pressuposto inserido no inciso I do art. 51, da lei de regência, de modo que, reconhecido o grupo econômico de fato e configurada a crise de todas as empresas, cabível o litisconsórcio ativo.



THOMAZ BASTOS
WAISBERG
KURZWEIL

ADVOGADOS

(TJPR. Agravo de instrumento nº 0044339-33.2017.8.16.0000; Rel. Des. Vitor Roberto Silva; 18ª Câmara Cível; J: 8/8/2018)[4]

14.        A verdade é que o caso dos autos se enquadra perfeitamente nas hipóteses do art. 113 do CPC[5]: entre os Requerentes não só há "*comunhão de direitos ou de obrigações relativamente à lide*" (inciso I) como também ocorre "*afinidade de questões por ponto comum de fato ou de direito*" (inciso III), na medida em que há garantias cruzadas prestadas pelas partes requerentes, e, ainda, os Requerentes **(i)** integram, conforme acima, o mesmo

---

[4] Também nesse sentido:
AGRAVO DE INSTRUMENTO. RECUPERAÇÃO JUDICIAL. REQUISITOS DO ART. 51 DA LEI Nº 11.101/2005. DEVIDA DEMONSTRAÇÃO DA CRISE ECONÔMICO-FINANCEIRA DAS EMPRESAS DO GRUPO. CONFIGURAÇÃO DE LITISCONSÓRCIO ATIVO. FORMAÇÃO DE GRUPO ECONÔMICO DE FATO. A DOUTRINA E JURISPRUDÊNCIA ACATAM A FORMAÇÃO DO LITISCONSÓRCIO ATIVO NA RECUPERAÇÃO JUDICIAL, A DESPEITO DA AUSÊNCIA DE PREVISÃO NA LEI Nº 11.101/2005, QUANDO SE TRATAM DE EMPRESAS QUE INTEGRAM UM MESMO GRUPO ECONÔMICO (DE FATO OU DE DIREITO). PEDIDO ALTERNATIVO PARA A ELABORAÇÃO DE UM PLANO DE RECUPERAÇÃO JUDICIAL PARA CADA EMPRESA. ANÁLISE DO CASO CONCRETO QUE MOSTRA SER MAIS ADEQUADA A APRESENTAÇÃO DE UM ÚNICO PLANO. RECURSO NÃO PROVIDO. 1 Substituindo Desº. Vitor Roberto Silva.
(...)
Ultrapassado este ponto e passando à análise do caso concreto, constata-se que é possível a formação de litisconsórcio ativo entre as empresas agravadas, na medida em que, ao contrário do que afirma o agravante, o laudo elaborado pelo perito concluiu expressamente pela situação de crise da Seara ou do grupo, isto é, o técnico não se opôs ao litisconsórcio, na medida em que concluiu pela demonstração da crise em relação à Seara ou ao grupo econômico, uma vez que se constatou a existência de dependência econômica entre a Seara e demais requerentes, e que o funcionamento de uma depende diretamente do funcionamento das outras.
(...)
Assim, sendo a Seara responsável por 99% do faturamento de todas as empresas do grupo e considerando que passa por situação de crise, é de concluir que tal fato inevitavelmente afetará todas as demais empresas, tendo em vista e inegável dependência mútua entre elas, não havendo que se falar em ausência de demonstração de crise.
Nesse contexto, esta relatora corrobora do entendimento do i. juíza singular, que asseverou que "(...) a retirada das demais requerentes prejudicaria sobremaneira os pequenos credores, em sua maioria credores da SEARA, enquanto privilegiaria poucos grandes credores, que teriam seus créditos garantidos pelo patrimônio das demais requerentes, em detrimento da continuidade da atividade empresarial de todo o grupo econômico".
Dessa forma, se o litisconsórcio ativo atende à finalidade última da recuperação judicial, precipuamente a superação da crise-econômico financeira das empresas, o seu deferimento é medida que se impõe.
(TJPR. Agravo de instrumento nº 0001627-91.2018.8.16.0000; Rel. Juíza Subst. 2º Grau Denise Antunes; 18ª Câmara Cível; J: 5/7/2018)
[5] Art. 113. Duas ou mais pessoas podem litigar, no mesmo processo, em conjunto, ativa ou passivamente, quando:
I - entre elas houver comunhão de direitos ou de obrigações relativamente à lide;
II - entre as causas houver conexão pelo pedido ou pela causa de pedir;
III - ocorrer afinidade de questões por ponto comum de fato ou de direito.

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



grupo empresarial; e **(ii)** atuam no mesmo ramo de atividade ou, no limite, em atividades complementares, de maneira harmônica, conjunta, e interdependente.

15.                    É inegável, pois, que o processamento do presente pedido de recuperação judicial em litisconsórcio ativo é medida imprescindível para assegurar o almejado soerguimento: somente uma solução global pode resolver a situação de crise atualmente por elas enfrentada, de modo a assegurar a continuidade de suas atividades e o cumprimento de sua função social.

## POSSIBILIDADE DO PROCESSAMENTO DE RECUPERAÇÃO JUDICIAL DE PRODUTORES RURAIS

16.                    Sabe-se que, nos termos do art. 47 da Lei nº 11.101/2005, o objetivo precípuo da recuperação judicial é *"viabilizar a superação da situação de crise econômico-financeira do **devedor**"* (grifamos), e, com isso, *"permitir a manutenção da fonte produtora, do emprego dos trabalhadores e dos interesses dos credores, promovendo, assim, a preservação da empresa, sua função social e o estímulo à atividade econômica"*.

17.                    Igualmente sabido é que, nos termos do art. 1º daquela mesma legislação, serão entendidos como **devedor** cujos processos de falência, recuperação extrajudicial e recuperação judicial serão por ela disciplinados não apenas a *"sociedade empresária"*, mas, também, o *"**empresário**"* (grifamos).

18.                    Pois bem.

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EGQZ BWJJ5 6MNFR

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



**THOMAZ BASTOS
WAISBERG
KURZWEIL**

ADVOGADOS

19.              O art. 966 do Código Civil estabelece que
"*[c]onsidera-se **empresário** quem exerce profissionalmente atividade
econômica organizada para a produção ou a circulação de bens ou de
serviços*", sendo certo que os dispositivos seguintes (arts. 967 a 969) preveem e
regulam as formalidades registrárias que, em circunstâncias normais, **são
indispensáveis** ao reconhecimento de tal caracterização.

20.              A ressalva, aplicável ao caso dos Requerentes
produtores rurais deste pedido de Recuperação Judicial, é feita pelo art. 971 do
mesmo Código Civil, de acordo com o qual

> "*[o] **empresário**, cuja atividade rural constitua sua
> principal profissão, **pode**, observadas as formalidades
> de que tratam o art. 968 e seus parágrafos, requerer
> inscrição no Registro Público de Empresas Mercantis
> da respectiva sede, caso em que, depois de inscrito,
> ficará equiparado, para todos os efeitos, ao
> empresário sujeito a registro*" (destacamos).

21.              Veja-se: ao contrário do que ocorre com os demais
empresários, o pequeno empresário e o empresário rural têm "*tratamento
favorecido, diferenciado e simplificado (...) quanto à inscrição e aos efeitos daí
decorrentes*" assegurado por lei[6].

22.              Daí decorre o fato de que, embora **possa** se inscrever
no Registro Público de Empresas Mercantis – *i.e.* na Junta Comercial – o
empresário rural **não tem a regularidade de sua atividade condicionada à**

---

[6] Art. 970 do Código Civil.



**aludida inscrição**. É dizer: o empresário rural é e deve ser considerado **empresário** regular mesmo sem o (facultativo, como se viu) registro na Junta Comercial – caso dos Requerentes Produtores Rurais

23.	Voltando à Lei nº 11.101/2005, é cediço que pode requerer recuperação judicial o **devedor** que, além de atender a todos os requisitos previstos nos incisos do art. 48 da LRF, "*exerça regularmente suas atividades há mais de 2 (dois) anos*", consoante exigido pelo *caput* do mesmo dispositivo legal.

24.	Ocorre que, como visto acima, para o caso do empresário rural a comprovação do regular exercício da atividade não se dá apenas por meio da demonstração da inscrição por todo o referido período.

25.	A esse respeito, os E. **Tribunais de Justiça dos Estados do Paraná** e São Paulo já formularam seu entendimento no sentido de que basta a comprovação do efetivo e contínuo exercício da atividade profissional por tal prazo. Vejamos:

> "A respeito do requisito objetivo indicado no caput do artigo 48 da Lei nº 11.101/2005, no sentido de que "poderá requerer recuperação judicial o devedor que, no momento do pedido, exerça regularmente suas atividades há mais de 2 (dois) anos", não há dúvidas de que sua comprovação, tratando-se de empresário, se dá pelo registro na respectiva Junta Comercial, inclusive por expressa disposição legal (artigo 967 do Código Civil), circunstância, que, a priori, não foge ao produtor rural que pretenda obter os benefícios da recuperação judicial de sua atividade empresarial, não

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



THOMAZ BASTOS
WAISBERG
KURZWEIL

ADVOGADOS

havendo dúvidas de que o registro da atividade empresarial realizada pelo produtor rural lhe é facultativo, nos termos do artigo 971 do Código Civil, cabendo ao interessado optar, portanto, se mantém a informalidade de sua atividade ou se passa ao regime empresarial com todos seus benefícios e deveres inerentes.

(...)

Nesse ponto, observo que o Enunciado nº 198, citado pelos agravantes e oriundo da mesma Jornada de Direito Civil, não entra em conflito com este, vez que aquele trata do empresário irregular, situação diversa do produtor rural, que por lhe ser facultativo não é considerado empresário irregular caso não leve à registro sua atividade empresarial. E **exatamente por ser uma opção do produtor rural é que a circunstância em tela merece maior atenção ao aplicador do Direito, sob o risco de proporcionar um desvirtuamento da Lei prestigiando o empresário rural com os benefícios da recuperação judicial sem que este tenha cumprido com os deveres inerentes ao empresário regular, como exemplo e de maior importância para a recuperação judicial, àqueles referentes à administração e contabilidade da atividade empresária, com a manutenção do registro de seu livro caixa e balançantes financeiros**.

(...)

**A Lei de Recuperação e Falências, ao exigir a comprovação do exercício regular da atividade, mesmo pelo produtor rural, não estabelece como condição, a comprovação da existência de registro por mais de dois anos, mas tão somente do exercício da atividade, por essa razão realmente deve-se concluir no sentido de que o registro na Junta Comercial, não tem o efeito de constituir a empresa do produtor rural, mas sim o exercício da atividade em conformidade com a previsão contida no art. 4º, VI, do Estatuto da Terra, em consonância com a**

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

**norma do art. 971/CC**." (TJPR. Decisão monocrática proferida nos autos do agravo de instrumento nº 0001366-92.2019.8.16.0000; Rel. Juiz Subst. 2º grau Francisco Jorge; J: 27/1/2019)[7]

"Ainda, com relação à inclusão do produtor rural no polo ativo da relação jurídica, registro que a medida é autorizada pela Lei nº 11.101/2005. A princípio, segundo a legislação civil, tal pedido demanda a inscrição na Junta Comercial, hipótese em que o produtor rural é equiparado ao empresário (art. 971, CC3). **No entanto, ao contrário da exigência direcionada aos empresários, o registro do produtor rural não precisa ter sido feito pelo menos 02 anos antes, bastando a observância do disposto no artigo 48, §2º da lei de regência, que assim dispõe: "Tratando-se de exercício de atividade rural por pessoa jurídica, admite-se a comprovação do prazo estabelecido no caput deste artigo por meio da Declaração de Informações Econômico-fiscais da Pessoa Jurídica - DIPJ que tenha sido entregue tempestivamente**". (Decisão monocrática proferida em 14/2/2019 nos autos do Agravo de Instrumento nº 4450-04.2019.8.16.0000; Rel. Des. Lauri Caetano da Silva)

"Agravo de instrumento. Recuperação judicial de empresários produtores rurais. Natureza declaratória do registro dos produtores rurais na JUCESP reconhecida. Art. 971 do CC. Aplicação da teoria da

_____

[7] No mesmo sentido: "O art. 48 da Lei nº 11.101/2005 exige que o devedor, no momento do pedido de Recuperação Judicial, exerça regularmente as suas atividades há mais de 2 (dois) anos, no entanto, nada dispõe sobre a necessidade de registro na Junta Comercial por igual período. No presente caso, nota-se que os agravados exercem a atividade de produtores rurais há mais de 30 (trinta) anos, ainda que sem registro na Junta Comercial (mov. 1.12 e 1.13). Portanto, **em que pese os agravados terem procedido as suas inscrições na Junta Comercial do Estado do Paraná poucos dias antes do ajuizamento da Recuperação Judicial, considerando que os agravados exercem as suas atividades há mais de 2 (dois) anos, não há óbice para processamento da Recuperação Judicial**". (TJPR. Decisão liminar proferida nos autos do Agravo de Instrumento nº 0001247-34.2019.8.16.0000; Rel. Des. Ramon de Medeiros Nogueira; 1ª Câmara Cível; J: 25/1/2019)



empresa. Conceito jurídico de empresário determinado pelo efetivo exercício de atividade econômica organizada para a produção ou circulação de bens ou serviços, nos termos do art. 966, caput, do CC. **Art. 48, caput, da LRF que apenas exige que o empresário que pleiteia a recuperação judicial exerça suas atividades há mais de dois anos, nada dispondo sobre a necessidade de registro na Junta Comercial por igual período. Processamento da recuperação que depende apenas da verificação formal dos requisitos objetivos dos arts. 48 e 51 da LRF**. Análise da natureza do crédito dos agravantes que não foi objeto da decisão recorrida. Matéria que deve ser discutida por meio dos incidentes próprios (divergência/impugnação de crédito). Recurso improvido.

(...)

**Fábio Ulhoa Coelho anota que o produtor rural está dispensado de requerer a sua inscrição no registro das empresas, mas pode fazê-lo. Se optar por se registrar na Junta Comercial, será considerado empresário e submeter-se-á ao regime correspondente**. Neste caso, deve manter a escrituração regular, levantar balanços periódicos e pode falir ou requerer a recuperação judicial. Sujeita-se, também, às sanções da irregularidade no cumprimento das obrigações gerais dos empresários (Curso de Direito Comercial: Direito de Empresa, v. 1, 16ª ed., 2012, Saraiva, p. 136)". (TJSP. Agravo de instrumento nº 2162126-36.2018.8.26.0000; Rel. Des. Hamid Bdine; 1ª Câmara Reservada de Direito Empresarial; J: 9/11/2018)[8]

"Recuperação judicial. **Requerimento por produtores rurais em atividade por prazo superior àquele de 2 (dois) anos exigido pelo artigo 48,**

---

[8] No mesmo sentido: TJSP. Agravo de instrumento nº 2062908-35.2018.8.26.0000; Rel. Des. Hamid Bdine; 1ª Câmara Reservada de Direito Empresarial; J: 4/7/2018.

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3ECQ2Z BWJJ5 6MNFR



> **caput, da Lei nº 11.101/2005, integrantes de grupo
> econômico na condição de empresários individuais
> respaldados pelos artigos 966 e 971 do Código Civil
> e/ou de sócios das sociedades coautoras**.
> Legitimidade reconhecida. Irrelevância da alegada
> proximidade entre as datas de ajuizamento do feito e
> das prévias inscrições dos produtores rurais como
> empresários individuais na Junta Comercial do Estado
> de São Paulo. **Firme entendimento jurisprudencial
> no sentido de que a regularidade da atividade
> empresarial pelo biênio mínimo estabelecido no
> supramencionado dispositivo legal deve ser aferida
> pela constatação da manutenção e continuidade de
> seu exercício, e não a partir da prova da existência
> de registro do empresário ou ente empresarial por
> aquele lapso temporal**. Manutenção do deferimento
> do processamento da demanda. Agravo de instrumento
> desprovido." (TJSP. Agravo de Instrumento nº
> 2037064-59.2013.8.26.0000, Rel. Des. José Reynaldo;
> 2ª Câmara Reservada de Direito Empresarial; j.
> 22/9/2014)

26.        Não poderia mesmo ser diferente, pois o § 2º do art. 48 da LRF admite, para a comprovação do biênio previsto no caput do mesmo dispositivo legal, que outros documentos sejam apresentados pela pessoa jurídica que exerce atividade rural, não havendo por que não o sê-lo também para a pessoa física que exerce atividade rural, o dito "produtor rural", como no caso em tela.

27.        Outrossim, o art. 51 da LRF dispõe que a petição inicial do pedido de recuperação judicial deve ser instruída, dentre outros documentos, com a *"certidão de regularidade do devedor no Registro Público*

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3ECQZ BWJJ5 6MNFR



*de Empresas, o ato constitutivo atualizado e as atas de nomeação dos atuais administradores"*, tal como se lê do inciso V.

28.　　　　　　　Todavia, se o empresário rural **não** está obrigado a se inscrever no Registro Público de Empresas para exercer regularmente sua atividade, referido documento não seria, em tese, exigido para a instrução da petição inicial do pedido de recuperação judicial, posto que absolutamente inaplicável.

29.　　　　　　　Ainda que assim não fosse, o fato é que o registro do empresário individual que exerce atividade rural na Junta Comercial poderia ser reputado, quando muito, como de **natureza declaratória**, mas nunca como de natureza constitutiva, em consonância com os recentes julgados do C. Superior Tribunal de Justiça e do eg. TJSP colacionados acima, mas desde que a inscrição seja realizada antes do pedido de recuperação judicial.

30.　　　　　　　Nessa linha, o Professor Alfredo de Assis Gonçalves Neto[9] entendeu que

> "se dita inscrição é indispensável para a instauração da recuperação judicial (tanto da sociedade como do produtor rurais), o exercício regular de suas atividades pelo período mínimo de dois anos é uma situação de fato, suscetível de ser demonstrada por um meio de prova induvidoso, sem qualquer vinculação com a data de sua inscrição no álbum do empresário
> (...) o produtor rural inscrito no Registro Público de Empresas Mercantis torna-se empresário e, como tal,

---

[9] Gonçalves Neto, Alfredo de Assis. *Direito Comercial: pareceres*. São Paulo: Lex, 2019; p. 66/68.

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EÇQZ BWJJ5 6MNFR

submete-se às disposições que compõe o denominado direito de empresa. Como empresário, é-lhe franqueado o instituto da recuperação judicial de que trata a Lei 11.101/2005. Uma vez insolvente, esse empresário pode pleitear tal medida, desde que prove exercer regularmente suas atividades por um mínimo de dois anos, computados desde o momento em que as iniciou, independentemente da data em que for obtida sua inscrição no mencionado Registro".[10]

31.          Cite-se, ainda, parecer apresentado nos autos da recuperação judicial requerida por José Pupin Agropecuária e Vera Lúcia Camargo Pupin, em que o Prof. Fabio Ulhoa Coelho[11] com muita propriedade consignou:

"5. Produtor rural pessoa física inscrito na Junta Comercial alguns dias antes de requerer a recuperação

---

[10] No mesmo sentido, o parecer elaborado por Bruno de Oliveira Castro para o fim de ser apresentada nos autos da recuperação judicial autuada sob n° 0003205-55.2018.8.16.0076 (em trâmite perante a Vara Cível de Coronel Vivida) para o fim de analisar a viabilidade da recuperação judicial do produtor rural: "(...) aos produtores rurais, por tratar de mera faculdade, o registro no órgão competente possui natureza jurídica declaratória, sendo possível permitir o acesso ao instituto recuperacional imediatamente após o arquivamento do ato constitutivo na Junta Comercial, ainda que não tenha os 02 anos de atividade regular exigido no caput do art. 48 da lei 11.101/2005. Aliás, um dos requisitos previstos pelo art. 48 da supracitada lei é justamente a comprovação de exercício da atividade há mais de 02 (dois) anos, sendo que para os empresários em geral, por ter natureza constitutiva, coincide com o tempo de registro dos atos constitutivos na Junta Comercial competente, divergindo, portanto, das particularidades dos produtores rurais. Concluímos que a natureza de inscrição do produtor rural é meramente declaratória, não possuindo função de constituição de empresa, diante da faculdade ofertada pelo Código Civil. (...) **É perfeitamente possível ao produtor rural requerer a Recuperação Judicial ainda que não tenha os 02 anos de registro na Junta Comercial, bastando, para isso que o produtor rural efetive seu registro na Junta Comercial para que fique comparado ao empresário para todos os efeitos. Frise que o registro na Junta Comercial tem o condão de apenas mudar o status da atividade, de civil para empresarial**"

[11] E ainda, nos mesmos autos, Manoel Justino Bezerra Filho: "(...) **a única conclusão a que se pode chegar é que o artigo 48 exige a comprovação de atividade regular "*há mais de (2) anos*", não exigindo em momento algum a comprovação de atividade de sociedade empresária há mais de dois anos. Dito de outra forma, se o exercício da atividade anterior por mais de dois anos era irregular (e não existe qualquer irregularidade na atividade que José Pupin e sua mulher exerceram durante mais de vinte e cinco anos) e se o artigo 971 permite a transformação do empresário rural em empresário equiparado à sociedade empresária pelo simples registro, não pode o intérprete exigir mais do que a lei exige**. Dito de forma mais sintética ainda: se o exercício da atividade anterior era irregular, o período deste exercício não pode ser somado para completar os dois anos: ao contrário, se o exercício da atividade era regular, o período pode ser somado para que se completem os dois anos".



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

> judicial, mas que comprova, por documentos fiscais, o exercício da atividade há mais de dois anos, tem direito à recuperação judicial?
>
> Sim; aliás, **o produtor rural pessoa física tem direito à recuperação judicial, mesmo que tenha providenciado o seu registro na Junta Comercial exclusivamente para preencher o requisito relacionado à empresarialidade da atividade econômica em crise.**
> **A LRE não preceitua um prazo mínimo de existência do registro na Junta Comercial para admitir a recuperação judicial pelo produtor rural. Não havendo prazo mínimo, qualquer que tenha sido a época da inscrição, desde que anterior ao pedido, o requisito da empresarialidade da atividade estará plenamente atendido.**"

32.          No mesmo sentido, o Enunciado 198 da III Jornada de Direito Civil:

> "A inscrição do empresário na Junta Comercial não é requisito para a sua caracterização, admitindo-se o exercício da empresa sem tal providência. O empresário irregular reúne os requisitos do art. 966, sujeitando-se às normas do Código Civil e da legislação comercial, salvo naquilo em que forem incompatíveis com a sua condição ou diante de expressa disposição em contrário".

33.          Conclui-se, portanto, que o produtor rural pode requerer recuperação judicial desde que comprove o exercício de sua atividade há mais de 2 (dois) anos, ainda que não esteja inscrito no Registro Público de Empresas por tal prazo – atendendo, assim, ao caput do art. 48 da LRF.



**THOMAZ BASTOS**
**WAISBERG**
**KURZWEIL**
ADVOGADOS

34.　　　　　　Não bastasse isso, observe-se que os produtores rurais pessoas físicas figuram em quase todos os contratos celebrados pelos demais Requerentes, com instituições financeiras e/ou fornecedores, seja como avalistas e responsáveis solidários, seja, ainda, até mesmo como devedores principais, o que basta para a comprovação de que também exercem atividade rural e cumprem o requisito legal para figurar no polo ativo deste pedido de recuperação judicial.

35.　　　　　　De fato, as dívidas em nome dos produtores rurais são todas intrinsicamente ligadas à atividade das empresas Requerentes, envolvendo-se no dia-a-dia das empresas, inclusive garantindo em nome próprio operações dos Requerentes.

36.　　　　　　Ou seja, os produtores rurais não figuraram nas avenças como meros "intervenientes", mas sim como principais pagadores dos recursos fomentadores do negócio. Ora, Exa., as próprias instituições financeiras os viram como empresários rurais e peças-chave da atividade empresarial, exigindo deles, para a disponibilização dos recursos, a efetiva assunção das dívidas, como principais pagadores das operações.

37.　　　　　　Assim sendo, diante não só da possibilidade de ajuizamento de pedido de recuperação judicial por produtor rural como também do atendimento aos requisitos para tanto, previstos especialmente nos arts. 48, *caput*, e 51, inciso V, da Lei 11.101/2005, bem se vê que não há qualquer óbice que os produtores rurais possam impetrar o presente Pedido de Recuperação Judicial.



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

## AS PRINCIPAIS RAZÕES DA CRISE ECONÔMICO-FINANCEIRA ENFRENTADA PELOS REQUERENTES E A NECESSIDADE DESTE PEDIDO DE RECUPERAÇÃO JUDICIAL

38.           Em atenção ao quanto previsto pelo art. 51 da LRF, é imperioso esclarecer as razões da crise econômico-financeira que se abateu sobre as atividades dos Requerentes, vítimas da volatilidade econômica e mercadológica que tem assolado o país nos últimos anos.

39.           Como se sabe, o setor sucroalcooleiro brasileiro passou (e ainda passa) por gravíssima crise de crédito que se iniciou em 2007[12], quando grande parte das empresas do setor, pressionada por preços e necessidade de caixa, foi obrigada a vender seus estoques abaixo do custo de produção na maior parte da safra, o que fez com que muitas usinas tivessem resultado operacional negativo.

---

[12] "*Muitas empresas brasileiras de açúcar e etanol ainda passam por uma situação financeira difícil, uma vez que grandes dívidas limitam investimentos que poderiam melhorar sua renda, disseram usinas e consultorias nesta segunda-feira (24).(...), a maioria das empresas de médio porte assumiu mais dívida ao longo dos últimos anos e estão tendo dificuldades para processar mais cana, disseram especialistas durante o seminário internacional de açúcar da F.O. Licht em São Paulo*" (Disponível em https://www.novacana.com/n/industria/financeiro/maioria-usinas-brasileiras-cana-enfrentam-dificuldades-financeiras-240417 - Acesso em 14/2/2019)
"*O setor realmente vem passando por dificuldades. Conforme informações da União da Indústria de Cana de Açúcar (Unica), 80 usinas fecharam as portas na região Centro-Sul do país desde 2008. Em 2015, outras dez sem condições financeiras ainda podem fechar.*" (Disponível em http://www.otempo.com.br/capa/economia/uma-das-maiores-do-mundo-no-setor-de-cana-quebra-1.1097344 - Acesso em 14/2/2019).



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

40.                  Nesse (já combalido) contexto, em 2008 o mercado de crédito foi drasticamente afetado pela crise financeira mundial e, em 2011, pela política de represamento do preço da gasolina pelo Governo Federal, as quais comprometeram a saúde financeira do setor mediante a queda da rentabilidade e o aumento das despesas financeiras, de forma que resultados líquidos negativos se tornaram recorrentes, o que comprometeu a geração de caixa operacional das empresas, cujas necessidades foram supridas majoritariamente por novos empréstimos a juros cada vez mais altos.

41.                  É certo, ainda, que a partir do ano de 2010 as safras não só foram prejudicadas por questões climáticas adversas – graves secas na região, o que demandou maiores investimentos para manutenção da produtividade do canavial –, como também continuaram amargando o achatamento do preço final em razão da política de preços da gasolina.

42.                  Lembre-se: com o avanço da inflação, a partir de 2011, o Governo Federal adotou diversas medidas de contenção dos preços de distribuição da gasolina – medidas artificiais – praticados pela Petrobras, mantendo-o em patamar extremamente baixo se comparado aos preços internacionais.

43.                  Isso teve um único significado para o setor: a conta, por muito tempo, não fechou. O preço final de venda não está relacionado aos custos do produto, mas sim ao preço da gasolina que foi controlado politicamente pelo governo. Assim, apenas sobrevivem aquelas empresas que estão mais capitalizadas para suportar os períodos de preço baixo. Ao contrário

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



do que se pode pensar, a saúde das usinas de etanol e açúcar não está exclusivamente ligada à capacidade gerencial ou à performance produtiva.

44.           O panorama acima, somado à necessidade de grandes investimentos necessários ao cultivo e manutenção do canavial, fez com que os Requerentes se sujeitassem a necessidade de se alavancar cada vez mais, em um mercado de altas taxas de juros e sujeito a variações cambiais que desequilibram assustadoramente os resultados.

45.           Desse modo, é evidente que o excesso de endividamento, perda de rentabilidade do etanol, o que, ao longo de anos se traduz em queda na produtividade das lavouras e a redução de moagem expuseram o setor sucroalcooleiro a uma situação de excesso de capacidade ociosa, elevando os custos operacionais e redundando em baixa lucratividade, de modo que prejuízos recorrentes comprometeram a capacidade dos Requerentes de honrar seus compromissos financeiros conforme originalmente pactuados.

46.           E, para piorar, o preço do açúcar caiu de forma intensa nas últimas safras, em especial na Safra 2018, quando atingiu os menores preços em dez anos[13], comprometendo significativamente a margem de lucro das usinas e, consequentemente, dos Requerentes que dependem substancialmente do mercado externo de tal commodity em seu faturamento.

---

[13]           http://www.udop.com.br/index.php?item=noticias&cod=1160137                    e
https://canalrural.uol.com.br/noticias/agricultura/cana/retrospectiva-mercado-de-acucar-atinge-minimas-de-dez-anos-em-2018/



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

47.            Vale destacar, em relação ao mercado internacional e açúcar, recentemente o Brasil e a Austrália formalizaram consulta à Organização Mundial do Comércio (OMC) quanto ao subsídio conferido à Índia ao açúcar[14], situação que afetou – e tem afetado – negativamente todo o mercado mundial e, nesse contexto, as Requerentes.

48.            Some-se a todo o contexto macroeconômico acima, a lamentável postura adotada pelo Banco Votorantim S.A. – abordada a seguir –, e pronto: há uma circunstancial, porém severa, crise financeira a ser superada.

49.            Não há dúvidas, no entanto, de que as políticas públicas recentemente adotadas pelo país – queda na taxa de juros, câmbio favorável às empresas exportadoras e a mudança na política de preços da gasolina, com a entrada de nova gestão na Petrobras – denotam uma perspectiva otimista para o setor sucroalcooleiro – apesar da baixa cotação internacional do açúcar, que, aliadas aos benefícios legais às quais os Requerentes indiscutivelmente fazem jus (entre os quais está o pedido de Recuperação Judicial), certamente viabilizarão uma rápida e suave reestruturação.

**REQUERIMENTO DE RECUPERAÇÃO JUDICIAL – VIABILIDADE
FINANCEIRA E OPERACIONAL DOS REQUERENTES**

---

[14] https://www.valor.com.br/agro/6139087/brasil-denuncia-subsidios-da-india-ao-acucar-na-omc
https://canalrural.uol.com.br/noticias/brasil-recorre-a-omc-por-causa-de-subsidio-da-india-ao-acucar/
https://www.noticiasagricolas.com.br/noticias/sucroenergetico/231025-brasil-e-australia-formalizam-consulta-na-omc-sobre-subsidio-ao-acucar-da-india.html#.XIvmlmdYaJA

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



50.                    Como dito acima, os Requerentes têm total confiança de que a crise de liquidez ora enfrentada é passageira e não deve afetar de modo definitivo a solidez das atividades por elas desenvolvidas.

51.                    Um exemplo claro disso é que os Requerentes já vinham, antes mesmo do ajuizamento do presente pedido, buscando a implementação de abrangente projeto de reestruturação financeira e operacional, com a finalidade de adequar suas operações à situação atualmente enfrentada.

52.                    De fato, a reestruturação amigável e, portanto, extrajudicial que vinha sendo costurada junto aos principais credores dos Requerentes **só não atingiu o êxito que se anunciava em função da absolutamente precipitada distribuição, pelo Banco Votorantim S.A., de 3 (três) milionários processos de execução judicial em face dos Requerentes**[15] e em cujos autos a referida instituição financeira tem insistentemente requerido o deferimento de medidas constritivas – incluindo-se mas não se limitando a penhora *on line* de ativos financeiros, **já deferida em 2 dos processos executivos** (!!!).

53.                    É importante ressaltar desde já, aliás, que não fosse a propositura das aludidas medidas judiciais, o ajuizamento desta Recuperação Judicial provavelmente seria desnecessário.

---

[15] (i) Execução de Título Extrajudicial nº 1007474-35.2019.8.26.0100, em trâmite perante a 19ª Vara Cível do Foro Central de São Paulo/SP; (ii) Execução de Título Extrajudicial nº 1007487-34.2019.8.26.0100, em trâmite perante a 14ª Vara Cível do Foro Regional de Santo Amaro/SP; e (iii) Execução de Título Extrajudicial nº 1008921-61.2019.8.26.0002, em trâmite perante a 9ª Vara Cível do Foro Regional de Santo Amaro/SP.

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br   |   E-mail: contato@twk.com.br

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

54.          De fato, foi num incompreensível e absolutamente intempestivo rompante que o Banco Votorantim notificou as Requerentes para o fim de informar a interrupção das produtivas e amigáveis negociações e conversas que até então vinham sendo mantidas entre todas as partes (devedores e credores financeiros) e, inesperadamente, passou a perseguir, de maneira forçada e unilateral, a satisfação do seu crédito.

55.          A deslealdade do banco não foi suficiente, no entanto, para desviar os Requerentes de sua trajetória de constante preocupação de assegurar a manutenção de suas atividades, como forma de continuar gerando receitas para a continuidade da sua operação e a recuperação da confiança do mercado: é importante dizer que os Requerentes seguem confiantes de que o presente pedido consiste em mais um passo bem-sucedido para sua integral reestruturação.

56.          De toda forma, neste momento não restou alternativa aos Requerentes senão se socorrer do presente pedido de recuperação judicial, não apenas para proteger o seu interesse privado, mas também, e principalmente, para garantir a continuidade de sua atividade empresarial e, por conseguinte, manter os postos de trabalho, produção de bens, geração de riquezas e recolhimento de tributos.

57.          E, neste caso, é cristalina a viabilidade econômica dos Requerentes, que possuem os meios necessários e o *know how* para manter a atividade empresarial e obter lucros justos com sua atividade. Relembre-se que os Requerentes possuem dez unidades operacionais, capazes de moer



THOMAZ BASTOS
WAISBERG
KURZWEIL
ADVOGADOS

aproximadamente 21.000.000 toneladas por safra, bem como um corpo profissional altamente qualificado e experiente no setor, o que faz delas uma das apostas do setor para o futuro do mercado sucroenergético brasileiro.

58.          Repita-se: os Requerentes estão passando por crise **momentânea** e **pontual**, plenamente passível de ser resolvida[16] de modo que é imperioso o deferimento do processamento de sua recuperação judicial.

## PREENCHIMENTO DOS REQUISITOS OBJETIVOS NECESSÁRIOS AO PROCESSAMENTO DA RECUPERAÇÃO

59.          Além de estar claro que os Requerentes preenchem absolutamente todos os requisitos subjetivos previstos pela LRF, nos termos dos arts. 1 e 48 da LRF, preenchem também os requisitos objetivos previstos no art. 51, a fim de que não só possam ajuizar o presente Pedido de Recuperação Judicial como também para que possa ser deferido o seu processamento. Confiram-se abaixo os documentos juntados à presente petição inicial:

| Doc. 1 | Documentos de constituição dos Requerentes, eleição dos administradores e fichas cadastrais demonstrando o exercício das atividades há mais de 2 anos[17] (arts. 1, 48 e 51, inciso V, LRF); |
|--------|----|
| Doc. 2 | |

---

[16] Nos dizeres de Sérgio Campinho, trata-se de uma crise **"episódica"**, que é aquela que geralmente é motivada *"por falta de liquidez momentânea, mas de fácil resolução"* (*ob. cit.*, p. 121).
[17] As Requerentes apresentam nesta oportunidade os comprovantes de protocolo do pedido de registro dos produtores rurais indicados nesta manifestação. Considerando, no entanto, que a inscrição nas respectivas Juntas Comerciais ocorreu às vésperas deste pedido de recuperação judicial – o que é amplamente aceito na jurisprudência e doutrina mais abalizada sobre o tema –, não foi possível apresentar as fichas cadastrais emitidas em nome de cada um dos produtores rurais em razão da ausência de apontamentos nos referidos documentos.

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br    |    E-mail: contato@twk.com.br

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



| | |
|---|---|
| | Procurações outorgadas aos patronos dos Requerentes; |
| **Doc. 3** | Autorizações societárias necessárias ao ajuizamento do presente Pedido de Recuperação Judicial; |
| **Doc. 4** | Certidões de distribuição falimentar, obtidas nos municípios onde estão situadas as sedes dos Requerentes, demonstrando que jamais foram falidas nem obtiveram a concessão de recuperação judicial (art. 48, incisos I, II e III, LRF); |
| **Doc. 5** | Certidões de distribuição criminal, demonstrando que os sócios e administradores[18] dos Requerentes jamais foram condenados por qualquer dos crimes previstos pela Lei 11.101/2005 (art. 48, inciso IV, LRF); |
| **Doc. 6** | Demonstrações contábeis dos Requerentes, compostas pelos balanços patrimoniais, demonstrações de resultados e relatórios de fluxo de caixa dos últimos 3 exercícios sociais e também as que foram extraídas especificamente para o presente pedido de recuperação judicial (art. 51, inciso II, LRF); |
| **Doc. 7** | Relações nominais dos credores dos Requerentes (art. 51, inciso III, LRF); |
| **Doc. 8** | Certidões de protesto extraídas nas comarcas das sedes e filiais dos Requerentes (art. 51, inciso VIII, LRF); e |
| **Doc. 9** | Relações subscritas das ações em que os Requerentes figuram como parte (art. 51, inciso IX, LRF). |

---

[18] As Requerentes informam que, em razão de seu falecimento, deixam de apresentar nesta oportunidade os documentos relacionados ao administrador **ALOISIO MENEGUETTI**.

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br | E-mail: contato@twk.com.br

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

60.              No que tange aos demais documentos exigidos pelo art. 51 da LRF, quais sejam a relação de funcionários (inciso IV), as relações de bens de seus administradores, bem como os extratos bancários de todas as contas-corrente e aplicações financeiras relativos aos últimos 3 (três) meses (incisos VI e VII), os Requerentes informam que, ante o teor e a relevância das informações neles prestadas – informações pessoais dos representantes e empregados dos Requerentes –, serão apresentadas em petição apartada a ser protocolada na sequência deste pedido inicial, com pedido de sigilo de tais documentos e informações[19].

61.              Por fim, importante esclarecer e destacar que, sempre considerando a urgência no ajuizamento dessa Recuperação Judicial e dado o momento de crise das Requerentes, os documentos constantes da lista ora juntada (**doc. 11**) estão sendo providenciados e serão juntados a esses autos com a maior brevidade possível, protestando-se, desde já, pela sua posterior juntada nestes autos.

---

[19] Tal pedido de sigilo já foi diversas vezes deferido em outros casos de Recuperação Judicial:
"Entretanto, o acesso irrestrito a essa informação, por qualquer pessoa, pode colocar em risco o direito à intimidade, ao sigilo fiscal e à vida privada dos trabalhadores incluídos na referida relação, já que tal documento contém dados pessoais e que poderiam expor essas pessoas desnecessariamente. Nesse sentido, determino que a relação de fls. 2195/2282 seja autuada em apartado, em incidente próprio, e seja mantida sob segredo de Justiça." (Recuperação Judicial nº 1030812-77.2015.8.26.0100, em trâmite junto à 1ª Vara de Falências e Recuperações Judiciais de São Paulo/SP).
"Determino que se observe o sigilo fiscal referente às declarações de imposto de renda dos bens particulares dos sócios, em cumprimento ao disposto no art. 51, VI, da LRE, devendo tal documentação ficar acautelada em Cartório, sob segredo de justiça, somente permitindo-se acesso a ela ao Administrador Judicial e ao Ministério Público." (Recuperação Judicial nº 0000078-34.2015.8.08.0013, em trâmite junto à 1ª Vara Cível de Castelo/ES)

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br   |   E-mail: contato@twk.com.br

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

## NECESSÁRIA CONCESSÃO DE TUTELA DE URGÊNCIA

62.          Como visto, os Requerentes desempenham importante papel, principalmente na economia do noroeste do Estado do Paraná, com a geração de empregos diretos e indiretos que movimentam a economia regional.

63.          Toda essa riqueza econômica e social corre o risco de desaparecer caso os Requerentes tenham que honrar imediatamente com as obrigações que assumiu e que estavam renegociando, de boa-fé junto aos credores financeiros, num momento em que necessitam de seus bens e capital para gerar recursos para o pagamento dos credores.

64.          Assim, apesar da previsão expressa disposta no *caput* do art. 6º da LRF, que dispõe que o deferimento do processamento da recuperação judicial de uma empresa *"suspende o curso da prescrição e de todas as ações e execuções em face do devedor, inclusive aquelas dos credores particulares do sócio solidário"*, é certo que a apreciação definitiva do pedido recuperacional e seu respectivo deferimento só terá lugar após a análise de toda a documentação[20] a ele acostada.

65.          No entanto, os Requerentes necessitam que este MM. Juízo determine a **imediata** suspensão de todas ações e execuções atualmente em trâmite, bem como a abstenção pelos credores da prática de qualquer ato que

---

[20] Em razão do grande volume de informações e documentos dos 29 (vinte e nove) requerentes que devem acompanhar o presente pedido de recuperação judicial, informa-se que os documentos pendentes estão sendo providenciados e serão juntados a esses autos com a maior brevidade possível, protestando-se, desde já, pela sua posterior juntada.

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br   |   E-mail: contato@twk.com.br

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

vise diminuir o patrimônio dos Requerentes, em especial as execuções já distribuídas.

66.                    Como já dito, os Requerentes foram surpreendidos com a inesperada proposição de 3 (três) Execuções de Título Extrajudicial[21] cujos valores, somados, supera R$ 155 milhões, e em cujos autos a referida instituição financeira tem insistentemente requerido o deferimento de medidas constritivas – incluindo-se mas não se limitando a penhora *online* de ativos financeiros.

67.                    Ora, Excelência, não parecem necessárias grandes digressões para se concluir quais e quantas seriam as catastróficas consequências do eventual deferimento dos requeridos bloqueios multimilionários nas contas de empresas que, sabidamente, enfrentam circunstancial crise econômico-financeira – daí a razão pela qual entraram em negociação com seus credores financeiros.

68.                    Vale ressaltar, também, que até o momento as Requerentes se esforçaram e conseguiram manter em dia o pagamento da folha de salário dos colaboradores no valor de aproximadamente R$ 24.000.000,00 (vinte e quatro milhões), as obrigações previdenciárias, além dos fornecedores de bens e serviços e as obrigações fiscais.

---

[21] **(i)** Execução de Título Extrajudicial nº 1007474-35.2019.8.26.0100, em trâmite perante a 19ª Vara Cível do Foro Central de São Paulo/SP; **(ii)** Execução de Título Extrajudicial nº 1007487-34.2019.8.26.0100, em trâmite perante a 14ª Vara Cível do Foro Regional de Santo Amaro/SP; e **(iii)** Execução de Título Extrajudicial nº 1008921-61.2019.8.26.0002, em trâmite perante a 9ª Vara Cível do Foro Regional de Santo Amaro/SP.

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR



Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ – Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

69.　　　　　　　O caso é que, para além de potencialmente inviabilizar o pagamento dos salários de seus empregados, dos insumos utilizados no cultivo da cana-de-açúcar e no preparo/produção do açúcar VHP e do etanol, e dos valores devidos a parceiros e fornecedores – o que, por si só, já representaria desrespeito ao princípio da preservação das atividades empresariais de que trata o art. 47 da LRF – as Execuções do Banco Votorantim S.A. e os bloqueios nelas requeridos – alguns inclusive já realizados – podem, como decorrência do acima exposto, comprometer gravemente a confiança das demais instituições financeiras credores de que os Requerentes seria capazes de cumprir as obrigações que pretendem assumir pelo seu PRE.

70.　　　　　　　É de se destacar, ainda, que a Usina Requerente encontra-se em início de Safra, ou seja, as plantas industriais estão iniciando as atividades de moagem da cana-de-açúcar para produção de açúcar, etanol e energia elétrica para geração de caixa. Neste momento, as provisões financeiras para a passagem da entressafra – período em que todos os equipamentos dos parques industriais e equipamentos agrícolas passam por manutenções – estão se esgotando. E assim, especialmente nesse período crítico, mostra-se extremamente prejudicial a efetivação de constrições diretamente no fluxo das Requerentes.

71.　　　　　　　Entender de outra forma, o que se alega apenas em respeito ao princípio da eventualidade, seria prestigiar uma ínfima gama de credores em detrimento de toda coletividade, conquanto poucos credores satisfariam seus respectivos créditos com os insumos essenciais ao desenvolvimento das empresas e deixariam os demais credores em posição de



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

desvantagem, eis que a manutenção da atividade dos Requerentes em posse de tais bens certamente é mais forte e rentável, possibilitando um soerguimento mais célere e eficaz.

72.          Sabe-se que, nos termos do art. 300 e ss. do Código de Processo Civil, a tutela de urgência haverá de ser deferida sempre que presentes a probabilidade do direito e o risco/receio de dano grave de difícil ou impossível reparação.

73.          *In casu¸* ambos os requisitos estão presentes.

74.          A presente petição inicial – e os documentos que a ela são acostados – preenchem, formal e materialmente, as exigências constantes da Lei nº 11.101/2005 para que o deferimento do processamento de recuperação judicial seja deferido e para que, com ele, seja proferida a ordem de suspensão das ações e execuções de que trata o art. 6º, §4 da mesma legislação. Eis a probabilidade do direito.

75.          Ademais, é certo que, na hipótese de se concretizarem e reiterarem os atos de constrição insistentemente requeridos pelo Banco Votorantim, os Requerentes poderão se ver privados de ativos indispensáveis à regular manutenção das suas atividades, sejam eles financeiros ou não, o que pode fazer cair por terra até mesmo a viabilidade do almejado soerguimento financeiro. Indiscutível, pois, o *periculum in mora*.

76.          Assim, a fim de evitar o prosseguimento de ações judiciais que possam impactar nos ativos da empresa e na sua viabilidade



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

econômica futura bem como impedir o perecimento dos milhares de empregos diretos e indiretos gerados por suas atividades, os Requerentes formulam o presente pedido de tutela de urgência, a fim de que este MM. Juízo determine, de imediato, a suspensão dos processos de execução ajuizados pelo Banco Votorantim S.A., no mínimo pelo prazo que entender necessário para análise da documentação acostada aos autos e a apreciação do pedido de processamento desta recuperação judicial.

## PEDIDOS

77.             Por todo o exposto, tendo sido adequadamente comprovado que os Requerentes preenchem todos os requisitos necessários ao deferimento do presente pedido de recuperação judicial, bem como que os documentos apresentados estão em perfeita consonância com o art. 51 da LRF, requer-se seja:

> **a)** concedida a tutela de urgência pleiteada para que, nos termos do art. 6º da LRF, seja determinada a suspensão de todas as ações e execuções movidas em face dos Requerentes, especialmente aquelas movidas pelo Banco Votorantim S.A., em que há iminência de atos de constrição de ativos dos Requerentes, com expedição de ofício destinado às 9ª e 14ª varas cíveis do Foro Regional de Santo Amaro, comarca de São Paulo/SP e à 19ª vara cível do Foro Central da comarca de São Paulo/SP, conforme lista anexa (vide doc. 9);

> **b)** deferido o processamento deste pedido de recuperação judicial;

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3ECQZ BWJJ5 6MNFR



**THOMAZ BASTOS**
**WAISBERG**
**KURZWEIL**
ADVOGADOS

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJD8F 3ECQ2Z BWJ5 6MNFR

    **c)**   nomeado administrador judicial – art. 52, I, da Lei nº 11.101/2005;

    **d)**   determinada a dispensa da apresentação de certidões negativas para o exercício de suas atividades – art. 52, II, da Lei nº 11.101/2005;

    **e)**   ordenada a suspensão de todas as ações e execuções em curso contra as Requerentes, conforme disposição expressa no art. 6º, § 4º da LRF[22] – art. 52, III, da Lei nº 11.101/2005;

    **f)**   intimado o Ministério Público e comunicadas as Fazendas Públicas Federal, Estadual e Municipal – art. 52, V, da Lei nº 11.101/2005;

    **g)**   publicado o edital a que se refere o parágrafo 1º do art. 52 da LRF.

78.        Outrossim, os Requerentes informam que apresentarão **(i)** contas demonstrativas mensais enquanto perdurar a recuperação judicial (art. 52, IV, da Lei nº 11.101/2005) e **(ii)** Plano de Recuperação Judicial, dentro do prazo legal, conforme disposição do art. 53 da mesma LRF.

79.        Por fim, requer-se que todas as intimações relativas ao presente pedido sejam feitas em nome dos advogados **Joel Luis Thomaz Bastos** (OAB/SP 122.443), **Ivo Waisberg** (OAB/SP 146.176) e **Bruno Kurzweil de**

---

[22] Art. 6º A decretação da falência ou o deferimento do processamento da recuperação judicial suspende o curso da prescrição e de todas as ações e execuções em face do devedor, inclusive aquelas dos credores particulares do sócio solidário.
(...)
§ 4o Na recuperação judicial, a suspensão de que trata o caput deste artigo em hipótese nenhuma excederá o prazo improrrogável de 180 (cento e oitenta) dias contado do deferimento do processamento da recuperação, restabelecendo-se, após o decurso do prazo, o direito dos credores de iniciar ou continuar suas ações e execuções, independentemente de pronunciamento judicial.



**THOMAZ BASTOS
WAISBERG
KURZWEIL**
ADVOGADOS

**Oliveira** (OAB/SP 248.704), todos com escritório na Avenida Brigadeiro Faria Lima, n° 3.311, 13° andar, São Paulo/SP, CEP 04538-133, sob pena de nulidade, nos termos do art. 272, § 5º, do CPC.

80.                    Dá-se à causa o valor de R$ 4.491.804.952,93 (quatro bilhões quatrocentos e noventa e um milhões oitocentos e quatro mil novecentos e cinquenta e dois reais e noventa e três centavos) e requer-se a juntada do comprovante de recolhimento das respectivas custas **(doc. 12).**

Termos em que, respeitosamente,

P. deferimento.

Maringá/PR, 21 de março de 2019.

**Joel Luís Thomaz Bastos**          **Ivo Waisberg**          **Bruno Kurzweil de Oliveira**
OAB/SP 122.443          OAB/SP 146.176          OAB/SP 248.704

**Lucas Rodrigues do Carmo**          **Patricia Fernandes da Silva**
OAB/SP 299.667          OAB/SP 391.729

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ – Identificador: PJD8F 3EQ2Z BWJJ5 6MNFR

**THOMAZ BASTOS
WAISBERG
KURZWEIL**

ADVOGADOS

## HONORABLE JUDGE OF THE __ CIVIL COURT OF THE JUDICIAL DISTRICT OF MARINGÁ/PR

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

**USINA DE AÇÚCAR SANTA TEREZINHA LTDA.**, a limited liability company, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 75.717.355/0001-03, headquartered in the city of Maringá, State of Paraná, at Avenida Pioneiro Victório Marcon, 693, Parque Industrial II, CEP 87065-120; **USINA RIO PARANÁ S.A.**, a corporation (*sociedade anônima*), enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 07.743.689/0001-93; **USACIGA – AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA LTDA.**, a company (*sociedade empresária limitada*), enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 75.031.633/0001-66; **SANTA TEREZINHA PARTICIPAÇÕES S.A.**, a corporation (*sociedade anônima*), enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 79.109.237/0001-65; **PARTICIPAÇÕES E AGROPECUÁRIA M.M. LTDA.**, a limited liability company, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 81.044.661/0001-10; **J.L. PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A.**, a corporation (*sociedade anônima*), enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 78.906.369/0001-55; **IMEF – PARTICIPAÇÕES E COMÉRCIO DE PRODUTOS AGRO**



**PASTORIL LTDA.**, a limited liability company, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 76.755.040/0001-05; **IGUATEMY PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL LTDA.**, a limited liability company, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 80.382.344/0001-41; **HEMFIL PARTICIPAÇÕES E COMÉRCIO DE PRODUTOS AGROPASTORIL S.A.**, a corporation (*sociedade anônima*), enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 81.039.133/0001-73; **AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A.**, a corporation (*sociedade anônima*), enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 81.039.687/0001-70; **P MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.061.181/0001-15; **S MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.103.647/0001-06; **M P M ZANIN MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.070.910/0001-08; **I M CREMA MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.083.839/0001-90; **MOACIR MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.070.810-0001-73; **M B MAGALHÃES SILVA MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.060.835/0001-96; **A. MENEGUETTE AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.082.423/0001-57;

[Bar code] Document digitally signed pursuant to MP No.2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http\:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



**ROSÂNGELA PERIN MENEGUETTE AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.061.019/0001-05; **J BATISTA MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.077.117/0001-22; **N. MARIA TORTATO MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.073.161/0001-64; **J CESAR MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.086.347/0001-58; **M E BOLONHEZ MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.060.847/0001-10; **FRANCISCO MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.086.726/0001-48; **NILSA CORREA FARIA MENEGUETTI** [1] , Brazilian, married, businesswoman, enrolled with the Individual Taxpayers' Registry (CPF) under No. 668.551.609-72, with address at Rua Cerqueira Cesar, 33, Maringá, State of Paraná, CEP 87014-190; **W J MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.060.734/0001-15; **A MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.070.980/0001-58; **S S MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.061.304/0001-18;

---

[1] On March 21, 2019, the petitioner filed her request to reopen her registration as sole proprietorship with the Board of Trade (*Junta Comercial*) of the State of Paraná and for this reason, it was not possible to present her Corporate Taxpayers' Registry (*Cadastro Nacional de Pessoa Jurídica*) on the date hereof.

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br  |  E-mail: contato@twk.com.br

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



**THOMAZ BASTOS
WAISBERG
KURZWEIL**

ADVOGADOS

**ELEN CRISTIAN MORENO MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.086.797/0001-40; and **V A FERNANDES MENEGUETTI AGROPECUÁRIA**, sole proprietorship, enrolled with the Corporate Taxpayers' Registry (CNPJ/ME) under No. 33.061.167/0001-11 **(exhibit 1)**, all of whom with principal business office in the city of Maringá, State of Paraná, at Avenida Pioneiro Victório Marcon, 693, Parque Industrial II, CEP 87065-120, through their counsel **(exhibit 2)**, pursuant to Article 47 of Law No. 11,101/2005, hereby file this **JUDICIAL RECOVERY PETITION**, in accordance with the *de facto* and *de jure* grounds set forth below.

## JURISDICTION OF THIS COURT TO PROCESS AND RULE ON THE JUDICIAL RECOVERY OF THE PETITIONERS

1.          Article 3 of Law No. 11,101/2005 sets forth that "*the court of the place of the principal place of business of the debtor has jurisdiction to (. . .) grant the judicial recovery.*"

2.          The principal place of business is, indeed, the place where the main strategic financial and operating decisions of the debtor(s) are taken. Accordingly, the processing and ruling of the judicial recovery must always occur at the venue/judicial district in which the debtor centralizes the general management of its business and where the largest volume of the businesses of the Petitioners is located—regardless of where their corporate headquarters are

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



located—as settled by court precedents of the Court of Justice of the State of Paraná (*Tribunal de Justiça do Estado do Paraná*)[2].

3.          In this case, there are no doubts that the **principal place of business** of the Petitioners is located in this judicial district of Maringá, State of Paraná. The headquarters set forth by the bylaws of the Petitioner, Usina de Açúcar Santa Terezinha Ltda.—parent company of the other mills that are part of the hereinafter called Santa Terezinha Group—, as well as the headquarters of other Petitioners, are located in this judicial district.  In addition, this is the place where **(i)** the meetings of the board of directors are held (**exhibit 10**); **(ii)** the entire management (including the commercial, financial, accounting and human resources areas) of the Mills that are Petitioners seats; **(iii)** the commercial operations that generate most of the revenues of the Petitioners are conducted; and **(iv)** most of the rural producers Petitioners reside and work.

4.          This is sufficient, we believe, to recognize the undisputable jurisdiction of this Court to process this Judicial Recovery case.

## HISTORY, ORGANIZATIONAL STRUCTURE AND ACTIVITIES DEVELOPED BY THE PETITIONERS

5.          Usina Santa Terezinha Ltda. was incorporated in the beginning of the 1960s by the Meneguetti brothers and sister, i.e., Albino, Felizardo, Hélio, Irineu, José, Mauro and Terezinha Meneguetti, and also by Mr.

---

[2] (TJPR. Conflict of Jurisdiction No. 1605387-5; Justice Rapporteur Marcelo Gobbo Dalla Dea; 18th Civil Chamber; J: 5/3/2017)

[Bar code] Document digitally signed pursuant to MP No. 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



**THOMAZ BASTOS
WAISBERG
KURZWEIL**

ADVOGADOS

Alberto Seghese, all of whom are responsible for transforming a small sugarcane distillery located in the district of Iguatemi into a productive sugar mill through considerable effort and entrepreneurship.

6.            In the end of the 1970s and beginning of the 1980s, benefiting from financings obtained under the Brazilian Ethanol Program (*Programa Nacional do Álcool* – PROÁLCOOL), and the increasing importance it gained in the sugar and ethanol market, the company began an ambitious expansion process of its existing industrial complex, which, by the end of the 1980s, was also implemented through the acquisition of other mills in the region, including the Paranacity (1989), Tapejara and Ivaté (1993) Units.

7.            Considering that the market was increasingly more demanding and in order to further increase its competitiveness, the company built, in this district of Maringá, its Logistics Terminal, including grain warehouses for sugar and other grains, one limestone terminal, a fertilizer mixer and tanks to store flammable and other liquids, whose operations commenced in 2002, and in 2003, a highway and railway fertilizer terminal in Paranaguá. In 2007, the Terra Rica unit commenced operations, the first green field unit of Petitioner Usina Santa Terezinha.

8.            Also in the 2000s, Usina Santa Terezinha acquired three additional units, which, together with two mills incorporated into the group in the 2010s (Usina de Açúcar e Álcool Goioerê Ltda. and Costa Bioenergia Ltda.), and the existing industrial complex, **currently account for eleven thousand (11,000) direct jobs**. They also ensure a milling capacity of twenty-one million

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



(21,000,000) tons of sugarcane/crop, an activity that is performed under the following corporate structure:



Corporate Structure: Usina de Açúcar Santa Terezinha Ltda.

9.          The earnestness, the focus, ethics and hard work of the Petitioners are characteristics that are recognized as inheret to them, having resulted in the awarding of a number of sustainability[3] certificates by VIVE International Account Manager (**exhibit 11**).

10.          In the context of the constant development and improvement of the activities of the referred units, during almost 60 years of history, the members of the Meneguetti Family, petitioners hereof, also started to plant and cultivate sugarcane in their rural real estate properties, selling it directly to the Petitioner legal entities.

---

[3] The Sustainability Supply Programme.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



THOMAZ BASTOS
WAISBERG
KURZWEIL
ADVOGADOS

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

11.            Therefore, there is no doubt that the business activities developed by the rural producers who are the Petitioners of this Judicial Recovery are closely and intrinsically related to the evolution and results of operations of these mills, which are also Petitioners hereof. For this reason, and for the reasons set forth below, the joinder of plaintiffs is absolutely relevant in the assignment of this case.

## JOINDER OF PLAINTIFFS

12.            As mentioned above, the companies and rural producers Petitioners operate in absolute harmony among themselves and rely on each other to continue their operations.  This is the reason why this Judicial Recovery Petition was filed to include the joinder of plaintiffs.

13.            Indeed, although the joinder of plaintiffs is not expressly provided under Brazilian Bankruptcy and Reorganization Law, it has been widely discussed in court precedents in similar cases. Today, the joinder of plaintiffs is widely and commonly accepted for cases such as this, including by secondary application of the Brazilian Code of Civil Procedure, pursuant to Article 189 of Law No. 11,101/2005:

> JUDICIAL RECOVERY. JOINDER OF PLAINTIFFS. POSSIBILITY, PROVIDED THAT THE COMPANIES ARE PART OF THE SAME ECONOMIC GROUP (*DE FACTO* OR *DE JURE*) AND MEET THE REQUIREMENTS SET FORTH IN LAW NO. 11,101/2005. MANIFEST RELATIONSHIP OF CONTROL AND RELIANCE BETWEEN THE COMPANIES. OPINION OF JURISTS AND COURT



PRECEDENTS. REQUIREMENTS MET. APPEAL DENIED.

(. . .)

In other words, it has been sufficiently shown (mov. 1.1 and mov. 11.041.1) that the reasons for the crisis faced by Appellee Seara directly interfere and affect the activities of the other companies of the group and the outcome of the pending Judicial Recovery. (. . .) A few months after the filing of the lawsuit, the crisis faced by all debtors became clear and is detailed in a number of Activity Monthly Reports (*Relatórios Mensais de Atividades* – RMA) entered in the original case records. Accordingly, all companies, rather than individually, met the requirement set forth in item I of Article 51 of the governing law. Since the existence of a *de facto* economic group and the crisis faced by all companies has been recognized, the joinder of plaintiffs applies.

(TJPR. Interlocutory appeal No. 0044339-33.2017.8.16.0000; Justice Rapporteur Vitor Roberto Silva; 18th Civil Chamber; J: 8/8/2018)[4]

---

[4] Also in this sense:

INTERLOCUTORY APPEAL. JUDICIAL RECOVERY. REQUIREMENTS OF ART. 51 OF LAW NO. 11,101/2005. DUE CONFIRMATION OF THE ECONOMIC AND FINANCIAL CRISIS FACED BY THE COMPANIES OF THE GROUP. ESTABLISHMENT OF THE JOINDER OF PLAINTIFFS. FORMATION OF A *DE FACTO* ECONOMIC GROUP. JURISTS AND COURT PRECEDENTS ACCEPT THE JOINDER OF PLAINTIFFS IN JUDICIAL RECOVERY CASES, NOTHWITHSTANDING THE ABSENCE OF PROVISION IN LAW NO. 11,101/2005, IN CASE OF COMPANIES THAT ARE PART OF THE SAME ECONOMIC GROUP (*DE FACTO* OR *DE JURE*). PEDIDO ALTERNATIVE REQUEST FOR PREPARATION OF A JUDICIAL RECOVERY PLAN FOR EACH COMPANY. THE REVIEW OF THE CASE SHOWS THAT THE PRESENTAION OF A SINGLE PLAN IS MORE APPROPRIATE. APPEAL DENIED. 1 Substituting Justice Vitor Roberto Silva.

(. . .)

Having reviewed this matter and reviewing the case in hand, I conclude that the joinder of plaintiffs is possible among the appellee companies, as, unlike the appellant's claims, the expert's report expressly concluded that Seara or the group is facing a crisis, i.e., the expert did not oppose the joinder of plaintiffs, as the expert concluded that Seara or the group is facing a crisis, finding an economic dependence between Seara and the other petitioners and that the operation of one directly depends on the operations of the others.

(. . .)

Accordingly, as Seara accounts for 99% of the revenue of all companies of the group and considering that it is facing a crisis, this fact inevitably affects all other companies, in view of the undeniable mutual dependence between them; one cannot say the existence of the crisis has not been confirmed.

In this context, I corroborate the understanding of the lower court judge, who said that "(. . .) the withdrawal of the other petitioners would significantly harm small creditors, most of whom are SEARA's creditors, privileging a few large creditors, who would have their claims guaranteed by the equity of the other petitioners, to the detriment of the continuity of the business activities of the entire economic group."

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



14.            The truth is that the case in hand perfectly fits the events set forth in Article 113 of the Brazilian Code of Civil Procedure[5]: between the Petitioners not only do we find "*community of rights or obligations regarding the dispute*" (item I), but also "*an affinity of issues sharing a common point, de facto or de jure*" (item III), as the petitioners provided cross-guarantees and the Petitioners also: **(i)** belong, as mentioned above, to the same corporate group; and **(ii)** operate in the same business segment or at least perform complementary activities, in a harmonious, joint and interdependent manner.

15.            It is therefore undeniable that this judicial recovery petition must be processed to include the joinder of plaintiffs to ensure the intended emergence: only a global solution can solve the crisis currently faced by them, ensuring the continuity of their activities and performance of their social function.

## POSSIBILITY OF PROCESSING THE JUDICIAL RECOVERY OF RURAL PRODUCERS

16.            Pursuant to Article 47 of Law No. 11,101/2005, the main objective of the judicial recovery is to "*enable the overcoming of the*

---

Accordingly, if the joinder of plaintiffs ultimately meets the purpose of the judicial recovery, mainly the overcoming of the economic and financial crisis faced by the companies, the joinder of plaintiffs must be granted. (TJPR. Interlocutory appeal No. 0001627-91.2018.8.16.0000; Substitute Justice Rapporteur. Appellate Judge Denise Antunes; 18th Civil Chamber; J: 7/5/2018)

[5] Art. 113. Two or more individuals may enter a dispute, in the same case, together, as plaintiffs or defendants, if:
I – they share a community of rights or obligations regarding the dispute;
II – the causes are connected through their claims or causes of action;
III – they have an affinity of issues sharing a common point, *de facto* or *de jure*.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJS 6MNFR



*economic and financial crisis of the **debtor***" (emphasis ours) and, accordingly, "*allow the maintenance of the source of production, employees' jobs and creditors' interests, thus promoting the preservation of the company, its social function and the encouragement to economic activities*."

17.            It is also known that, pursuant to Article 1 of Law No. 11,101/2005, the definition of **_debtor_**, whose bankruptcy, extrajudicial recovery and judicial recovery cases will be governed by this law, includes not only "companies" (*sociedades empresárias*), but also "**_businessmen_**" (emphasis ours).

18.            Very well.

19.            Article 966 of the Brazilian Civil Code sets forth that "**_businessman_** *is the individual who professionally exercises economic activities organized towards the production or distribution of goods or services*." Articles 967 to 969 set forth and regulate the registry formalities that, under normal circumstances, **are indispensable** to the recognition of this definition.

20.            The exception, applicable to the case of the rural producers Petitioners of this Judicial Recovery petition, is set forth in Article 971 of the Brazilian Civil Code, as follows:

> "*[the]* **_businessman_**, *whose rural activities constitute his or her main profession, **may**, subject to the formalities set forth in Article 968 and paragraphs, register with the Public Notary of Companies (*Registro Público de Empresas Mercantis*) of the respective*

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



*headquarters, in which case, once registered, the businessman will be deemed equal, for all purposes, to the businessman subject to registration."* (emphasis ours).

21.          Well, unlike other businessmen, small businessmen and rural businessmen have a "*favorable, different and simplified treatment (. . .) with regards to registration and the effects resulting therefrom*" ensured by the law[6].

22.          Accordingly, although they **may** register with the Public Notary of Companies (*Registro Público de Empresas Mercantis*), i.e., the Board of Trade (*Junta Comercial*), **the regular exercise of business activities of rural businessmen is not subject to this registration**. In other words: rural businessmen are and must be deemed regular **businessmen** even if not registered with the Board of Trade, which registration is optional, as mentioned above. This is the case of the Rural Producers Petitioners.

23.          Back to Law No. 11,101/2005, **debtors** who, in addition to meeting all the requirements set forth in Article 48 of the LRF, "*regularly exercise their activities for more than two (2) years*," as required by the head provision of Article 48, may file for judicial recovery.

24.          However, as mentioned above, the regular exercise of business activities by rural businessmen is not confirmed only by the registration for the entire period referred to above.

---

[6] Art. 970 of the Brazilian Civil Code.

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br   |   E-mail: contato@twk.com.br

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQZZ BWJJ5 6MNFR



25.                    In this regard, the **Courts of Justice of the States of Paraná** and São Paulo already settled their understanding in the sense that the confirmation of effective and continuous exercise of professional activities for this period suffices. We transcribe excerpts of judgments below:

> "In regard to the objective requirement set forth in the head provision of Article 48 of Law No. 11,101/2005, providing that "debtors who regularly exercise their activities for more than two (2) years, at the time of filing, may file for judicial recovery," there are no doubts that this confirmation, in case of businessmen, occurs through registration with the relevant Board of Trade, including pursuant to express legal provision (Article 967 of the Brazilian Civil Code), which, at first, also applies to rural producers who intend to benefit from judicial recovery for their business activities. There are no doubts that the registration of business activities by rural producers is optional, pursuant to Article 971 of the Brazilian Civil Code, and interested parties must therefore choose to maintain their activities informal or adopt a corporate regime, including all the inherent benefits and duties.
>
> (. . .)
>
> At this point, I note that Precedent 198, quoted by the appellants and derived from the III Civil Law Meeting, is not conflicting, as it refers to irregular businessmen, different from rural producers, who are not deemed irregular businessmen if they do not register their business activities, as this registration is optional for them. Moreover, **exactly because this is optional for rural producers, we need to give the case in hand special attention, in order to avoid the misapplication of the Law by privileging rural businessmen with the benefits of judicial recovery, in cases in which they fail to fulfill the duties**

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE

Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

**THOMAZ BASTOS
WAISBERG
KURZWEIL**

ADVOGADOS

**inherent to regular businessmen, including, as an example that is important for judicial recovery, the duties regarding the management and accounting of business activities, such as bookkeeping and the preparation of trial financial balances.**

(. . .)

**The Brazilian Bankruptcy and Reorganization Law, in requiring the confirmation of regular exercise of business activities, even by rural producers, does not set forth the confirmation of existence of registration for more than two years as a condition, only the confirmation of exercise of activities. Accordingly, we must conclude that the registration with the Board of Trade does not incorporate a rural producer's company, but rather records the exercise of activities in compliance with Article 4, item VI, of the Brazilian Land Law (*Estatuto da Terra*), in accordance with Article 971 of the Brazilian Civil Code.**" (TJPR. Decision by the trial court rendered in the interlocutory appeal No. 0001366-92.2019.8.16.0000; Substitute Appellate Judge Rapporteur Francisco Jorge; J: 1/27/2019)[7]

"Also, with regard to the inclusion of rural producers as plaintiffs in a lawsuit, I note that this is authorized by Law No. 11,101/2005. In principle, pursuant to Brazilian civil law, this request requires the registration with the Board of Trade (*Junta Comercial*), in which event the rural producer is deemed equal to a businessman (Art. 971, Brazilian Civil Code). **However, unlike the requirement directed at**

---

[7] In the same sense: "Art. 48 of Law No. 11,101/2005 requires that debtors, at the time of filing for Judicial Recovery, regularly exercise their activities for more than two (2) years; however, it does not require registration with the relevant Board of Trade for an equal period. In the case in hand, the appellees have been exercising activities as rural producers for more than thirty (30) years, albeit without registration with the Board of Trade (mov. 1.12 and 1.13). Therefore, **although the appellees proceeded with their registrations with the Board of Trade of the State of Paraná a few days before the filing for Judicial Recovery, considering that the appellees have been exercising their activities for more than two (2) years, I find no obstacle to the processing of the Judicial Recovery**". (TJPR. Interlocutory judgment rendered in the records of Interlocutory Appeal No. 0001247-34.2019.8.16.0000; Justice Rapporteur Ramon de Medeiros Nogueira; 1st Civil Chamber; J: 1/25/2019)

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



**businessmen, the registration of rural producers does not have to be made at least two years in advance, and it suffices to comply with Article 48, paragraph 2, of the governing law, which provides as follows: "In case of exercise of rural activity by a legal entity, it is permitted to confirm the period set forth in the head provision of this Article through the presentation of the Statements of Economic and Tax Information of Legal Entities (*Declaração de Informações Econômico-fiscais da Pessoa Jurídica – DIPJ) that has been timely filed.*"** (Decision by the trial court rendered on February 14, 2019, in the records of the Interlocutory Appeal No. 4450-04.2019.8.16.0000; Justice Rapporteur Lauri Caetano da Silva)

"Interlocutory appeal. Judicial recovery of rural producer businessmen. Recognition of the declaratory nature of the registration of rural producers with JUCESP. Art. 971 of the Brazilian Civil Code. Application of the company theory. Legal concept of businessman determined by the effective exercise of economic activities organized towards the production or distribution of goods or services, pursuant to Article 966, head provision, of the Brazilian Civil Code. **Article 48, head provision, of the LRF only requires that businessmen who files for judicial recovery exercises their activities for more than two years and it does not provide for the requirement of registration with the Board of Trade for an equal period. The processing of the recovery depends only on the formal confirmation that the objective requirements set forth in Articles 48 and 51 of the LRF were met**. Analysis of the nature of the claim held by the appellants that was not included in the challenged decision. The matter must be discussed through the appropriate procedural incidents (appeal against a divergent decision/objection to claim). Appeal denied.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



(. . .)

**According to Fábio Ulhoa Coelho, rural producers do not have to request their registration with the registry of companies, but can do it. If they choose to register with the Board of Trade, they will be deemed businessmen and will be subject to the corresponding regime**. In this case, rural producers must keep appropriate bookkeeping, prepare periodic balance sheets and they file for bankruptcy or judicial recovery. They are also subject to penalties for non-compliance with the general obligations of businessmen (*Curso de Direito Comercial: Direito de Empresa*, v. 1, 16th ed., 2012, Saraiva, p. 136)". (TJSP. Interlocutory appeal No. 2162126-36.2018.8.26.0000; Justice Rapporteur Hamid Bdine; 1st Corporate Law Reserved Chamber; J: 11/9/2018)[8]

"Judicial recovery. **Filing by rural producers exercising activities for more than the two-year period required by Article 48, head provision, of Law No. 11,101/2005, members of an economic group as individual businessmen, pursuant to Articles 966 and 971 of the Brazilian Civil Code, and/or partners in the co-plaintiff companies**. Standing recognized. The claim that the date of filing for judicial recovery and the date of registration of the rural producers as individual businessmen with the Board of Trade of the State of Estado de São Paulo are close is irrelevant. **Court precedents have settled the understanding that the conduction of regular business activities for a minimum period of two years, as set forth in the aforementioned law, must be confirmed by the maintenance and continuity of these activities, rather than by the proof of registration of the businessman or corporate entity for that period of time**. I uphold the granting of the

---

[8] In the same sense: TJSP. Interlocutory appeal No. 2062908-35.2018.8.26.0000; Justice Rapporteur Hamid Bdine; 1st Corporate Law Reserved Chamber; J: 7/4/2018.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

processing of the case. Interlocutory appeal denied."
(TJSP. Interlocutory Appeal No. 2037064-59.2013.8.26.0000, Justice Rapporteur José Reynaldo; 2nd Corporate Law Reserved Chamber; j. 9/22/2014)

26.        So it has to be, as paragraph 2 of Article 48 of the LRF provides that, in order to confirm the two-year period set forth in the head provision of Article 48, other documents must be presented by a legal entity that exercises rural activities. There is no reason not to apply the same rationale to individuals who exercise rural activities, the so called "rural producers," as in the case in hand.

27.        Furthermore, Article 51 of the LRF provides that the judicial recovery petition must present, among other documents, the *"certificate of good standing of the debtor with the Public Notary of Companies (*Registro Público de Empresas*), updated organizational documents and the minutes of meetings that appointed the current members of management*," pursuant to item V.

28.        However, if rural businessmen are **not** required to register with the Public Notary of Companies (*Registro Público de Empresas*) to regularly exercise their activities, this document, in theory, would not be required to accompany the judicial recovery petition, as this requirement would not apply at all.

29.        Even if this was not so, the fact is that the registration of individual businessmen who exercise rural activities with the Board of Trade could be deemed to have, at best, a **declaratory nature**, but never an



**THOMAZ BASTOS**
**WAISBERG**
**KURZWEIL**
ADVOGADOS

organizational nature, in accordance with recent decisions rendered by the Superior Court of Justice (*Superior Tribunal de Justiça*) and the Court of Justice of São Paulo, as set forth above, provided that the registration is made before the filing for judicial recovery.

30.            In this sense, according to Professor Alfredo de Assis Gonçalves Neto[9]:

> "if this registration is indispensable to file for judicial recovery (regarding both companies and rural producers), the regular exercise of their business activities for at least two years is a *de facto* situation, which can be confirmed by firm evidence, bearing no relation with the date of their registration as businessmen
> (. . .) rural producers registered with the Public Notary of Companies (*Registro Público de Empresas*) become businessmen and, as such, are subject to corporate law. As businessmen, they can file for judicial recovery, as provided by Law No. 11,101/2005. Once insolvent, businessmen can file for judicial recovery, provided that they confirm that they regularly exercised their activities for at least two years, from the time they began to exercise them, regardless of the date of registration with the abovementioned Notary."[10]

---

[9] Gonçalves Neto, Alfredo de Assis. *Direito Comercial: pareceres*. São Paulo: Lex, 2019; p. 66/68.
[10] In the same sense, the opinion prepared by Bruno de Oliveira Castro to be presented in the records of judicial recovery case No. 0003205-55.2018.8.16.0076 (pending before the Civil Court of Coronel Vivida) reviewing the feasibility of judicial recovery of rural producers: "(. . .) the registration of rural producers with the competent board is optional, for which reason this registration is declaratory in nature, and rural producers may file for judicial recovery immediately after the registration of their organizational documents with the Board of Trade, even if they have not conducted regular business activities for two (2) years, as required by the head provision of Art. 48 of Law No. 11,101/2005. Moreover, one of the requirements set forth in Art. 48 of the aforementioned law is exactly the confirmation of exercise of activities for more than two (2) years, which period, for businessmen in general, coincides with the registration of their organizational documents with the competent Board of Trade, due to their organizational nature, therefore differing from the particularities of rural producers. We conclude that the nature of the registration of rural producers is merely declaratory, having no organizational function in view of the option set forth in the Brazilian Civil Code.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br  |  E-mail: contato@twk.com.br



31.                    We also quote an opinion presented in the records of the judicial recovery filed by José Pupin Agropecuária and Vera Lúcia Camargo Pupin, wherein Prof. Fabio Ulhoa Coelho[11] very accurately said:

> "5. Does a rural producer who is an individual registered with the Board of Trade (*Junta Comercial*) some days before filing for judicial recovery and who confirms, through tax documents, the exercise of activities for more than two years, have the right to judicial recovery? Yes; in fact, **a rural producer who is an individual may file for judicial recovery, even if he or she only registered with the Board of Trade (*Junta Comercial*) exclusively to fulfill the requirement related to the business nature of the economic activity in crisis.**
> **The LRF does not provide for a minimum period of registration with the Board of Trade (*Junta Comercial*) to admit the filing for judicial recovery by rural producers. In the absence of a minimum period, whatever the time of the registration, provided that it occurred before the filing, the requirement of the business nature of the activity is fully fulfilled.**"

---

(. . .) **It is perfectly possible for rural producers to file for Judicial Recovery even if they have not been registered with the Board of Trade for 2 years. The registration of rural producers with the Board of Trade suffices for them to be deemed equal to businessmen for all purposes. We emphasize that the registration with the Board of Trade only changes the qualification of activities, from civil activities to business activities.**

[11] Also, in the same records, according to Manoel Justino Bezerra Filho: "(. . .) **the only conclusion we may reach is that Article 48 requires the confirmation of regular activities "*for more than two (2) years*," rather than the confirmation of business activities for more than two years. In other words, if the previous exercise of activities was irregular (and there is no irregularity in the activities that José Pupin and his wife exercised for more than twenty-five years) and if Article 971 allows the conversion of a rural businessman into a businessman deemed equal to a company by simple registration, the interpreter cannot require more than what is required by law.** In an even more summarized way: if the previous exercise of activities was irregular, this period of exercise cannot be added to obtain a total of two years; as opposed to, if the previous exercise of activities was regular, this period of exercise can be added to obtain a total of two years."

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br   |   E-mail: contato@twk.com.br

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



32.　　　　　　　In the same sense, Precedent 198 of the III Civil Law Meeting (*III Jornada de Direito Civil*):

> "The registration of businessmen with the Board of Trade (*Junta Comercial*) is not a requirement to be deemed businessmen, as one can conduct a company without this registration. Irregular businessmen meet the requirements set forth in Article 966, and are subject to the Brazilian Civil Code and commercial law, except for the provisions that are incompatible with their condition as businessmen or unless expressly provided otherwise."

33.　　　　　　　Therefore, rural producers may file for judicial recovery, provided that they confirm they have been exercising their activities for more than two (2) years, even if not registered with the Public Notary of Companies (*Registro Público de Empresas*) for such period, thus meeting the requirement set forth in the head provision of Article 48 of the LRF.

34.　　　　　　　Moreover, rural producers who are individuals are parties to almost every agreement entered into by the other Petitioners with financial institutions and/or suppliers, either as joint and several guarantors or even principal debtors, which is sufficient to confirm that they also exercise rural activities and meet the legal requirement to be plaintiffs in this judicial recovery petition.

35.　　　　　　　Indeed, the debts incurred by the rural producers are all intrinsically related to the activities of the Petitioner companies, as they are

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br  |  E-mail: contato@twk.com.br



**THOMAZ BASTOS
WAISBERG
KURZWEIL**

ADVOGADOS

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

involved in the day-to-day routine of these companies, including by acting as guarantors of the operations of the Petitioners.

36.                    That is, the rural producers do not act in these agreements as mere "intervening parties," they rather act as principal payors of the funds obtained to foster businesses. Honorable Judge, the financial institutions themselves saw them as rural businessmen who play a key role in business activities, demanding from them, as a requirement to make funds available, the effective assumption of debt as principal payors in these transactions.

37.                    Accordingly, in view of not only the possibility of rural producers filing for judicial recovery, but also the fulfillment of the requirements to do so, as set forth especially in Article 48, head provision, and Article 51, item V, of Law No. 11,101/2005, there is clearly no obstacle for the filing of this Judicial Recovery Petition by the rural producers.

## THE MAIN REASONS OF THE ECONOMIC AND FINANCIAL CRISIS FACED BY THE PETITIONERS AND THE NEED FOR THIS JUDICIAL RECOVERY PETITION

38.                    In view of Article 51 of the LRF, we must clarify the reasons of the economic and financial crisis that affected the activities of the Petitioners, victims of the economic and market volatility that has been ravaging Brazil in recent years.



**THOMAZ BASTOS
WAISBERG
KURZWEIL**

ADVOGADOS

[Bar code] Document digitally signed pursuant to MP No 2.200-2/2001, Law No. 11.419/2006. Projudi resolution. of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJS 6MNFR

39.                          As it is known, the Brazilian sugar and ethanol industry has undergone (and still is undergoing) a severe credit crisis that began in 2007[12], when most companies in this industry, pressured by prices and cash requirements, were forced to sell their inventories below production cost for most of their crops, which resulted in negative results of operations for many mills.

40.                          In this already weakened scenario, in 2008, the credit market was drastically affected by the global financial crisis and, in 2011, by the gasoline price control policy of the Brazilian Government, which compromised the financial health of the industry by causing a decrease in profitability and increase in financial expenses, making negative net results recurrent. Accordingly, the generation of cash from operations was compromised and companies had to resort to additional loans at increasingly high interest rates to meet their cash requirements.

41.                          As of 2010, crops were affected not only by adverse weather conditions, i.e., severe drought in the region, which demanded higher investments to maintain the productivity of the sugarcane plantation, but also by the continuous drop in the final price of the crops as a result of the gasoline price control policy.

---

[12] "*Many Brazilian sugar and ethanol companies are still undergoing a difficult financial situation, as large debt limits investments that could be improving their revenues, according to mills and consulting firms on Monday (24).(. . .), most medium-sized companies incurred additional debt in recent years and are having difficulties to process more sugarcane, according to specialists during the sugar international seminar of F.O. Licht in São Paulo*" (Available at https://www.novacana.com/n/industria/financeiro/maioria-usinas-brasileiras-cana-enfrentam-dificuldades-financeiras-240417 - Accessed on February 14, 2019)
"*The industry has been facing difficulties. According to the Sugarcane Industry Association (*União da Indústria de Cana de Açúcar – Unica*), 80 mills closed in the center-south region of Brazil since 2008. In 2015, ten other mills in poor financial condition may also close.*" (Available at http://www.otempo.com.br/capa/economia/uma-das-maiores-do-mundo-no-setor-de-cana-quebra-1.1097344 - Accessed on February 14, 2019).

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br   |   E-mail: contato@twk.com.br



[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

42.                    Remember: as of 2011, inflation started to increase and the Brazilian Government adopted a number of measures to restrain the prices of distribution of gasoline, which were artificial measures practiced by Petrobras, keeping prices at an extremely low level if compared to international prices.

43.                    This had only one meaning to the industry: the numbers, for a long time, just did not add up. The final sales price is not related to the cost of product, but rather to the price of gasoline, which was subject to the government's price control policy. Accordingly, only the companies that had capital to withstand periods of low prices were able to survive. Unlike what we may think, the health of ethanol and sugar mills is not exclusively related to managerial capacity or productive performance.

44.                    The aforementioned scenario, together with the large investments required to cultivate and maintain sugarcane plantation, forced the Petitioners to increasingly resort to leveraging, in a market of high interest rates and subject to exchange rate variations that frightfully cause an imbalance in results.

45.                    Accordingly, it is evident that excess indebtedness and the loss of profitability of ethanol, which along the years translates into decreased crop productivity and milling capacity, exposed the sugar and ethanol industry to a scenario of excess idle capacity, increasing operating costs and decreasing profitability. Therefore, recurring losses compromised the ability of the Petitioners to meet their financial obligations as originally agreed.



46.            To make matters worse, the price of sugar decreased dramatically in recent crops, especially in the 2018 Crop, when it reached the lowest level in ten years[13], significantly compromising the profit margin of mills and, as a result, the profit margin of the Petitioners, whose revenues substantially rely on the international sugar market.

47.            It is noteworthy that, in relation to the international sugar market, Brazil and Australia recently formalized a consultation with the World Trade Organization (WTO) regarding the subsidy granted to India for sugar[14], which negatively affected—and has been negatively affecting— the entire global market and, in this context, the Petitioners.

48.            In addition to the entire macroeconomic scenario described above, we have the regrettable attitude adopted by Banco Votorantim S.A.—set forth below—and there it is: a circumstantial, however severe, financial crisis to be overcome.

49.            Nonetheless, there are no doubts that the governmental policies recently adopted in Brazil, including the decrease in interest rate; an exchange rate that is favorable to exporting companies; and the change in the gasoline price policy, as the new management of Petrobras took office; point

---

[13] http://www.udop.com.br/index.php?item=noticias&cod=1160137 and
https://canalrural.uol.com.br/noticias/agricultura/cana/retrospectiva-mercado-de-acucar-atinge-minimas-de-dez-anos-em-2018/
[14] https://www.valor.com.br/agro/6139087/brasil-denuncia-subsidios-da-india-ao-acucar-na-omc
https://canalrural.uol.com.br/noticias/brasil-recorre-a-omc-por-causa-de-subsidio-da-india-ao-acucar/
https://www.noticiasagricolas.com.br/noticias/sucroenergetico/231025-brasil-e-australia-formalizam-consulta-na-omc-sobre-subsidio-ao-acucar-da-india.html#.XIvmlmdYaJA

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



towards an optimistic prospect for the sugar and ethanol industry, notwithstanding low sugar prices in the international market, all of which, together with the legal benefits to which the Petitioners undoubtedly are entitled (including the filing for Judicial Recovery), will certainly enable a quick and smooth restructuring.

## JUDICIAL RECOVERY PETITION – FINANCIAL AND OPERATING FEASIBILITY OF THE PETITIONERS

50.                    As mentioned above, the Petitioners are fully confident that the liquidity crisis they currently face is transient and should not definitively affect the strength of their activities.

51.                    A clear example is that, even before the filing of this petition, the Petitioners were already seeking the implementation of a comprehensive financial and operating restructuring project to adjust their operations to the current adverse scenario.

52.                    Indeed, **the only reason why the amicable and extrajudicial restructuring that the Petitioners have been negotiating with their main creditors did not succeed was because Banco Votorantim S.A. precipitously filed three (3) multimillionaire judicial foreclosure proceedings against the Petitioners**[15]. In the records of these proceedings, the financial institution has been insistently requesting the grating of restrictions—including,

---

[15] (i) Execution of Extrajudicially Enforceable Instrument No. 1007474-35.2019.8.26.0100, pending before the 19th Civil Court of the Central Forum of São Paulo/SP; (ii) Execution of Extrajudicially Enforceable Instrument No. 1007487-34.2019.8.26.0100, pending before the 14th Civil Court of the Regional Forum of Santo Amaro/SP; and (iii) Execution of Extrajudicially Enforceable Instrument No. 1008921-61.2019.8.26.0002, pending before the 9th Civil Court of the Regional Forum of Santo Amaro/SP.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



but not limited to, the online pledge of financial assets, **which has already been granted in two judicial foreclosure proceedings** (!!!).

53.                    It is important to highlight that, were it not for the filing of these judicial measures, the filing of this Judicial Recovery would probably be unnecessary.

54.                    Indeed, in an incomprehensible and absolutely untimely impulse, Banco Votorantim notified the Petitioners to inform about the interruption of the productive and amicable negotiations and talks that had been kept so far between all parties (financial debtors and creditors) and, unexpectedly, Banco Votorantim started to forcibly and unilaterally seek the satisfaction of its credit.

55.                    However, the lack of loyalty of the bank was not sufficient to deviate the Petitioners from their trajectory of constant preoccupation in maintaining their activities to continue to generate revenues and remain a going concern, recovering the trust of the market. It is important to say that the Petitioners remain confident that this petition is one more successful step towards its full restructuring.

56.                    In any event, at this time, the Petitioners had no alternative but to resort to this judicial recovery petition, not only to protect their private interests, but also, and mainly, to ensure that they remain as going concerns and, as a result, are able to maintain jobs and continue to produce goods, generate wealth and collect taxes.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br  |  E-mail: contato@twk.com.br



[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

57.         In this case, the economic feasibility of the Petitioners is clear, as they have the required means and expertise to maintain their businesses and obtain fair profit from their activities. Remember that the Petitioners have ten operating units, with a milling capacity of approximately 21,000,000 tons per crop, as well as engage highly qualified professionals, who have experience in this industry, all of which make the Petitioners one of the bets in the industry for the future of the Brazilian sugar and ethanol market.

58.         Once again: the Petitioners are facing a **momentary** and **one-off** crisis, which can be fully overcome[16]. Accordingly, the processing of their judicial recovery must be granted.

## FULFILLMENT OF THE OBJECTIVE REQUIREMENTS TO PROCESS THE RECOVERY

59.         The Petitioners clearly and fully meet all the subjective requirements set forth in the LRF, pursuant to Arts. 1 and 48, as well as the objective requirements set forth in Article 51, not only to file this Judicial Recovery Petition, but also to obtain the granting of its processing. The table below sets forth the documents entered with this petition:

| Exhibit 1 | |
|---|---|
| | |

---

[16] According to Sérgio Campinho, this is an **"episodic"** crisis, a crisis that is generally motivated *"by a momentary lack of liquidity, which can be easily solved"* (*ob. cit.*, p. 121).



| | |
|---|---|
| | Organizational documents of the Petitioners, election of members of management and records showing the exercise of activities for more than 2 years[17] (Articles 1, 48 and 51, item V, of the LRF); |
| **Exhibit 2** | Powers of Attorney granted to the Petitioners' counsel; |
| **Exhibit 3** | Corporate authorizations required for the filing of this Judicial Recovery Petition; |
| **Exhibit 4** | Clearance certificates from bankruptcy courts, obtained in the cities in which the headquarters of the Petitioners are located, showing that they have never been adjudicated bankruptcy, nor have been granted judicial recovery (Article 48, items I, II and III, of the LRF); |
| **Exhibit 5** | Clearance certificates from criminal courts, showing that the partners and members of management[18] of the Petitioners have never been convicted for any of the crimes set forth in Law No. 11,101/2005 (Article 48, item IV, of the LRF); |
| **Exhibit 6** | Financial statements of the Petitioners, including balance sheets, statements of income and statements of cash flows for the last 3 fiscal years and statements specifically extracted for the filing of this Judicial Recovery Petition (Article 51, item II, of the LRF); |
| **Exhibit 7** | List of names of creditors of the Petitioners (Article 51, item III, of the LRF); |

---

[17] The Petitioners hereby present the proof of filing of the registration application of the rural producers mentioned in this petition. However, taking into account that the registration with the relevant Boards of Trade (*Juntas Comerciais*) occurred just before the filing of this judicial recovery—which is widely accepted in the most distinguished court precedents and opinions of jurists on this subject—it was not possible to present the record files issued in the name of each of the rural producers due to the lack of entries in these documents.
[18] The Petitioners inform that, **ALOISIO MENEGUETTI**, member of management, died. Accordingly, the Petitioners will not present documents related to him at this time.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



| Exhibit 8 | Protest clearance certificates obtained in the judicial districts in which the headquarters and branches of the Petitioners are located (Article 51, item VIII, of the LRF); and |
|---|---|
| Exhibit 9 | List of lawsuits to which the Petitioners are parties (Article 51, item IX, of the LRF). |

60.　　　　　　In regard to the other documents required by Article 51 of the LRF, namely, the list of employees (item IV), the lists of assets of members of management, as well as bank statements of all bank accounts and investments for the last three (3) months (items VI and VII), the Petitioners inform that, in view of the content and importance of the information included therein—personal information of the representatives and employees of the Petitioners—these documents will be filed in a separate petition, following the filing of this petition, requesting that these documents and information be kept under seal[19].

61.　　　　　　Finally, it is important to clarify and highlight that, always taking into account the urgency of filing this Judicial Recovery Petition and given the crisis faced by the Petitioners at the moment, the documents included in the list attached hereto (**exhibit 12**) are being collected and will be

---

[19] This request for secrecy has been many times granted in other Judicial Recovery cases:
"However, unrestricted access to this information, by any person, may jeopardize the right to privacy, tax secrecy and private life of workers included in the referred list, as this document contains personal data that could unnecessarily expose these persons. Accordingly, I order that the list on pages 2195/2282 be entered in a separate record, as a procedural incident, and kept under seal." (Judicial Recovery No. 1030812-77.2015.8.26.0100, pending before the 1st Bankruptcy and Judicial Recovery Court of São Paulo/SP).
"I order tax secrecy regarding the income tax returns listing the private assets of the partners, pursuant to Art. 51, item VI, of the LRE, which documentation must be kept under seal at the Notary Office, and only the Trustee and the Prosecution Office may have access to it." (Judicial Recovery No. 0000078-34.2015.8.08.0013, pending before the 1st Civil Court of Castelo/ES).

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



entered in the records of this case as soon as possible. The Petitioners hereby request the entry of these documents at a later time.

## REQUIRED GRANTING OF THE INTERLOCUTORY RELIEF

62.                    As mentioned above, the Petitioners play an important role, primarily in the economy of the northwestern region of the State of Paraná, creating direct and indirect jobs that support the regional economy.

63.                    All this economic and social wealth may disappear if the Petitioners are required to immediately fulfill the obligations they assumed and were renegotiating, in good faith, with their financial creditors, at a time when they need their assets and capital to generate funds to pay their creditors.

64.                    The head provision of Article 6 of the LRF expressly sets forth that the granting of the processing of the judicial recovery to a company *"tolls the statute of limitations and stays all lawsuits and execution proceedings filed against the debtor, including those filed by private creditors of joint and several partners."* However, the definitive review and grant of the recovery petition can only happen after an analysis of the entire and extensive documentation[20] attached thereto.

---

[20] Due to the large volume of information and documents of the twenty-nine (29) petitioners that must accompany this judicial recovery petition, we inform that the pending documents are being collected and will be entered in the records of this case as soon as possible. The Petitioners hereby request the entry of these documents at a later time.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006. Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



**THOMAZ BASTOS
WAISBERG
KURZWEIL**

ADVOGADOS

65.	Nonetheless, the Petitioners require that this Court grants the __immediate__ stay of all currently pending lawsuits and foreclosure proceedings, as well as the order to refrain creditors from performing any acts intended to decrease the equity of the Petitioners, especially foreclosure proceedings that have already been assigned.

66.	As mentioned above, the Petitioners were surprised by the unexpected filing of three (3) Foreclosure Proceedings related to extrajudicially enforceable instruments[21], which currently exceed the amount of R$155 million. The financial institution that filed these proceedings has insistently claimed the granting of restrictions, including, but not limited to, the online pledge of financial assets.

67.	Your Honor, we do not have to digress a great deal to find which and how many catastrophic consequences would befall in case of granting the multimillionaire freezing of accounts held by companies that are knowingly facing a circumstantial economic and financial crisis, for which reason they engaged into negotiations with their financial creditors.

68.	It is also noteworthy that, as of the date hereof, the Petitioners have endeavored and managed to timely pay the salaries of their employees, in the approximate amount of twenty-four million *Reais*

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

---

[21] **(i)** Foreclosure of Extrajudicially Enforceable Instrument No. 1007474-35.2019.8.26.0100, pending before the 19th Civil Court of the Central Forum of São Paulo/SP; **(ii)** Execution of Extrajudicially Enforceable Instrument No. 1007487-34.2019.8.26.0100, pending before the 14th Civil Court of the Regional Forum of Santo Amaro/SP; and **(iii)** Execution of Extrajudicially Enforceable Instrument No. 1008921-61.2019.8.26.0002, pending before the 9th Civil Court of the Regional Forum of Santo Amaro/SP.

Av. Brig. Faria Lima, 3311, 13º andar, Itaim Bibi, São Paulo, SP | 04538-133 – Brasil | Tel.: 11 3552-5000
www.twk.com.br  |  E-mail: contato@twk.com.br



(R$24,000,000.00), social security obligations, as well as suppliers of goods and service providers, and tax obligations.

69.           The fact is that in addition to potentially preventing the payment of salaries to employees, the purchase of inputs used in sugarcane cultivation and in the preparation/production of VHP sugar and ethanol, and the payment of amounts due to partners and suppliers—which, on its own already represents a disrespect to the principle of preservation of corporate activities set forth in Article 47 of the LRF—the Execution Proceedings filed by Banco Votorantim S.A. and the account freezing requested therein—some of which have already been granted—may, as a result of the foregoing, severely compromise the trust of the other creditor financial institutions regarding the ability of the Petitioners to fulfill the obligations they intend to assume under the PRE.

70.           We also highlight that it is the beginning of the Crop period for the Petitioner Mill, i.e., the industrial units are beginning to mill sugar cane to produce sugar, ethanol and electricity to generate cash. At this time, the financial provisions for the period between crops—when all pieces of equipment of the industrial units and agricultural equipment undergo maintenance—are running out. Accordingly, especially in this critical period, the imposition of restrictions directly on the flow of the Petitioners is extremely harmful.

71.           To understand otherwise, as alleged only with respect to the principle of contingency, would be to privilege a tiny number of creditors to the detriment of an entire collectivity, as few creditors would satisfy their claims with inputs that are key to the development of these companies, leaving the other

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



creditors in disadvantage. Therefore, maintaining the businesses of the Petitioners in possession of these assets certainly leave them in a stronger and more profitable position, allowing a quicker and more efficient reemergence.

72.                   It is known that, pursuant to Article 300 and following of the Brazilian Code of Civil Procedure, the interlocutory relief must always be granted in the presence of likelihood of success in the proceeding and the danger of irreparable or difficult-to-repair harm.

73.                   In the case in hand, both requirements are present.

74.                   This initial petition—and the documents attached hereto—formally and materially fulfill the requirements set forth in Law No. 11,101/2005 for the granting of the processing of the judicial recovery and the order to stay the lawsuits and foreclosure proceedings set forth in Article 6, paragraph 4 of Law No. 11,101/2005. This is the likelihood of success in the proceeding.

75.                   Moreover, it is certain that, in the event the restrictions insistently requested by Banco Votorantim are imposed and reiterated, the Petitioners may be deprived from assets that are key to the regular maintenance of their activities, whether financial assets or not, which may defeat even the feasibility of the intended financial emergence. Therefore, the danger of delay undeniably exists.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

76.        Accordingly, in order to avoid the continuation of lawsuits that may affect the assets of the company and its future economic feasibility, as well as to prevent the loss of thousands of direct and indirect jobs created by their activities, the Petitioners hereby request interlocutory relief, to obtain from this Court the immediate order to stay the foreclosure proceedings filed by Banco Votorantim S.A. listed in the document attached hereto (**exhibit 13**), for at least the period required to review the documentation attached hereto and review the request for processing of this judicial recovery.

## REQUESTS

77.        In view of the foregoing, having adequately confirmed that the Petitioners meet all the requirements for the granting of this judicial recovery petition, and presented all documents pursuant to Article 51 of the LRF, the Petitioners hereby request:

**a)**    the granting of the interlocutory relief to, pursuant to Article 6 of the LRF, order the stay of all lawsuits and foreclosure proceedings filed against the Petitioners, especially those filed by Banco Votorantim S.A., which claim immediate restrictions on the assets of the Petitioners; and the issuance of an official letter to the 9th and 14th civil courts of the Regional Forum of Santo Amaro, judicial district of São Paulo/SP, and to the 19th civil court of the Central Forum of the judicial district of São Paulo/SP, in accordance with the list attached hereto (see exhibit 9);

**b)**    the granting of the processing of this judicial recovery petition;



**c)**    the appointment of a judicial administrator – Article 52, item I, of Law No. 11,101/2005;

**d)**    the dismissal of presentation of clearance certificates related to the performance of their activities – Article 52, item II, of Law No. 11,101/2005;

**e)**    the stay of all pending lawsuits and foreclosure proceedings filed against the Petitioners, as expressly provided in Article 6, paragraph 4 of the LRF [22] – Article 52, item III, of Law No. 11,101/2005;

**f)**    service of process to the Prosecution Office (*Ministério Público*) and notification of the Federal State and Municipal Treasuries – Article 52, item V, of Law No. 11,101/2005;

**g)**    publication of the notice referred to in paragraph 1 of Article 52 of the LRF.

78.    Furthermore, the Petitioners inform that they will present **(i)** monthly statements for the duration of the judicial recovery (Article 52, item IV, of Law No. 11,101/2005) and **(ii)** a Judicial Recovery Plan, within the legal term, pursuant to Article 53 of the LRF.

---

[22] Art. 6. The adjudication of bankruptcy or granting of processing of judicial recovery tolls the statute of limitations and stays all lawsuits and execution proceedings filed against the debtor, including those filed by private creditors of joint and several partners.

(…)

Paragraph 4. In the case of judicial recovery, the stay referred to in the head provision of this Article can, under no circumstances, exceed the unextendible term of one hundred eighty (180) days from the date of granting of processing of the judicial recovery; after the end of this term, creditors are once again entitled to file or continue lawsuits or execution proceedings, regardless of judicial order.

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR



79.                    Finally, the Petitioners requests that all notices related to this petition be sent to counsel **Joel Luis Thomaz Bastos** (OAB/SP 122.443), **Ivo Waisberg** (OAB/SP 146.176) and **Bruno Kurzweil de Oliveira** (OAB/SP 248.704), all of whom with office at Avenida Brigadeiro Faria Lima, 3.311, 13° andar, São Paulo/SP, CEP 04538-133, under penalty of nullity, pursuant to Article 272, paragraph 5, of the Brazilian Code of Civil Procedure.

80.                    The amount in dispute is four billion, four hundred ninety-one million, eight hundred four thousand, nine hundred fifty-two *Reais* and ninety-three *centavos* (R$4,491,804,952.93) and the Petitioners request the entry of the proof of payment of court costs in the court records **(exhibit 14).**

Grant is requested.

Maringá/PR, March 21, 2019.

**Joel Luís Thomaz Bastos**          **Ivo Waisberg**          **Bruno Kurzweil de Oliveira**
    OAB/SP 122.443                      OAB/SP 146.176                  OAB/SP 248.704

**Lucas Rodrigues do Carmo**          **Patricia Fernandes da Silva**
    OAB/SP 299.667                          OAB/SP 391.729

[Bar code] Document digitally signed pursuant to MP No 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of TJPR/OE
Verify the authenticity of this document at http:\\projudi.tjpr.jus.br/projudi/ – Identifier: PJD8F 3EQ2Z BWJJ5 6MNFR

## DECLARATION CERTIFYING ACCURACY OF TRANSLATION

I, Juliana Kurasawa, Managing Partner of Flow Translations, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

1. I am a professional translator with approximately eight years of professional experience in translating Portuguese into English.

2. I have prepared the attached translation of the Judicial Recovery Petition, dated March 22, 2019, which to the best of my professional knowledge and belief is a true and accurate translation from Portuguese into English.

I, Juliana Kurasawa, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:     March 22, 2019
                 São Paulo, Brazil

By:    Juliana Kurasawa
Title:  Managing Partner, Flow Translations

# **EXHIBIT G**

**Preliminary Injunction**

PROJUDI - Processo: 0006422-55.2019.8.16.0017 - Ref. mov. 90.1 - Assinado digitalmente por Roberta Carmen Scramim de Freitas:9937
30/03/2019: CONCEDIDA A LIMINAR. Arq: Decisão

19-CED199-MRGA    Doc 4    Filed 04/18/19    Entered 04/18/19 16:07:03    Main Document
Pg 122 of 144



**PODER JUDICIÁRIO DO ESTADO DO PARANÁ**
**COMARCA DA REGIÃO METROPOLITANA DE MARINGÁ - FORO CENTRAL DE MARINGÁ**
**4ª VARA CÍVEL DE MARINGÁ - PROJUDI**
**Av. Pedro Taques, 294 - 1ª Sobreloja - Torre Norte - Atendimento ao público: das 12h às 18h -**
**Maringá/PR - CEP: 87.030-008 - Fone: (44) 3472-2304**

**Autos nº. 0006422-55.2019.8.16.0017**

Processo: 0006422-55.2019.8.16.0017
Classe Processual: Recuperação Judicial
Assunto Principal: Recuperação judicial e Falência
Valor da Causa: R$4.491.804.952,93
Autor(es):
- A MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- A. MENEGUETTE AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A., AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A. representado(a) por Joel Luis Thomaz Bastos
- ELEN CRISTIAN MORENO MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- FRANCISCO MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- HEMFIL PARTICIPAÇÕES E COMERCIO DE PRODUTOS AGROPASTORIL S.A. representado(a) por Joel Luis Thomaz Bastos
- I M CREMA MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- IGUATEMY PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL LTDA representado(a) por Joel Luis Thomaz Bastos
- IMEF – PARTICIPAÇÕES E COMÉRCIO DE PRODUTOS AGRO PASTORIL LTDA. representado(a) por Joel Luis Thomaz Bastos
- J BATISTA MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- J CESAR MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- J.L. PARTICIPACOES E COMERCIO AGROPASTORIL S.A representado(a) por Joel Luis Thomaz Bastos
- M B MAGALHÃES SILVA MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- M E BOLONHEZ MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- M P M ZANIN MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- MOACIR MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- N. MARIA TORTATO MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- Nilsa Correa Faria Meneguetti representado(a) por Joel Luis Thomaz Bastos
- P MENEGUETTI AGROPECUARIA representado(a) por Joel Luis Thomaz Bastos
- PARTICIPAÇÕES E AGROPECUÁRIA M.M. LTDA. representado(a) por Joel Luis Thomaz Bastos
- ROSÂNGELA PERIN MENEGUETTE AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- S MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos


Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJYGQ PAYCQ 5BP JS YG64D

PROJUDI - Processo: 0006422-55.2019.8.16.0017 - Ref. mov. 90.1 - Assinado digitalmente por Roberta Carmen Scramim de Freitas:9937

30/03/2019: C19 CEDL99-MTEWA LDocR4 ArqFiles 04/18/19    Entered 04/18/19 16:07:03    Main Document

Pg 123 of 144



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJYGQ PAYCQ 5BPJS YG64D

- S S MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- USACIGA AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA S/A representado(a) por Joel Luis Thomaz Bastos
- USINA DE AÇÚCAR SANTA TEREZINHA representado(a) por Joel Luis Thomaz Bastos
- USINA RIO PARANÁ S.A. representado(a) por Joel Luis Thomaz Bastos
- V A FERNANDES MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- W J MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos

Réu(s):
- AGROPECUÁRIA SANTA TEREZINHA S/A representado(a) por Joel Luis Thomaz Bastos

1. Trata-se de pedido de recuperação judicial, no qual o **GRUPO ECONÔMICO**, formado pelos autores - 29 empresas em litisconsórcio ativo - pleiteia, em sede liminar, a concessão da tutela de urgência para que sejam suspensas todas as ações e execuções movidas em face da parte autora, em especial aquelas movidas pelo Banco Votorantim S.A.

Na petição inicial narram, ainda, que estão passando por crise econômico-financeira causada pela volatilidade econômica e mercadológica que ocorre no país nos últimos anos, porém possuem viabilidade financeira e operacional para a superação.

2. Ao analisar o pedido liminar formulado pela parte autora, verifica-se que possui natureza cautelar, já que visa garantir o resultado útil e eficaz do processo, qual seja, no presente caso, a plena recuperação das empresas que formam o grupo econômico. E, pelo menos em cognição sumária e *inaudita altera pars*, entendo que é caso de concessão da medida pleiteada, para determinar a suspensão de todas as ações e execuções já movidas (e que possam vir a ser) em face dos autores. Até o momento, ao que consta da inicial, o grupo conseguiu manter em dia o pagamento da folha de salário dos colaboradores no valor aproximado de R$ 24.000.000,00 (vinte e quatro milhões), as obrigações previdenciárias, além dos fornecedores de bens e serviços e as obrigações fiscais. Ressalto que a tutela de urgência pleiteada se mostra necessária, de acordo com o princípio da preservação das atividades empresariais (art. 47 da LRF), bem como possibilitando que todos os compromissos continuem sendo cumpridos pelo grupo, evitando que a crise econômico-financeira se agrave ainda mais e torne inviável e inútil eventual recuperação judicial, e/ou comprometendo a confiança dos demais credores e parceiros, de que os requerentes sejam capazes de cumprir as obrigações que pretendem assumir em eventual plano de recuperação.

Ainda não é caso de deferir o processamento recuperação judicial, pois resta pendente a juntada de documentos, o que, inclusive, é reconhecido pela parte autora (mov. 79.11). Também ainda não é o momento deste juízo se posicionar, deferindo ou não, o litisconsórcio quanto aos requerentes que promoveram o registro da atividade na Junta há poucos dias. No entanto, permitir que as ações e execuções contra os requerentes continuem tramitando, possibilitando a efetivação de constrições patrimoniais de grande monta, é medida que pode agravar a situação do grupo e ir em desencontro ao princípio da preservação insculpido na Lei nº 11.101/05.

Nos termos do art. 300 do NCPC, para a concessão da tutela de urgência, é necessária a presença de elementos que evidenciem a probabilidade do direito (*fumus boni iuris*) e o perigo de dano ou risco ao resultado útil do processo (*periculum in mora*). Pelos argumentos expostos nos parágrafos anteriores, resta clara a presença dos requisitos legais.

Ainda no que diz respeito à probabilidade do direito, mesmo que reste pendente a juntada de alguns documentos previstos no art. 51 da LFR, verifica-se que grande parte deles já foi exibida nos autos, de modo que a falta pode ser sanada mediante emenda à petição inicial.

É importante destacar que a medida é totalmente reversível, não gerando prejuízos irreparáveis aos credores que estão ingressando com ações judiciais em face das empresas pertencentes ao grupo econômico, porque, caso a recuperação judicial não seja deferida, os processos poderão ser retomados de pronto.

Ante todo o exposto, **defiro** a tutela de urgência de natureza cautelar, para o fim de determinar a suspensão de todas as ações e execuções movidas em face dos autores, especialmente aquelas elencadas na inicial, ressalvadas as hipóteses previstas no art. 6º, §§1º, 2º e 7º, da Lei nº 11.101/05.

3. Caberá à parte autora comunicar os juízos em que tramitam as ações e execuções, acerca da concessão da referida tutela de urgência, podendo se utilizar de cópia desta decisão para os devidos fins.

4. Considerando que ainda restam pendentes alguns documentos a serem juntados para instruir o pedido inicial, e a necessidade de aferimento da regularidade da documentação técnica e das reais condições econômico-financeiras das empresas, especialmente daquelas recém registradas na junta Comercial, o que proporcionará condições mais garantidas ao juízo acerca do deferimento ou não do processamento da recuperação judicial, **determino** a realização de perícia prévia.

Ressalta-se que já existem Tribunais que vêm adotando esta prática em determinados casos, como é o exemplo do Tribunal de Justiça do Estado de São Paulo:

> Agravo de instrumento – Recuperação judicial – Empresa recuperanda que pretende a reforma da decisão que determinou perícia para avaliar a real existência de crise empresarial, seu regular funcionamento e a regularidade da documentação – Perícia prévia ao processamento que embora não possua previsão legal mostra-se necessária no caso em exame – Decisão mantida – Recurso não provido. Dispositivo: negaram provimento ao recurso, por maioria de votos. (TJSP – AI 21335044420188260000, Rel. Ricardo Negrão, 2ª Câmara Reservada de Direito Empresarial, J. 22.10.18, DJe 07.11.18)

5. **Nomeio**, para realização da perícia prévia, **DELOITTE TOUCHE TOHMATSU**, com CNPJ nº 02.189.924/0001-03, representado pelo Sr. **LUIS VASCO ELIAS**, CPF nº



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ – Identificador: PJYGQ PAYCQ 5BPJS YG64D

073.762.938-09, com endereço na Av. Dr. Chucri Zaidan, nº 1240, 4.º ao 12º andares, CEP 04711-130, São Paulo – SP, e telefone (11) 5186-1000. Anoto já ter sido noticiada pelo juízo, nesta data (pessoalmente), a nomeação, na pessoa do representante, sr. LUIS VASCO ELIAS.

6. **Proceda-se** com a habilitação da empresa nomeada como Perita nos autos.

7. **Anoto** o prazo de 7 dias (corridos) para apresentação da perícia.

8. **Decreto** o segredo de justiça dos documentos juntados em mov. 79, com fulcro no art. 189 do NCPC, e 5º, inciso X, da CF/88.

9. **Intimem-se**.

Diligências necessárias.


Maringá, data da assinatura eletrônica.


**Roberta C. Scramim de Freitas**

**Juíza de Direito Substituta**



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJYGQ PAYCQ 5BPJS YG6xD

PROJUDI – Case: 0006422-55.2019.8.16.0017 – Ref. mov. 90.1 – Digitally signed by Roberta Carmen Scramim de Freitas: 9937
03/30/2019: INTERLOCUTORY RELIEF GRANTED. File: Decision



**JUDICIARY BRANCH OF THE STATE OF PARANÁ**

**JUDICIAL DISTRICT OF THE METROPOLITAN REGION OF MARINGÁ – CENTRAL FORUM OF MARINGÁ**

**4th CIVIL COURT OF MARINGÁ – PROJUDI**

**Av. Pedro Taques, 294 – 1ª Sobreloja – Torre Norte – Open to the public from 12 p.m. to 6 p.m.**

**Maringá/PR – CEP: 87030-008 – Telephone: (44) 3472-2304**

---

**Case No. 0006422-55.2019.8.16.0017**

---

| | |
|---|---|
| Case: | 0006422-55.2019.8.16.0017 |
| Procedural Class: | Judicial Recovery |
| Main Subject: | Judicial Recovery and Bankruptcy |
| Amount in Controversy: | R$4,491,804,952.93 |
| Plaintiff(s): | |

- A MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- A. MENEGUETTE AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A., AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A. represented by Joel Luis Thomaz Bastos
- ELEN CRISTIAN MORENO MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- FRANCISCO MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- HEMFIL PARTICIPAÇÕES E COMERCIO DE PRODUTOS AGROPASTORIL S.A. represented by Joel Luis Thomaz Bastos
- I M CREMA MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- IGUATEMY PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL LTDA represented by Joel Luis Thomaz Bastos
- IMEF – PARTICIPAÇÕES E COMÉRCIO DE PRODUTOS AGRO PASTORIL LTDA. represented by Joel Luis Thomaz Bastos
- J BATISTA MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- J CESAR MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- J.L. PARTICIPACOES E COMERCIO AGROPASTORIL S.A represented by Joel Luis Thomaz Bastos
- M B MAGALHÃES SILVA MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- M E BOLONHEZ MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- M P M ZANIN MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- MOACIR MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- N. MARIA TORTATO MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- Nilsa Correa Faria Meneguetti represented by Joel Luis Thomaz Bastos


Digitally signed document, pursuant to MP No. 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of the TJPR/OE
Verify the authenticity of this document at https://projudi.tjpr.jus.br/projudi/ – Identifier: PJYGQ PAYCQ 5BPJS YG64D

PROJUDI – Case: 0006422-55.2019.8.16.0017 – Ref. mov. 90.1 – Digitally signed by Roberta Carmen Scramim de Freitas: 9937
03/30/2019: INTERLOCUTORY RELIEF GRANTED. File: Decision

- P MENEGUETTI AGROPECUARIA represented by Joel Luis Thomaz Bastos
- PARTICIPAÇÕES E AGROPECUÁRIA M.M. LTDA. represented by Joel Luis Thomaz Bastos
- ROSÂNGELA PERIN MENEGUETTE AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- S MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- S S MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- USACIGA AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA S/A represented by Joel Luis Thomaz Bastos
- USINA DE AÇUCAR SANTA TEREZINHA represented by Joel Luis Thomaz Bastos
- USINA RIO PARANÁ S.A. represented by Joel Luis Thomaz Bastos
- V A FERNANDES MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos
- W J MENEGUETTI AGROPECUÁRIA represented by Joel Luis Thomaz Bastos

Defendant(s):
- AGROPECUÁRIA SANTA TEREZINHA S/A represented by Joel Luis Thomaz Bastos



1.      This is with regards to a judicial recovery, in which the **ECONOMIC GROUP**, comprised of 29 companies joined as plaintiffs, requesting interlocutory relief to stay all lawsuits and foreclosure proceedings filed against the plaintiff, especially those filed by Banco Votorantim S.A.

In the initial petition, the plaintiffs also state that they are undergoing an economic and financial crisis caused by the economic and market volatility in Brazil in recent years; however, they claim to have financial and operational feasibility to overcome this crisis.

2.      The analysis of the request for interlocutory relief filed by the plaintiff shows its provisional nature, as it aims at ensuring the useful and efficient result of the proceeding, i.e., in this case, the full recovery of the companies that comprise the economic group. And, at least in a summary cognizance and *ex parte*, I understand that the relief requested must be granted to order the stay of all lawsuits and foreclosure proceedings that have already been filed (and may be filed in the future) against the plaintiffs. Until now, based on the initial petition, the group managed to pay, on the due dates, the salaries of employees in the approximate amount of twenty-four million *Reais* (R$24,000,000.00), social security obligations, suppliers of goods, service providers and tax obligations. I note that the interlocutory relief requested is needed, based on the principle of preservation of corporate activities (Article 47 of the LRF), to allow all obligations to continue to be fulfilled by the group, avoiding a further worsening of the economic and financial crisis, which could render any judicial recovery unfeasible and useless and/or compromise the trust of the other creditors and partners in the ability of the plaintiffs to meet the obligations they intend to assume under any future recovery plan.

It is not the case yet to grant the processing of the judicial recovery because documents still have to be entered in the records, as recognized by the plaintiff (mov. 79.11). Neither is it time yet for this court to grant or deny the joinder of the plaintiffs that registered with the Board of Trade a few days ago. However, to allow the continuation of the lawsuits and foreclosure proceedings filed against the plaintiffs, allowing the imposition of restrictions on assets in significant amounts, may worsen the condition of the group, which is against the principle of preservation set forth in Law No. 11,101/05.

Pursuant to Article 300 of the Brazilian New Code of Civil Procedure, the granting of interlocutory relief is subject to the presence of elements that evidence the likelihood of success in the proceeding (*fumus boni iuris*) and the danger of harm or risk to the useful result of the proceeding (*periculum in mora*). Based on the aforementioned arguments, the legal requirements are clearly present.

PROJUDI – Case: 0006422-55.2019.8.16.0017 – Ref. mov. 90.1 – Digitally signed by Roberta Carmen Scramim de Freitas: 9937
03/30/2019: INTERLOCUTORY RELIEF GRANTED. File: Decision

Still in regard to the likelihood of success in the proceeding, even if some of the documents set forth in Article 51 of the LFR still have to be entered in the records, we find that most of them have already been shown in the records, and this failure can be cured by amending the initial petition.

It is important to highlight that this measure is fully reversible and does not create irreparable harm to the creditors that are filing lawsuits against the companies that comprise the economic group because, if the judicial recovery is not granted, these lawsuits may be readily resumed.

As a result of the foregoing, **I hereby grant** the interlocutory relief to order the stay of all lawsuits and foreclosure proceedings filed against the plaintiffs, especially those listed in the initial petition, subject to the events set forth in Article 6, paragraphs 1, 2 and 7, of Law No. 11,101/05.

3.        The plaintiffs must inform the courts that are processing the lawsuits and foreclosure proceedings about the granting of this interlocutory relief, and they may use a copy of this decision for the due purposes.

4.        Considering that some documents still have to be entered in the records to support the initial petition, and the need to verify the good standing of the technical documentation and the actual economic and financial conditions of the companies, especially those that were recently registered with the Board of Trade, which will provide stronger conditions for the court to grant or deny the processing of the judicial recovery, **I hereby order** the production of preliminary expert evidence.

I highlight that some Courts have already been adopting this practice in certain cases, including the Court of Justice of the State of São Paulo.

> Interlocutory appeal – Judicial recovery – Company debtor that seeks to overrule the judgment that ordered the production of expert evidence to verify any actual corporate crisis, its regular operations and the good standing of the documentation – although the production of expert evidence before the processing is not supported by legal provisions, it is required in this case – Judgment upheld – Appeal denied. Conclusion: the appeal was denied, by majority vote. (TJSP – AI 21335044420188260000, Justice rapporteur: Ricardo Negrão, 2nd Reserved Chamber of Corporate Law, J. 10.22.18, DJe 11.7.18)

5.        **I hereby appoint**, for the production of preliminary expert evidence, **DELOITTE TOUCHE TOHMATSU**, enrolled with the Corporate Taxpayers' Registry (CNPJ) under No. 02.189.924/0001-03, represented by Mr. **LUIS VASCO ELIAS**, enrolled with the Individual Taxpayers' Registry (CPF) under No. 073.762.938-09, with address at Av. Dr. Chucri Zaidan, 1240, 4º to 12º andares, CEP 04711-130, São Paulo – SP, telephone (11) 5186-1000. On the date hereof, this court has already notified, in person, Mr. LUIS VASCO ELIAS of his appointment.

6.        **I order** the recording of the company appointed as Expert in the records.

7.        **I set forth** a term of seven (7) calendar days for presentation of the expert evidence.

8.        **I order** that the documents entered in mov. 79 be kept under seal, pursuant to Article 189 of the Brazilian New Code of Civil Procedure, and Article 5, item X, of the Brazilian Federal Constitution of 1988.

9.        **Notify the parties**.

Proceed with the required diligences.

Maringá, date of the electronic signature.

**Roberta C. Scramim de Freitas**

**Substitute Judge**



Digitally signed document, pursuant to MP No. 2,200-2/2001, Law No. 11,419/2006, Projudi resolution, of the TJPR/OE
Verify the authenticity of this document at https://projudi.tjpr.jus.br/projudi/ – Identifier: PJYGQ PAYCQ 5BPJS YG64D

## DECLARATION CERTIFYING ACCURACY OF TRANSLATION

I, Juliana Kurasawa, Managing Partner of Flow Translations, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

1. I am a professional translator with approximately eight years of professional experience in translating Portuguese into English.

2. I have prepared the attached translation of the Decision Granting Interlocutory Relief, dated March 30, 2019, which to the best of my professional knowledge and belief is a true and accurate translation from Portuguese into English.

I, Juliana Kurasawa, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:     March 31, 2019
                 São Paulo, Brazil

_____

By:    Juliana Kurasawa
Title:    Managing Partner, Flow Translations

## EXHIBIT H

**RJ Acceptance Order[1]**

---

[1] The Foreign Representative will file with the Court an English translation of the RJ Acceptance Order as soon as it is available.



**PODER JUDICIÁRIO DO ESTADO DO PARANÁ**
**COMARCA DA REGIÃO METROPOLITANA DE MARINGÁ - FORO CENTRAL DE MARINGÁ**
**4ª VARA CÍVEL DE MARINGÁ - PROJUDI**
Av. Pedro Taques, 294 - 1ª Sobreloja - Torre Norte - Atendimento ao público: das 12h às 18h -
Maringá/PR - CEP: 87.030-008 - Fone: (44) 3472-2304

**Autos nº. 0006422-55.2019.8.16.0017**

Processo: 0006422-55.2019.8.16.0017
Classe Processual: Recuperação Judicial
Assunto Principal: Recuperação judicial e Falência
Valor da Causa: R$4.491.804.952,93
Autor(es):
- A MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- A. MENEGUETTE AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A., AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A. representado(a) por Joel Luis Thomaz Bastos
- ELEN CRISTIAN MORENO MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- FRANCISCO MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- HEMFIL PARTICIPAÇÕES E COMERCIO DE PRODUTOS AGROPASTORIL S.A. representado(a) por Joel Luis Thomaz Bastos
- I M CREMA MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- IGUATEMY PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL LTDA representado(a) por Joel Luis Thomaz Bastos
- IMEF – PARTICIPAÇÕES E COMÉRCIO DE PRODUTOS AGRO PASTORIL LTDA. representado(a) por Joel Luis Thomaz Bastos
- J BATISTA MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- J CESAR MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- J.L. PARTICIPACOES E COMERCIO AGROPASTORIL S.A representado(a) por Joel Luis Thomaz Bastos
- M B MAGALHÃES SILVA MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- M E BOLONHEZ MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- M P M ZANIN MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- MOACIR MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- N. MARIA TORTATO MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- Nilsa Correa Faria Meneguetti representado(a) por Joel Luis Thomaz Bastos
- P MENEGUETTI AGROPECUARIA representado(a) por Joel Luis Thomaz Bastos
- PARTICIPAÇÕES E AGROPECUÁRIA M.M. LTDA. representado(a) por Joel Luis Thomaz Bastos
- ROSÂNGELA PERIN MENEGUETTE AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- S MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3



- S S MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- USACIGA AÇÚCAR, ÁLCOOL E ENERGIA ELÉTRICA S/A representado(a) por Joel Luis Thomaz Bastos
- USINA DE AÇUCAR SANTA TEREZINHA representado(a) por Joel Luis Thomaz Bastos
- USINA RIO PARANÁ S.A. representado(a) por Joel Luis Thomaz Bastos
- V A FERNANDES MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos
- W J MENEGUETTI AGROPECUÁRIA representado(a) por Joel Luis Thomaz Bastos

Réu(s): 
- AGROPECUÁRIA SANTA TEREZINHA S/A representado(a) por Joel Luis Thomaz Bastos

Vistos.

1. **Recebo** as petições e documentos em mov. 79, 81, 95, 96 e 97 como emenda à inicial.

2. **Altere-se** o polo passivo da demanda, para o fim de incluir e constar somente "O JUÍZO" e excluir "AGROPECUÁRIA SANTA TEREZINHA S/A". Em seguida, deve ser incluída no polo ativo a empresa "SANTA TEREZINHA PARTICIPAÇÕES S.A." (que é o nome que consta nos documentos), inscrita no CNPJ nº 79.109.237/0001-65, cadastrando o advogado, Dr. Joel Luis Thomaz Bastos (OAB/SP 122.443), como representante legal da parte. **Comunique-se** ao Distribuidor.

3. Tratam-se os autos de pedido de recuperação judicial formulado por **USINA DE AÇUCAR SANTA TEREZINHA**, **USINA RIO PARANÁ S.A.**, **USACIGA – AÇUCAR ÁLCOOL E ENERGIA ELÉTRICA LTDA.**, **SANTA TEREZINHA PARTICIPAÇÕES S.A.**, **PARTICIPAÇÕES E AGROPECUÁRIA M.M. LTDA.**, **J.L. PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A.**, **IMEF- PARTICIAÇÕES E COMÉRCIO DE PRODUTOS AGRO PASTORIL LTDA.**, **IGUATEMY PARTICIPAÇÕES LTDA.**, **HEMFIL PARTICIPAÇÕES E COMÉRCIO DE PRODUTOS AGROPASTORIL S.A.**, **AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A.**, **P MENEGUETTI AGROPECUÁRIA**, **S MENEGUETTI AGROPECUÁRIA**, **M P M ZANIN MENEGUETTI AGROPECUÁRIA**, **I M CREMA MENEGUETTI AGROPECUÁRIA**, **MOACIR MENEGUETTI AGROPECUÁRIA**, **M B MAGALHÃES SILVA MENEGUETTI AGROPECUÁRIA**, **A. MENEGUETTE AGROPECUÁRIA**, **ROSÂNGELA PERIN MENEGUETTE AGROPECUÁRIA**, **J BATISTA MENEGUETTI AGROPECUÁRIA**, **MARIA TORTATO MENEGUETTI AGROPECUÁRIA**, **J CESAR MENEGUETTI AGROPECUÁRIA**, **M E BOLONHEZ MENEGUETTI AGROPECUÁRIA**, **FRANCISCO MENEGUETTI AGROPECUÁRIA**, **NILSA CORREA FARIA MENEGUETTI**, **W J MENEGUETTI AGROPECUÁRIA**, **A MENEGUETTI AGROPECUÁRIA**, **S S MENEGUETTI AGROPECUÁRIA**, **ELEN CRISTIAN MORENO MENEGUETTI AGROPECUÁRIA** e **V A FERNANDES MENEGUETTI AGROPECUÁRIA**, denominadas **GRUPO SANTA TEREZINHA**.

Na petição inicial (mov. 1.1), narram, em apertada síntese, que o Grupo Santa Terezinha surgiu no início da década de 1960 e sempre empreendeu esforços para conseguir relevância

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3

PROJUDI - Processo: 0006422-55.2019.8.16.0017 - Ref. mov. 111.1 - Assinado digitalmente por Roberta Carmen Scramim de Freitas:9937
15/04/2019: CONCEDIDO PROCESSAMENTO. Arq: Decisão

Pg 133 of 144

cada vez maior no mercado sucroalcooleiro, mediante processo de ampliação do parque industrial, aquisição de outras usinas e unidades produtivas na região, e expansão das operações. No entanto, o grupo está passando por crise econômico-financeira causada pela volatilidade econômica e mercadológica que ocorre no país nos últimos anos, por questões climáticas adversas, pelo avanço da inflação e pela contenção de preço da gasolina. Alegam que possuem viabilidade financeira e operacional para a superação, sendo que a crise é momentânea e pontual.

As recuperandas emendaram a exordial e procederam com a juntada de documentos que estavam pendentes (mov. 79, 81, 95, 96 e 97).

A tutela de urgência cautelar requerida pelas recuperandas foi deferida, para determinar a suspensão de todas as ações e execuções movidas em face das mesmas, bem como houve determinação para realização de perícia prévia (mov. 90).

A empresa Deloitte Touche Tohmatsu, nomeada como perita, apresentou o relatório de perícia prévia em mov. 99, com retificação em mov. 104.2.

O credor ING BANK N.V. peticionou nos autos, defendendo que os produtores rurais não podem pedir recuperação judicial, ante a natureza constitutiva do registro perante a Junta Comercial; ainda, porque a atividade empresarial é exercida por pessoas jurídicas criadas pelos produtores, mas não por eles próprios, e porque deve ser respeitada a segurança jurídica das operações, uma vez que a instituição financeira contratou com pessoas físicas, não com empresários (mov. 101.1).

O credor Bruno Erico Gonçalves requereu a habilitação de seu crédito (mov. 105.1).

Manifestação das recuperandas ao mov. 106.1.

É o relatório. Passo a decidir.

3. Os documentos juntados aos autos comprovam que quase todas as recuperandas preenchem os requisitos legais para requerer a recuperação judicial, conforme art. 48 da Lei nº 11.101/05. A petição inicial foi suficientemente instruída, nos termos exigidos pelo art. 51 da Lei nº 11.101/05. A análise prévia efetuada pela empresa nomeada revela que os requisitos legais foram preenchidos. Em síntese, com uma pequena ressalva quanto a uma das empresas, o pedido está em termos para ter o seu processamento deferido, já que presentes os requisitos legais (artigos 47, 48 e 51 da Lei 11.101/2005), verificando-se a possibilidade de superação da "crise econômico-financeira" do grupo.

## 4. RECUPERAÇÃO JUDICIAL DO PRODUTOR RURAL

No caso em tela, necessária a discussão e análise do tema relacionado à possibilidade, ou não, do empresário produtor rural requerer a recuperação judicial. A questão gravita em torno de dois pontos principais: (i) natureza jurídica do registro na Junta Comercial, se


Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3

declaratória ou constitutiva; (ii) comprovação do exercício da atividade rural há mais de dois anos, e se é necessário, ou não, já estar registrado perante a Junta Comercial.

O Código Civil de 2002, em seu art. 966, estabelece que o empresário é "*quem exerce profissionalmente atividade econômica organizada para a produção ou a circulação de bens ou de serviços*". E, como regra geral, é obrigatória a inscrição do empresário na Junta Comercial antes do início de sua atividade, nos termos do art. 967 do mesmo *codex*. Entretanto, para o produtor rural, o legislador decidiu prever situação favorecida, diferenciada e simplificada (art. 970), ao estabelecer que a inscrição deste tipo de empresário é facultativa, de modo que, caso venha a requerer a inscrição, ficará equiparado, para todos os efeitos, ao empresário sujeito a registro, conforme se verifica pela leitura do art. 971:

> O empresário, cuja atividade rural constitua sua principal profissão, **pode**, observadas as formalidades de que tratam o art. 968 e seus parágrafos, requerer inscrição no Registro Público de Empresas Mercantis da respectiva sede, caso em que, depois de inscrito, ficará equiparado, para todos os efeitos, ao empresário sujeito a registro. (grifou-se)

A Lei nº 11.101/05 "*disciplina a recuperação judicial, a recuperação extrajudicial e a falência do empresário e da sociedade empresária, doravante referidos simplesmente como devedor*", nos termos do art. 1º. O aplicador do direito deve, então, realizar interpretação sistemática dessa norma conjuntamente com o art. 966 citado acima, com o intuito de verificar quem pode, dentro de nosso ordenamento jurídico pátrio, pleitear a recuperação judicial, a recuperação extrajudicial e a falência.

Logo em seguida, a Lei de Recuperação de Empresas e Falência (LRF), no art. 2º, exclui do seu âmbito de aplicação as empresas públicas, sociedades de economia mista, instituições financeiras, cooperativas de crédito, consórcios, entidades de previdência complementar, operadoras de planos de saúde, seguradoras, sociedades de capitalização e outras a elas equiparadas.

Portanto, ressalvadas as exceções acima listadas, as normas e institutos previstos na LRF serão aplicados para qualquer pessoa que tenha a qualidade de empresário.

É importante destacar que o art. 48, *caput*, da LRF, estabelece que somente "*poderá requerer recuperação judicial o devedor que, no momento do pedido, exerça regularmente suas atividades há mais de 2 (dois) anos*".

Surge, então, a discussão sobre a regularidade do exercício da atividade (empresarial) do produtor rural.

Parcela da doutrina e jurisprudência[1] defende a tese de que o registro na Junta Comercial deve ser efetuado dois anos antes do ajuizamento do pedido de recuperação judicial, ao argumento que somente após essa inscrição o produtor rural alcança a condição de empresário. Sob esse prisma, o registro tem natureza constitutiva, com efeitos *ex nunc*.

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA58Q TYPV3

Segundo essa corrente, o Código Civil de 2002 tornou facultativo o registro. O produtor rural, portanto, poderá escolher entre promover o registro ou não. Esta escolha, entretanto, afetará diretamente o seu regime jurídico, pois, promovido o registro, estará inserido no regime jurídico empresarial (abrangido pela Lei nº 11.101/05), caso contrário, estará sujeito ao regime jurídico civil[2].

No entanto, *data venia*, entendo que a posição acima não vai de encontro com a interpretação teleológica e sistemática que deve ser feita quanto ao tema.

Como já explicitado, para o produtor rural – especialmente pela redação do art. 970 – seu registro é facultativo, mas a ausência do registro não desvirtua todas as características do negócio, posto que está exercendo profissionalmente atividade econômica organizada para a produção e circulação de bens, conforme determina o art. 966. Assim, mesmo que sem o registro, o produtor rural pode exercer regularmente suas atividades, sendo que "*o que a lei exige no referido artigo 48 é o exercício de dois anos de regular atividade, e não dois anos de inscrição na Junta Comercial*"[3].

Sobre o tema, o professor Manoel Justino Bezerra Filho explica o porquê da confusão:

> Este óbice surgiu porque houve uma certa confusão com a lei anterior, o Decreto-Lei nº 7.661/1945, que exigia, em seu artigo 158, a prova de "exercer regularmente o comércio há mais de dois anos", enquanto a lei atual exige "exercer regularmente suas atividades". O produtor rural não inscrito na Junta, por óbvio, exerce regularmente suas atividades e pode pedir recuperação com inscrição inferior a dois anos. Neste sentido: AI 2.037.064-59. 2013.8.26.0000 - TJ-SP; AI - CV nº 1.0000.17.026108-5/001 - TJ-MG; AI 2.048.349-10.2017.8. 26.0000 - TJ-SP; AI 2.251.128- 51.2017.8.26.0000 - TJ-SP; AREsp 896.041 - STJ - (decisão monocrática do Min. Marco Aurélio Bellizze) - j. em 12.5.2016; REsp 1.478.001 - STJ - Rel. Min. Raul Araújo; REsp 1.193.115-MT- Rel. Min. Sidnei Beneti - (este julgado não exige o exercício por dois anos após a inscrição, exige apenas que a inscrição seja anterior ao ajuizamento do pedido de recuperação).[4]

A inscrição no Registro Público, nesse contexto, é necessária para que o empresário rural possa seja equiparado ao empresário sujeito a registro, permitindo a ele requerer a recuperação judicial e a falência, por exemplo. Mas, a ausência da inscrição não acarreta, por si só e de modo algum, em irregularidade do exercício das atividades.

A jurisprudência pátria[5] vem caminhando no sentido de que o exercício da atividade há mais de dois anos e a existência do registro, independente da data em que foi efetuado, possibilitam ao produtor rural requerer a recuperação judicial, conforme decisões a seguir, dos Egrégios Tribunais de Justiça do Estado de Minas Gerais e do Estado do Paraná, respectivamente, salientando que a última decisão não é definitiva, tendo sido proferida em sede liminar:

> DIREITO EMPRESARIAL. DEFERIMENTO DA RECUPERAÇÃO JUDICIAL. PREENCHIMENTO DOS ART. 48 E 51 DA LEI Nº 11.101/2005. ALTERAÇÃO DO TIPO SOCIETÁRIO. RECURSO DESPROVIDO.



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3

PROJUDI - Processo: 0006422-55.2019.8.16.0017 - Ref. mov. 111.1 - Assinado digitalmente por Roberta Carmen Scramim de Freitas:9937

15/04/2019: CONCEDIDA LIMINAR. Arq: Decisão    Doc 4    Filed 04/18/19    Entered 04/18/19 16:07:03    Main Document
Pg 136 of 144

- A Lei nº 11.101/2005, que disciplina o processo falimentar e de recuperação judicial, não estabelece um prazo de carência para que a sociedade empresária possa postular a recuperação judicial.

- Hipótese na qual a modificação da natureza societária da pessoa jurídica de direito privado – de sociedade simples para empresária – ocorrida dias antes do pedido de recuperação judicial não traduz conduta abusiva e que impeça a aplicação da Lei nº 11.101/2005. (AI 0261085-73.2017.8.13.0000, Rel. Alberto Vilas Boas, 1ª C. Cível, J. 14.11.17)

O art. 48 da Lei nº 11.101/2005 exige que o devedor, no momento do pedido de Recuperação Judicial, exerça regularmente as suas atividades há mais de 2 (dois)anos, no entanto, nada dispõe sobre a necessidade de registro na Junta Comercial por igual período. No presente caso, nota-se que os agravados exercem a atividade de produtores rurais há mais de 30 (trinta)anos, ainda que sem registro na Junta Comercial (mov. 1.12 e 1.13). Portanto, em que pese os agravados terem procedido as suas inscrições na Junta Comercial do Estado do Paraná poucos dias antes do ajuizamento da Recuperação Judicial,considerando que os agravados exerciam as suas atividades há mais de 2 (dois) anos, não há óbice para processamento da Recuperação Judicial". (TJPR. Decisão liminar proferida nos autos do Agravo de Instrumento nº 0001247-34.2019.8.16.0000; Rel. Des. Ramon de Medeiros Nogueira; 1ª Câmara Cível; J: 25/1/2019).

Insta salientar também, dentro dessa discussão, que os créditos constituídos pelos produtores rurais, mesmo antes da inscrição, estarão abarcados pela recuperação judicial, haja vista a impossibilidade de os credores virem a alegar desconhecimento das leis, porque o art. 971 do CC/02 previu situação excepcional e nova para o produtor rural. Ou seja, a norma é clara ao lhe permitir, em qualquer momento, a possibilidade de efetuar a inscrição perante a Junta Comercial, tornando-se um empresário equiparado. Cai por terra, então, a defesa dos credores (ao exemplo daquele que já se manifestou nos autos) no que tange ao alegado desrespeito à segurança jurídica das operações, por ter a instituição financeira contratado com pessoas físicas, não com empresários. Ora, a instituição contratou com pessoas físicas que, comprovando o exercício regular da atividade por prazo superior a dois anos e efetuando o registro (e apenas esses requisitos são exigidos pela lei), tornam-se empresários equiparados, sujeitos à recuperação.

Isto evidencia, ainda mais, a natureza declaratória do registro.

Cito, ainda, trecho importante do voto da Ministra Nancy Andrighi, no julgamento do REsp nº 1.193.115/MT, que destaca o dever de analisar as finalidades da Lei nº 11.101/05:

Ao lidar com a matéria, deve-se atentar, igualmente, à necessidade imposta pelo art. 970 do CC de se dispensar, no que concerne ao registro e seus efeitos, tratamento diferenciado e simplificado ao empresário rural, de modo a facilitar a continuidade e a manutenção de suas atividades.

Por derradeiro, é imprescindível reconhecer que o foco do aplicador do Direito, no que se refere à questão discutida, deve estar voltado ao atendimento precípuo das finalidades a que se destina a Lei 11.101/05.

Os princípios que orientaram a elaboração e que devem direcionar a interpretação e



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3

> a aplicação dessa lei objetivam garantir, antes de tudo, o atendimento dos escopos maiores do instituto da recuperação de empresas, tais como a **manutenção do ente no sistema de produção e circulação de bens e serviços, o resguardo do direito dos credores e a preservação das relações de trabalho envolvidas**, direta ou indiretamente na atividade. É o que se dessume do texto expresso da norma constante no art. 47 da LFRE. (grifo no original)

Ultrapassado esse ponto do tema, qual seja, a possibilidade de o produtor rural requerer recuperação judicial, desde que tenha comprovado o exercício da atividade por mais de dois anos e tenha o registro na Junta Comercial (corrente à qual me filio), passo a análise do caso concreto.

Ao compulsar os autos, verifica-se que os produtores rurais juntaram o comprovante do cadastro nacional da pessoa jurídica e o requerimento de empresário formulado junto a Junta Comercial (mov. 1.12 – p. 35 e 1.13). A única exceção é a autora NILSA CORREA FARIA MENEGUETTI, que juntou apenas comprovante do pedido de reabertura do registro de empresário perante a Junta Comercial (mov. 1.12 – p. 79/81), mas, para os fins da LRF, entendo ser ele suficiente, ao menos no atual momento processual.

Em seguida, as recuperandas juntaram aos autos (mov. 97.2/97.11) os comprovantes do exercício da atividade rural. Tratam-se de contratos de parceria agrícola, que demonstram efetivamente que os produtores rurais exerceram atividade por mais de dois anos. Inclusive, no relatório da perícia prévia (mov. 99.3) consta a data do início do exercício da atividade em relação a cada um dos produtores. Entretanto, não há qualquer documento comprovando o exercício da atividade que diga respeito ao autor SIDNEY SAMUEL MENEGUETTI, inexistindo a possibilidade de se deferir o processamento da recuperação judicial em relação a ele, uma vez que sequer comprovou que "*exerce profissionalmente atividade econômica organizada para a produção ou a circulação de bens ou de serviços*" (art. 966, CC).

Assim, demonstrado o exercício regular da atividade por mais de dois anos, bem como o registro perante a Junta, os produtores rurais indicados na exordial, salvo SIDNEY SAMUEL MENEGUETTI (S S MENEGUETTI AGROPECUÁRIA ), devem ser admitidos a pleitear a recuperação.

Por fim, importa salientar que o patrimônio pessoal dos produtores, na qualidade de empresários individuais, se confunde com o de seu empreendimento.

## 5. LITISCONSÓRCIO ATIVO E CONSOLIDAÇÃO SUBSTANCIAL

A Lei nº 11.101/05 não prevê especificamente a hipótese de pedido de recuperação judicial formulado por empresas em litisconsórcio ativo sob o fundamento de que integram o mesmo grupo econômico.

Todavia, em razão da lacuna legislativa, a própria lei falimentar indicou a solução no art. 189, permitindo aplicação subsidiária do Código de Processo Civil. Destarte, cabível a



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ – Identificador: PJX4P TYUDZ AA68Q TYPV3

PROJUDI - Processo: 0006422-55.2019.8.16.0017 - Ref. mov. 111.1 - Assinado digitalmente por Roberta Carmen Scramim de Freitas:9937

15/04/2019: CONCLUSÃO PARA DECISÃO. Doc: 4. Filed 04/18/19    Entered 04/18/19 16:07:03    Main Document

Pg 138 of 144

pluralidade de sujeitos no polo ativo da demanda, nos termos do art. 113 do CPC.

Desta maneira, uma vez reconhecida a existência do grupo empresário formado pelas empresas autoras, para que o processamento do pedido de recuperação judicial seja deferido, aceitando-se a formação do litisconsórcio ativo, devem ser observados não apenas os requisitos previstos nos artigos 48 e 51 da LRE, mas também aqueles constantes do artigo 113 do CPC.

Sob esse prisma, é preciso diferenciar duas situações, que devem ser analisadas pelo magistrado, para que as decisões sejam tomadas de maneira correta e condizente com a realidade, a fim de possibilitar o sucesso da recuperação judicial.

A primeira situação se relaciona com o grupo de fato, cujas sociedades possuem participação relevante entre si ou de controle, mas a personalidade jurídica de cada um dos integrantes é preservada e cada qual se orienta preservando sua autonomia e tutela de seu interesse social. Neste caso, a relação jurídica entre a empresa integrante do grupo e o credor é estabelecida de maneira individual, posto que a autonomia da personalidade perante as sociedades do mesmo grupo garante que o credor possa aferir os riscos da contratação diretamente com base no capital social da contraparte, bem como assegura que eventual situação de crise de outra pessoa jurídica integrante do grupo não contaminará as demais, eventualmente em situação financeira sadia.

Diante dessa autonomia entre as empresas pertencentes ao mesmo grupo, tornar-se-ia inviável a elaboração de um único plano de recuperação judicial para englobar todas as dívidas, já que cada credor analisou individualmente os riscos dos negócios jurídicos firmados com cada sociedade, não podendo ser igualados esses riscos. Trata-se, então, de uma consolidação processual[6]. O litisconsórcio ativo de diversas personalidades jurídicas num único feito, nesse caso, é apenas medida de economia processual, mas não imprescindível.

Situação diversa ocorre quando, no interior do grupo, as diversas personalidades jurídicas não são preservadas como centros de interesses autônomos. Nessa hipótese, há confusão patrimonial em sua atuação conjunta e as diversas pessoas jurídicas do grupo exercem "*suas atividades sob unidade gerencial, laboral e patrimonial*" (STJ, ROMS 14168/SP, rel. Min. Nancy Andrighi).

Nesse segundo cenário, como há confusão entre as personalidades jurídicas das empresas e a reestruturação de um dos integrantes depende da reestruturação dos demais, é de se admitir a consolidação substancial, que é realizada quando os direitos e obrigações dos devedores são, para fins da recuperação judicial, aglutinados/consolidados, como se tais devedores, ainda que detentores de personalidades jurídicas autônomas, se unificassem em uma só massa patrimonial.

A respeito do tema, essas são as lições de Fábio Ulhoa Coelho:

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE

Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3

Assim sendo, admite-se a consolidação dos planos quando a superação da crise das recuperandas depende de ações coordenadas. Em outros termos, se a superação da crise de cada um dos litisconsortes está condicionada à superação da crise dos demais, o instituto da recuperação judicial é dotado de suficiente flexibilidade para comportar a consolidação. Neste cenário de interdependência, a propósito, a recuperação judicial somente alcançaria o seu objetivo com a consolidação.

Em suma, no litisconsórcio ativo em recuperação judicial, admite-se a consolidação do plano de recuperação sempre que, em razão das especificidades do caso, a superação da crise das empresas recuperandas for mais facilmente alcançada por meios coordenados.[7]

Noutras palavras, a consolidação substancial implica na apresentação de plano unitário e do tratamento igualitário entre os credores componentes de cada classe, ainda que de diferentes pessoas jurídicas integrantes do grupo. Por consequência, a votação do referido plano será feita em único conclave de credores.

O E. Tribunal de Justiça do Estado de São Paulo possui decisões reconhecendo a possibilidade do processamento da recuperação judicial de grupo empresarial em consolidação substancial, conforme a ementa a seguir:

RECUPERAÇÃO JUDICIAL. Litisconsórcio ativo. Decisão que determina o processamento conjunto, em consolidação substancial, das recuperações de três empresas que integram grupo econômico (Grupo SINA). Manutenção. Insurgência ao argumento de que seria necessária a individualização dos Planos, a ser votados exclusivamente pelos credores de cada devedora. Discussão sobre a elaboração de Plano único, a ser votado em Assembleia conjunta. Possibilidade, desde que as empresas integrantes do grupo econômico assumam a roupagem de um grande bloco, com potencial de transmitir a terceiros a impressão de que se trata de um todo unitário. Precedentes das Câmaras Reservadas de Direito Empresarial desta Corte. Empresa FAS aderiu à moratória, após deliberação tomada em Assembleia Geral de Credores de SINA INDÚSTRIA e SINA COMÉRCIO. Recuperação da empresa FAS é mera decorrência de deliberação da comunidade de credores, os quais reconheceram inequivocamente a existência de grupo econômico, e disso decorre a possibilidade de as devedoras apresentarem Plano único. Eventual abuso de direito, ou manipulação de votos, pode levar à elaboração de planos distintos e de Assembleias separadas. Distorções de créditos individuais podem ser apreciadas e corrigidas, mediante análise do caso concreto, e não de modo hipotético. Recurso desprovido. (TJSP, Agravo de Instrumento 2248169-44.2016.8.26.0000, Rel. Francisco Loureiro, 1ª C. Reservada de Direito Empresarial, J. 31.05.17, DJe 01.06.17)

Ao analisar o caso concreto, então, o julgador deve verificar se cabe a consolidação substancial. Conforme consta da perícia prévia (mov. 99.3), diante da ausência legislativa sobre o instituto, a jurisprudência pátria vem apontando os seguintes elementos para sua aplicação: a existência de (i) grupo de fato; (ii) caixa único; (iii) empréstimos entre partes relacionadas; (iv) administração comum e centralizada, além da (v) aparência, perante terceiros, de que as sociedades são um todo unitário.



Documento assinado assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3

*In casu*, sobre os elementos supracitados, a Perita apresentou a conclusão a seguir: "
**Localização**: *Todas as empresas Requerentes estão localizadas no Estado do Paraná. Vide
página 15.; **Administração do Grupo**: Há diretores que ocupam cargos concomitantes em
mais de uma das sociedades Requerentes. Vide página 17.; **Atividade econômica**: O Grupo
Santa Terezinha é composto por sociedades que atuam todas no mesmo ramo econômico
(setor sucroalcooleiro). Vide página 16.; **Garantias cruzadas**: A maior parte dos contratos
financeiros possuem garantias compartilhadas com a maioria das Empresas Requerentes.
Vide página 31.; **Partes relacionadas**: Para dar suporte ao sistema de caixa único, há
inúmeras transferências de recursos e empréstimos entre as sociedades, em regra, por meio
de mútuos ou aportes de capital. Vide página 29.; **Controle de Caixa**: O Grupo Santa
Terezinha emprega um sistema de caixa único para fazer frente às operações e obrigações
assumidas pelas sociedades que o compõem. O fluxo de caixa consolidado é a base para
tomada de decisão da Administração. Vide página 29.*"

Ao que tudo indica, portanto – pelo menos em cognição inicial –, a consolidação
substancial é o caminho a ser seguido para a recuperação do Grupo Santa Terezinha. Segundo
as análises realizadas, a administração é centralizada, há emprego do sistema de caixa único
(utilizado para arcar com as operações e obrigações assumidas), há garantias cruzadas
prestadas pelos requerentes e a estrutura adotada permite concluir pela interligação entre
todos os integrantes.

6. Diante do exposto, estando presentes, ao menos em um exame formal, os requisitos
legais, com base no art. 52 da Lei nº 11.101/05, **DEFIRO** o processamento da recuperação
judicial das empresas **USINA DE AÇUCAR SANTA TEREZINHA**, **USINA RIO PARANÁ S.A.,
USACIGA – AÇUCAR ÁLCOOL E ENERGIA ELÉTRICA LTDA.**, **SANTA TEREZINHA
PARTICIPAÇÕES S.A.**, **PARTICIPAÇÕES E AGROPECUÁRIA M.M. LTDA.**, **J.L.
PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A.**, **IMEF- PARTICIPAÇÕES E
COMÉRCIO DE PRODUTOS AGRO PASTORIL LTDA.**, **IGUATEMY PARTICIPAÇÕES
LTDA.**, **HEMFIL PARTICIPAÇÕES E COMÉRCIO DE PRODUTOS AGROPASTORIL S.A.**,
**AMEFIL PARTICIPAÇÕES E COMÉRCIO AGROPASTORIL S.A.**, e dos empresários
individuais **P MENEGUETTI AGROPECUÁRIA**, **S MENEGUETTI AGROPECUÁRIA**, **M P M
ZANIN MENEGUETTI AGROPECUÁRIA**, **I M CREMA MENEGUETTI AGROPECUÁRIA**,
**MOACIR MENEGUETTI AGROPECUÁRIA**, **M B MAGALHÃES SILVA MENEGUETTI
AGROPECUÁRIA**, **A. MENEGUETTE AGROPECUÁRIA**, **ROSÂNGELA PERIN
MENEGUETTE AGROPECUÁRIA**, **J BATISTA MENEGUETTI AGROPECUÁRIA**, **MARIA
TORTATO MENEGUETTI AGROPECUÁRIA**, **J CESAR MENEGUETTI AGROPECUÁRIA**, **M
E BOLONHEZ MENEGUETTI AGROPECUÁRIA**, **FRANCISCO MENEGUETTI
AGROPECUÁRIA**, **NILSA CORREA FARIA MENEGUETTI**, **W J MENEGUETTI
AGROPECUÁRIA**, **A MENEGUETTI AGROPECUÁRIA**, **ELEN CRISTIAN MORENO
MENEGUETTI AGROPECUÁRIA** e **V A FERNANDES MENEGUETTI AGROPECUÁRIA**.

7. **INDEFIRO** o requerimento e **JULGO EXTINTO O PROCESSO**, sem resolução do
mérito, com fulcro no art. 485, incisos IV e VI, do NCPC, quanto à pessoa de **S S**

**MENEGUETTI AGROPECUÁRIA (SIDNEY SAMUEL MENEGUETTI)**, porque não houve a comprovação do exercício da atividade por mais de dois anos, conforme fundamentação retro. **Proceda-se** com sua exclusão do polo ativo, com anotações e comunicação ao Distribuidor.

8. **Nomeio**, como Administrador Judicial das Recuperandas, **DELOITTE TOUCHE TOHMATSU CONSULTORES LTDA**, com CNPJ nº 02.189.924/0001-03, representado por sr. LUIS VASCO ELIAS, CPF nº 073.762.938-09, com endereço na rua Henri Dunant, nº 1383, 16º andar, CEP 04709-111, chácara Santo Antonio, em São Paulo – SP, e endereço eletrônico ajcana@deloitte.com, para fins do art. 22, incisos I e II, da Lei nº 11.101/05, que deverá prestar compromisso, até quarta-feira próxima (17/04/2019), e, no prazo de 10 dias, apresentar o primeiro relatório e proposta de remuneração, atentando às tratativas preliminares submetidas a esta Magistrada, com observância e tendo por base a amplitude das atividades empresariais das Recuperandas, sua importância social, duração das empresas integrantes do aventado Grupo Econômico, porte econômico das empresas, assim também o volume do ativo e do passivo declarados. **Autorizo** a intimação via e-mail.

8.2. Os relatórios mensais deverão ser instruídos com fotografias dos estabelecimentos, incluindo maquinário e estoque, com o administrador judicial presente, e deverão constar informações a respeito da existência das atividades, número de empregados em exercício, demissões no período, pagamentos de verbas trabalhistas e rescisórias, recolhimento de impostos e encargos sociais. Também deverá ser objeto de exame, em cada relatório, a movimentação financeira das recuperandas, a fim de que se verifique eventual ocorrência de hipótese prevista no art. 64 da LRF.

8.3. Quanto aos relatórios, deverá o administrador judicial protocolar o primeiro relatório na forma de Incidente à recuperação judicial, separado dos autos principais, sendo que os relatórios mensais subsequentes deverão ser, sempre, direcionados ao incidente já instaurado.

9. **Determino** que as Recuperandas apresentem, no prazo de 60 dias, o Plano de Recuperação Judicial, de modo a ser concreto e objetivamente viável, fundamentado e documentado, para soerguimento das empresas, sob pena de convolação em falência, nos termos do art. 53 da LRF.

10. Com a apresentação do plano, **expeça-se** o edital contendo o aviso do art. 53, parágrafo único, da LFR, com prazo de 30 dias para as objeções, devendo as recuperandas providenciar, no ato da apresentação do plano, a minuta do edital, inclusive em meio eletrônico, bem como o recolhimento das custas para publicação.

11. **Determino** apresentação de contas demonstrativas, claras e objetivas, a serem organizadas pelas recuperandas até o dia 30 de cada mês, sendo que o primeiro demonstrativo mensal deverá ser protocolado como Incidente à recuperação judicial, separado dos autos principais, e os demonstrativos mensais subsequentes deverão ser, sempre, direcionados ao incidente já instaurado. Cabe às recuperandas disponibilizar mensalmente ao Administrador Judicial os extratos de movimentação de todas as contas bancárias e os documentos de

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3

recolhimentos de impostos, encargos sociais, e verbas trabalhistas para verificação regular, conforme o art. 64 da LRF.

12. **Suspendo** as ações e execuções contra as recuperandas, e o curso dos prazos prescricionais, pelo prazo de 180 dias, mantendo os autos nos Juízos onde se processam, ressalvadas as disposições dos §§ 1º, 2º, e 7º do art. 6º, §§ 3º e 4º do art. 49 e inc. III do art. 52 da LRF. Caberá às recuperandas a comunicação da suspensão aos Juízos e instituições destinatárias de ordens judiciais em favor de credores sujeitos à recuperação. Servirá cópia desta decisão como ofício.

13. Via de consequência, **revogo** a tutela de urgência cautelar deferida anteriormente, tendo em vista que, com o deferimento do processamento da recuperação judicial, tem início o *stay period*, sendo desnecessária a manutenção da medida liminar.

14. **Dispenso** apresentação de certidões negativas para que as recuperandas continuem a exercer suas atividades, ressalvando-se exceções legais, como previsto no inc. II do art. 52 da LRF.

15. **Expeça-se** comunicação, por carta, às Fazendas Públicas Federal e de todos os Estados e Municípios em que a devedora tiver estabelecimentos e filiais (LRF, art. 52, V), providenciando as recuperandas o encaminhamento.

16. **Determino** a intimação da Junta Comercial do Paraná, com cópia da decisão, para anotação do processamento de recuperação judicial, e que as Recuperandas repercutam a comunicação em até três dias à Junta Comercial de outros Estados onde possuam estabelecimentos.

17. **Determino** a expedição de Edital, na forma do § 1º do art. 52 da LRF, com prazo de 15 dias para habilitações ou divergências, que deverão ser apresentadas diretamente ao Administrador Judicial, na sede ou endereço eletrônico supra (o qual também deverá constar do Edital).

18. **Determino** que as Recuperandas apresentem a minuta do Edital até a próxima quarta-feira, em arquivo eletrônico. Caberá à Serventia cotar a despesa com publicação do Edital, intimando por telefone algum dos Advogados das recuperandas para recolhimento em 24 horas. No mesmo ato deverá ser intimado o Advogado para a publicação do Edital em jornal de grande circulação na mesma data em que for programada a publicação em órgão oficial.

19. Eventuais habilitações ou divergências quanto aos créditos relacionados pela devedora (art. 7º, § 2º), que têm de ser apresentadas no prazo de 15 dias e que são dirigidas ao administrador judicial, **deverão ser digitalizadas e encaminhadas diretamente ao administrador judicial, SOMENTE através do e-mail AJCANA@DELOITTE.COM, criado especificamente para este fim e informado no edital a ser publicado, conforme item 10 acima**.

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ – Identificador: PJX4P TYUDZ AA68Q TYPV3

20. Publicada a relação de credores apresentada pelo administrador judicial (art. 7º, § 2º), eventuais impugnações (art. 8º) deverão ser protocoladas, individualmente, como Incidentes à recuperação judicial, separados dos autos principais (art. 8º, parágrafo único).

21. **Defiro** a habilitação de advogados de credores nos autos, mediante juntada de petição e procuração, para mero acompanhamento dos atos processuais, mas devem se atentar ao disposto nos itens "18" e "19" acima, no intuito de evitar tumulto processual. Inclusive, a habilitação de crédito pleiteada ao mov. 105.1 deverá ser regularizada, observando-se as determinações ora expendidas.

24. Quanto aos prazos, surge a dúvida, se devem ser contados em dias úteis ou corridos. O Superior Tribunal de Justiça apreciou a matéria referente ao *stay period* no julgamento do REsp 1.699.528/MG, relatado pelo Ministro Luís Felipe Salomão, a 4ª Turma entendeu que o NCPC não alterou a forma de computar os prazos processuais no âmbito da recuperação judicial, prevalecendo a incidência da forma de contagem definida pelo microssistema da Lei 11.101/2005. Ficou estabelecido, portanto, que a aplicação do novo diploma "*deve ter cunho eminentemente excepcional, incidindo tão somente de forma subsidiária e supletiva, desde que se constate evidente compatibilidade com a natureza e o espírito do procedimento especial, dando-se sempre prevalência às regras e aos princípios específicos da LRF e com vistas a atender o desígnio da norma-princípio disposta no art. 47*". Restou afastada, portanto, a incidência da contagem de prazos em dias úteis, reconhecendo o cômputo em dias corridos.

Assim, seguindo a orientação da Corte, **declaro que os prazos serão contados em dias corridos**.

25. No mais, **decreto** o segredo de justiça quanto à relação de empregados e à relação dos bens particulares dos acionistas, sócios controladores e administradores das recuperandas (mov. 79 e 96). Embora deva ser garantida a publicidade e a ampla informação aos credores, a divulgação dos referidos documentos poderia violar, de modo injustificado, a intimidade dos ali indicados.

O acesso será permitido ao Administrador Judicial e ao Ministério Público. O acesso aos credores será facultado se devidamente fundamentado, conforme apreciação judicial.

26. No prazo de 5 dias, às recuperandas para complementarem os endereços dos credores, conforme determina o art. 51, III, LRF, posto que indicados como incompletos na perícia prévia.

27. **Intimem-se**, inclusive o Ministério Público.

Diligências necessárias.

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ – Identificador: PJX4P TYUDZ AA68Q TYPV3

PROJUDI - Processo: 0006422-55.2019.8.16.0017 - Ref. mov. 111.1 - Assinado digitalmente por Roberta Carmen Scramim de Freitas:9937

15/04/2019: 19-CEDIDO MEIO Doc 4 Filed 04/18/19 Entered 04/18/19 16:07:03 Main Document
Pg 144 of 144

Maringá, 15 de abril de 2019.


**Roberta C. Scramim de Freitas**

**Juíza de Direito Substituta**

---

[1] Cf. TJMT, AI 0100923-66.2014.8.11.0000.

[2] GERBASI, Thiago Soares. A controversa recuperação judicial do produtor rural. **Consultor Jurídico**. 27.jan.18. Disponível em: . Acesso em: 22.03.18.

[3] BEZERRA FILHO, Manoel Justino. A recuperação judicial do empresário rural. **Valor Econômico**. 23.mar.19. Disponível em: . Acesso em: 02.abril.19.

[4] Ibidem.

[5] Cf. TJSP, AI 2.037.064-59.2013.8.26.0000; TJSP, AI 2.048.349-10.2017.8.26.0000; TJSP, AI 2.251.128- 51.2017.8.26.0000; STJ, AREsp 896.041; STJ, REsp 1.478.001; TJPR, AI 0001247-34.2019.8.16.0000.

[6] A consolidação processual exige que "*a votação do plano, ainda que programada para ocorrer em assembleias convocadas para a mesma data, é feita de forma separada e em respeito à separação jurídica existente entre as sociedades do grupo. Os credores de cada devedora se reunirão e, em observância às classes e aos quoruns previstos na LRE, deliberarão sobre o plano. O resultado do conclave será, portanto, apurado com relação a cada uma das devedoras*" (CEREZETTI, Sheila C. Neder,, Grupos de sociedades e recuperação judicial: o indispensável encontro entre Direitos Societário, Processual e Concursal, in **Processo Societário II** - Flávio Luiz Yarshell e Guilherme Setoguti J. Pereira coord., São Paulo, Quartier Latin, 2015, p. 763)

[7] COELHO, Fábio Ulhoa. **Comentários à Lei de Falências e Recuperação de Empresas**. 3. ed. e-book. São Paulo: Thomson Reuters Brasil, 2018.



Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em https://projudi.tjpr.jus.br/projudi/ - Identificador: PJX4P TYUDZ AA68Q TYPV3